IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SUBPOENAS SERVED ON JSC STATE EXPORT-IMPORT BANK OF UKRAINE; BANK POLSKA KASA OPIEKI SA; DEUTSCHE BUNDESBANK; RESERVE BANK OF AUSTRALIA; AB SEB BANKAS; SEB SECURITIES, INC.; BANK OF MONTREAL; BMO FINANCIAL CORP.; BMO CAPITAL MARKETS CORP.; THE BANK OF NEW YORK MELLON CORPORATION; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS FORTIS SA/NV; BNP PARIBAS USA, INC.; BNP PARIBAS; CITIBANK N.A.; CITIGROUP INC.; CITIGROUP GLOBAL MARKETS LTD.; COMMERZBANK AG; COMMERZ MARKETS LLC; CREDIT SUISSE (SWITZERLAND) LTD.; CREDIT SUISSE AG; CREDIT SUISSE (USA), INC.; DANSKE BANK A/S; DANSKE MARKETS INC.; DEUTSCHE BANK TRUST COMPANY AMERICAS; DEUTSCHE BANK TRUST CORPORATION; DEUTSCHE BANK AG; DNB BANK ASA; DNB CAPITAL LLC; DNB MARKETS, INC.; HSBC BANK PLC; HSBC NORTH AMERICA HOLDINGS INC.; JPMORGAN CHASE BANK N.A.; JPMORGAN CHASE & CO.; J.P. MORGAN SECURITIES PLC; J.P. MORGAN SECURITIES LLC; MUFG BANK, LTD.; MUFG AMERICAS HOLDING CORPORATION; MUFG SECURITIES AMERICAS INC.; RAIFFEISEN BANK INTERNATIONAL, AG; RB INTERNATIONAL MARKETS (USA) LLC; SANTANDER BANK POLSKA S.A.; STANDARD CHARTERED BANK PLC; STANDARD CHARTERED BANK (HONG KONG) LTD.; STANDARD CHARTERED SECURITIES (NORTH AMERICA) LLC; UBS SWITZERLAND AG; UBS AMERICAS INC.; UBS AG; UBS AMERICAS HOLDINGS LLC; UNICREDIT BANK AG; AND UNICREDIT CAPITAL MARKETS LLC: <br><br> UKRAINE, <br><br>         Petitioner, <br><br>     -against- <br><br> PAO TATNEFT, <br><br>         Respondent. | Misc. Case No. 1:22-mc-00036 <br><br> (Arising from Case No. 1:17-cv-00582-CKK in the United States District Court for the District of Columbia) <br><br> **MEMORANDUM OF LAW IN SUPPORT OF UKRAINE'S MOTION TO QUASH OR MODIFY THIRD-PARTY SUBPOENAS** |

Ukraine respectfully moves to quash or, alternatively, to modify, fifty-two identical subpoenas issued by Tatneft's counsel to fifty-two financial institutions demanding that the recipients produce a wide variety of documents purportedly sought in aid of enforcement of the judgment in *Pao Tatneft v. Ukraine*, 17-cv-00582 (D.D.C.).  Especially in the context of Russia's imminently threatened invasion of Ukraine, a Russian oil company with close ties to the Russian government should not be permitted to use discovery in aid of a judgment as a pretext for demanding sensitive information bearing on Ukraine's military, national security, and monetary stability.  Tatneft's subpoenas use a legally inaccurate definition of "Ukraine" to target the financial information of numerous third parties with important roles in Ukraine's national security and defense, without making any showing of relevance for execution of a judgment against Ukraine.  Moreover, Tatneft's subpoenas are not tailored to the purposes of Rule 69 discovery, place a disproportionate burden on the sovereign interests of Ukraine, and are invasive to its sovereign dignity.  For these reasons, the subpoenas should be quashed or narrowed.

## I.     BACKGROUND

Ukraine's U.S. Ambassador has warned that Tatneft's discovery demands "appear to be a mere pretext" motivated by a "far-reaching interstate agenda."  Markarova Decl. ¶ 19.  After evaluating the national security implications of Tatneft's subpoenas, Ukraine's Minister of Defense stated the "strongly held view that the Russian Federation through Tatneft is exploiting the U.S. justice system and legal mechanisms available under the American law in order to extract sensitive information from Ukraine."  Reznikov Decl. ¶ 45.  As he further observed, Tatneft's behavior suggests that it is at least as interested in obtaining sensitive information from Ukraine as it is in actually collecting payment.  *Id.*

This case involves far more than simple enforcement of the D.C. District Court's judgment for circa $172 million confirming an arbitral award against Ukraine in *Pao Tatneft v. Ukraine*, 17-

1

cv-00582.  Tatneft has refused to seek satisfaction of the award for years, declining to submit a claim for payment that would allow Ukraine to release public funds, and declining to attach any property in parallel French, Russian, and UK proceedings.  (The only exception is Tatneft's attempt to attach the shares held by Ukraine in PAO Kamaz, a Russian company, worth approximately $1,100 in Russia.)  Instead, it has turned to the U.S. for sweeping worldwide discovery about the assets and financial transactions of Ukraine and third parties with key roles in strategic industries like defense, energy, transportation, and communications.  Ex. A at 10, Notice of Subpoenas (listing third parties); Ex. B at 8–9, 24–25, 40–41, 56–57, Notice of Subpoenas (same).[1]  Tatneft's conduct underscores that Tatneft—at the cost of foregoing the payment it claims to seek—has carefully manufactured the circumstances giving rise to its putative right to discovery that Ukraine's Minister of Defense has determined would "inevitably cause extreme and irreparable harm to Ukraine's national security."  Reznikov Decl. ¶ 6.

Tatneft's agenda is explained only by what the D.C. Circuit has temperately described as the company's "close ties to the Russian government."  *See Tatneft v. Ukraine*, 21 F.4th 829, 832 (D.C. Cir. 2021).  Tatneft was originally created pursuant to a decree by Joseph Stalin as the national oil company of Tatarstan—then a member of the USSR and now a state within Russia.[2]  While Tatneft has repeatedly emphasized determinations that it is now a separate legal entity from Tatarstan, it is undisputed that the company retains close government ties.  Numerous government officials are directly involved in the company's management, including the President of Tatarstan, who is Chairman of the Board, and five other members of the Board of Directors.[3]  Tatarstan

---

[1] In most respects, the fifty-two subpoenas are identical.  For the remainder of this brief, Ukraine will cite to Exhibit A as an exemplar except where more specific references are necessary.

[2] Exhibit, *Pao Tatneft v. Ukraine*, 17-cv-00582, Dkt. 24-1 (D.D.C. July 25, 2017).

[3] Tatneft, Board of Directors, https://www.tatneft.ru/for-shareholders/control-and-management-system/board-of-directors/?lang=en (last accessed Jan. 26, 2022).

retains a substantial ownership interest in the company, including a "golden share" that, irrespective of other shareholding, gives it veto power over important decisions.[4] The practical extent of Tatarstan's influence over Tatneft is illustrated by the fact that—even after the company's nominal privatization—the government has used company assets to raise capital for public use and to pay public debts.[5]

In this context, it is hardly surprising to learn from a senior Ukrainian defense official that Russian intelligence proactively targets "information like that requested by Tatneft." Reznikov Decl. ¶ 15. For example, a full response to Document Requests 1–3 would require sensitive information about "the extent of Ukraine's military funding and expenditures, account information for every person or company that has been the recipient of Ukrainian military and defense spending and receivables under the supply contract, including personnel suppliers of military and defense equipment and technology, and the dates and amounts of all such payments." *Id.* ¶¶ 8(b)–(c). "This would shed light on Ukraine's defense capabilities and disclose the entire network of companies and individuals involved in supporting Ukraine's national defense, including substantial amounts of non-public information, thereby posing a real danger to Ukraine's military, state and national intelligence security." *Id.* ¶ 8(c). The sensitivity of such information is reflected by Minister of Defense's determination that much of it has been classified as state secret or is eligible to be classified and is handled with the utmost discretion even if the designation has not been formally applied. *Id.* ¶¶ 11–14.[6]

---

[4] *OAO Tatneft v. Ukraine*, PCA Case No. 2008-8, Partial Award on Jurisdiction, ¶ 43.

[5] *Id.* ¶¶ 129, 141.

[6] Materials may be classified as state secrets under Ukrainian law only if they contain information "the disclosure of which may cause damage to the national security of Ukraine." Tyshchenko Decl. Ex. 6 at 35, Law of Ukraine No. 3855-XII, "On State Secrecy" of 21 January 1994, art. 1(1), *Pao Tatneft v. Ukraine*, 17-cv-00582 (D.D.C. Aug. 23, 2021), Dkt. 81-3.

Russia is known to target this information "in a variety of ways, including by offering positive and negative incentives to encourage private individuals and companies to share information and by hacking private individuals and companies in whom Ukraine has confided." *Id.*[7]  In the substantial and varied professional experience of Ukraine's Minister of Defense, "the risk of leakage elevates exponentially" when a hostile state knows that significant volumes of highly sensitive information are concentrated in the hands of a single entity or person, especially if outside Ukraine.  *Id.* ¶ 16.  And Russia will surely be aware if this Court publicly orders Ukraine to provide highly sensitive information to Tatneft or Tatneft's counsel.  Tatneft's leadership includes numerous Russian officials.[8]  Tatneft's counsel represents Russia in other proceedings.  Shevchenko Decl. ¶ 38.  And one of Tatneft's legal advisors represents Tatarstan in a parallel case and is a member of the Advisory Council on International Law of the Ministry of Justice of the Russian Federation.  *See* Ex. C at 6 (confirming the individual is Advisor on International Legal Matters to Tatneft's General Director); Ex. D ¶ 43 (confirming the individual attended PCA arbitration merits hearing on behalf of PAO Tatneft as a party representative); Ex. E ¶ 3.3(a)(xii) (confirming the same individual attended PCA arbitration merits hearing on behalf of the Republic of Tatarstan and/or its Ministry of Land and Property Relations); Ex. F (identifying same individual as "the client," that is, the Republic of Tatarstan and/or its Ministry of Land and Property Relations, for purposes of requesting a summons to attend a hearing at the Paris Court of Appeal);

---

[7] *See also* National Security Agency, "NSA, Partners Release Cybersecurity Advisory on Brute Force Global Cyber Campaign" (July 1, 2021) (available at https://www.nsa.gov/Press-Room/PressReleases-Statements/Press-Release-View/Article/2677750/nsa-partners-release-cybersecurityadvisory-on-brute-force-global-cyber-campaign/) (last accessed January 21, 2022) (confirming Russia cyber-attacks on U.S. law firms); Patrick Howell O'Neill, "The $1 billion Russian cyber company that the US says hacks for Moscow" (Apr. 15, 2021) (available at https://www.technologyreview.com/2021/04/15/1022895/us-sanctions-russia-positive-hacking/) (last accessed Jan. 21, 2022) (describing "abusive" relationship by which Russia obtained intelligence from private company under an "implicit threat for non-cooperation").
[8] *See, e.g.*, Tatneft, Board of Directors, https://www.tatneft.ru/for-shareholders/control-and-management-system/board-of-directors/?lang=en (last accessed Jan. 26, 2022).

Ex. G at 11 (confirming that the individual is a member of the Advisory Council on International Law of the Ministry of Justice of the Russian Federation).[9]

Tatneft has previously suggested that there is no risk of a leak unless Tatneft is conflated with Russia or has a documented "history of disclosing sensitive information to Russia."  D.D.C. Dkt. 82 at 13 n.9.  But this position is strikingly hypocritical in light of its position, discussed below, that numerous third parties should be conflated with "Ukraine" and subjected to discovery without any evidence at all concerning their relationship with Ukraine.  Tatneft's position is also unreasonable because, as Ukraine's Minister of Defense has explained, it is "extraordinarily difficult" and "frequently . . . not possible" to identify the source of a leak.  Reznikov Decl. ¶ 16. Ukraine's concerns about Russian access to discovery materials are well substantiated by the detailed analysis that prompted Ukraine's Minister of Defense to conclude that there is a real threat of Russian access to Tatneft's requested discovery, which would undermine Ukraine's national security.  As he summarized:

> Based on the evidence and information that is available to me as the Minister of Defense of Ukraine and member of the Military Cabinet of the National Security and Defense Council of Ukraine, there is a very practical and realistic threat that information provided to Tatneft, or even to Tatneft's outside counsel in the United States, will find its way into the hands of the Russian Federation and where it will be used to undermine Ukraine national security and defense.

Reznikov Decl. ¶ 17.

---

[9] Tatneft has previously emphasized that participation in the Advisory Council does not make Tatneft's counsel a Russian government official.  But this does not change the fact that he comes in contact with such officials, who could facilitate efforts to hack his computer—by, for example, sending him malware in emails about otherwise legitimate business—or who could subtly or overtly ply him for information that—even if seemingly innocuous or shared inadvertently—would undermine Ukraine's interests.  The relevant question is not whether Tatneft and Russia share identity of legal personality but whether there is a risk that Russia will obtain discovery that is provided to Tatneft. This question is squarely answered by the declaration of Ukraine's Minister of Defense and its supporting exhibits, which provide concrete and substantial proof that Tatneft's subpoenas are "invasive of sovereign dignity," especially in the context of Russia's massing of troops around Ukraine.  *See Aurelius Cap. Master, Ltd. v. Republic of Argentina*, 589 F. App'x 16, 18 (2d Cir. 2014).

The Minister of Defense also detailed specific harms that would be caused if Russia accessed Tatneft's requested discovery:

> Should the requested information in response to PAO Tatneft's discovery requests and subpoenas fall into the hands of an adversary . . . it will no doubt be used to evaluate Ukraine's defense capabilities with the view to identify vulnerabilities, to plan offensive measures that account for Ukraine's defense capabilities and exploit its weaknesses, and to interfere with Ukraine's peaceful efforts to sustain its interests in the sphere of national defense and territorial integrity, including by identifying, intimidating, and harming companies and individuals, including soldiers, intelligence agents, and informants, with important roles in Ukraine's national defense.

*Id.* ¶ 10.

The Minister of Defense also noted that Tatneft's expansive definition of "Ukraine" means that a full response to its discovery requests would include "sensitive, non-public information about the assets, financial health, and economic vulnerabilities of key players with roles related to Ukraine's national defense," such as "SC Ukroboronprom, a strategic manufacturer of weapons and military hardware in Ukraine consolidating enterprises in the strategic sectors of Ukraine's national defense industry, SE Ukrkosmos, which maintains satellite communications in Ukraine that are necessary to gather intelligence and to coordinate movements of military personnel and supplies, SE Ukrainian Aviation and Transport Enterprise, an enterprise owing dozens of helicopters forming a unified aviation security and protection system in Ukraine that are also used to patrol Ukraine's state borders, and State Aviation Enterprise Ukraine, an enterprise owning a helicopter and aircrafts used to fly by senior-level governmental officials and [the] President of Ukraine." *Id.* ¶¶ 8–9.

These concerns have taken on increased significance as the Russian threat to Ukraine's national security has escalated since late 2021.  *See* Reznikov Decl. ¶ 25; Markarova Decl. ¶ 11. In December 2021, U.S. Undersecretary of State for Political Affairs Victoria Nuland warned the

6

Senate that Russia was positioning itself "to destabilize Ukraine from within" as well as "to act decisively in Ukraine when ordered to do so, potentially in early 2022. The intended force, if fully mobilized, would be twice the size of what we saw last spring, including approximately 100 Battalion Tactical Groups (BTGs), or nearly all of Russia's ready ground forces based West of the Urals." *Id.* ¶¶ 14–15. In January 2022, the United States "disclosed intelligence showing that Russia has a war plan envisioning an invasion force of 175,000 troops." *Id.* ¶ 17. On January 12, the U.S. Embassy in Kyiv noted "[c]oncerning reports of further unusual Russian military activity near Ukraine's borders and in occupied Crimea" and warned that "the security conditions may change with little or no notice." *Id.* ¶ 18. On January 14, Ukraine was subjected to a massive cyber-attack, which a U.S. diplomat recognized as a "tried and true part of the Russian playbook," consistent with past Russian efforts "to destabilise governments, to test their own capabilities, to undercut the sense of confidence of governments that they have gripes with." Reznikov Decl. ¶ 40.

Last week, NATO's Secretary General noted that Russia purports to be planning a joint military exercise in Belarus from February 10 to 20 and warned there is "a serious risk" that, consistent with its strategy for annexing the Crimea in 2014, Russia will use such exercises to disguise a military invasion of Ukraine. *Id.* ¶ 36. The latest intelligence data indicates that Russia now has about 130,000 troops near Ukraine's borders. *Id.* ¶ 28. The Biden-Harris Administration appears pessimistic about attempts at diplomatic de-escalation, and President Biden warned the President of Ukraine on January 27 that he believes Russia may invade Ukraine in February. *Id.* ¶¶ 34–35.

Rather than addressing Ukraine's increasing concerns about Tatneft's discovery requests in the deteriorating geopolitical context, Tatneft ambushed Ukraine with fifty-two third-party

subpoenas on January 25, 2022, when it knew full well Ukraine's litigation resources were overstretched in parallel proceedings. *Compare* Exs. A–B (Tatneft's January 25 subpoena notices, demanding compliance by February 10, 2022) *with Pao Tatneft v. Ukraine*, 20-7091 (hereinafter "D.C. Cir. Dkt."), Doc. 1932592 (Ukraine's January 27 Petition for Rehearing or Rehearing En Banc); *Pao Tatneft v. Ukraine*, 17-cv-00582 (hereinafter "DDC Dkt."), DDC Dkt. 94 (Ukraine's February 2 Reply Brief), DDC Dkts. 90–91 (Ukraine's January 21 Motion for Protective Order, with supporting declarations and errata), *and* SDNY Dkts. 34–37 (Ukraine's January 21 Motion for Protective Order, with supporting declarations), etc.  There is no justification for Tatneft sitting since March 26, 2021 on fifty-two additional subpoenas addressed to fifty-two additional subpoena recipients, other than to deplete and overstretch Ukraine's resources or to ambush the new subpoena recipients and deprive them of their procedural rights of recourse against the subpoenas. Tatneft used the same litigation tactics with regard to the previous twenty-five third-party subpoenas, which were notified to Ukraine on March 22 and 23, 2021, as Ukraine and Tatneft's related party, Tatarstan, were going into a week-long arbitration hearing.  *See* SDNY Dkt. 3 at 5; SDNY Dkt. 12 at 2 & n.2.  When Ukraine moved to quash the previous twenty-five subpoenas in New York and opposed Tatneft's motion to compel in D.C., it did not have sufficient time to collect most of the evidence provided with this motion due to the imminent compliance deadlines imposed by Tatneft's subpoenas.  The courts ultimately determined that Ukraine would have had to provide more evidence about the risk of Russia obtaining access to sensitive discovery materials in order to prevail.  SDNY Dkts. 16, 27; DDC Dkt. 83.

Despite its full knowledge of Ukraine's concerns and the heightened danger that discovery poses to Ukraine during a time of escalating geopolitical tensions, Tatneft has now tripled the number of subpoenas and even gone so far as to state, covertly in a footnote, that the court's rulings

in a prior proceeding, without the benefit of Ukraine's evidence and prior to the escalation of military tensions, "should logically extend" to Tatneft's second wave of subpoenas. SDNY Dkt. 38 at 7 n.6.

Tatneft's "logic" is flawed for many reasons. The most obvious are that the present case involves a different subject matter and different parties/subpoena recipients. This case concerns new subpoenas served on fifty-two parties who had no interest in or awareness of the prior New York proceeding, and who are subject to a new set of procedural timelines for objecting, moving to quash, joining or intervening in support of Ukraine's motion to quash, or taking any other action. Tatneft cannot covertly add fifty-two subpoenas and subpoena recipients to the prior action by a footnote in its last submission made in that action, which will not even be served on any of the new subpoena recipients because they are not case participants. This would be an abuse of process, especially because it would ambush the new subpoena recipients, presenting them with a *fait accompli* as of February 4, 2022, even though they are not even required to respond the subpoenas until February 10, 2022 according to the terms of the subpoenas themselves. *See* Ex. A at 2; Ex. B at 1. It would be inherently unjust and unfair to the fifty-two third parties that have only just been subpoenaed if they were ambushed in this way and dragged into a fully (or almost fully) litigated first-instance court proceeding that has been pending since March 26, 2021, when the final step, the issuance of a protective order, is imminent. Contrary to Tatneft's covert footnote, which is unsupported by argument or authority, there is nothing "logical" about depriving fifty-two third parties of their procedural rights to oppose the subpoenas to the full extent possible under the applicable rules of procedure.

Moreover, this miscellaneous action requires independent consideration to account for the new evidence and the changed circumstances underlying the present motion. A court presented

with this motion and with the entire evidence of Ukraine's national interests and the dangers of disclosure will be left with the definite and firm conviction that these fifty-two subpoenas must be quashed or, at the very least, modified.  Tatneft's footnote provides no basis to forego judicial review of Ukraine's arguments in this motion, which are presented with specificity and with the concrete support of newly available declarations by senior Ukrainian officials who are familiar with the matters at stake.

On January 28, 2022, Ukraine timely responded to the notices of subpoenas served by Cleary Gottlieb and Binder & Schwartz on January 25, 2022.  Ukraine objected to the subpoenas on multiple grounds, including their inaccurate and overbroad definition of Ukraine and their patent disregard of Ukraine's national security interests.  Ukraine sent its written objections with a request for a reply indicating counsel's agreement to narrow the subpoenas.  However, Tatneft's counsel has not responded concerning its next steps.  Ukraine is therefore compelled to file the present motion to quash or modify Tatneft's fifty-two third-party subpoenas.

## II.    ARGUMENT

Rule 69 discovery is "[i]n aid of the judgment or execution," Fed. R. Civ. P. 69(a)(2), and therefore "must be limited to information that relates to the judgment debtors, their assets or suspected transfers of their assets," *Jacobson v. Moller & Moller, Inc.*, 2007 WL 1989260, at *2 (E.D.N.Y. July 5, 2007).  "The party seeking discovery bears the initial burden of proving the discovery is relevant[.]"  *Citizens Union of City of New York v. Att'y Gen. of New York*, 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017).

In any discovery dispute, a court will weigh the probity of the proposed discovery against the "real and defined interest" of the party opposing discovery, *Albany Molecular Rsch., Inc. v. Schloemer*, 274 F.R.D. 22, 25 (D.D.C. 2011), and the "specific and serious injury" that this party would face if the proposed discovery occurs, *FTC v. Parnon Energy Inc.*, 2013 WL 5882921, at

*2 (S.D.N.Y. Oct. 25, 2013).  It will quash or modify a subpoena that "requires disclosure of privileged or other protected matter," "subjects a person to undue burden," or "fails to allow a reasonable time to comply."  Fed. R. Civ. P. 45(d)(3)(A).  And it may also quash or modify a subpoena "to protect a person subject to or affected by a subpoena" if it requires disclosing a trade secret or other confidential research, development, or commercial information.  Fed. R. Civ. P. 45(d)(3)(B)(i).

"[I]n suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation," courts evaluate the "the demands of comity" and "take care to demonstrate due respect for . . . any sovereign interest expressed by a foreign state."  *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 546 (1987).  For example, a foreign state may object to subpoenas served on non-party financial institutions that seek information about the state's financial affairs "on the grounds that the document requests are excessively broad and seek irrelevant private information."  *Aurelius Cap. Partners v. Republic of Argentina*, 2013 WL 857730, at *2 (S.D.N.Y. Mar. 7, 2013).

### A. The subpoenas threaten Ukraine's physical and economic security by targeting the financial information of strategic third parties of importance to the nation's security and welfare without showing relevance.

"The party seeking discovery bears the initial burden of proving the discovery is relevant[.]"  *Citizens Union*, 269 F. Supp. 3d at 139.  Rule 69 discovery must be relevant to a specific purpose.  It must be "[i]n aid of the judgment or execution."  Fed. R. Civ. P. 69(a)(2); *cf.* NY CPLR § 5223 (authorizing discovery only of "matter relevant to the satisfaction of the judgment").  Post-judgment discovery that is not reasonably related to execution and reasonably likely to lead to execution is not provided for by Rule 69.  *NML Capital v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012) ("The scope of discovery under Rule 69(a)(2) is constrained principally in that it must be calculated to assist in collecting on a judgment").  Thus, "disclosure

concerning the assets of a non-party is generally not contemplated." *GMA Accessories, Inc. v. Elec. Wonderland, Inc.*, 2012 WL 1933558, at *5 (S.D.N.Y. May 22, 2012). Instead, Rule 69 discovery "must be limited to information that relates to the judgment debtors, their assets or suspected transfers of their assets." *Jacobson*, 2007 WL 1989260 at *2; *see also Costomar Shipping Co. v. Kim-Sail, Ltd.*, 1995 WL 736907, at *3 (S.D.N.Y. Dec. 12, 1995) ("Generally, non-parties may only be examined about the assets of a judgment debtor and cannot be required to disclose their own assets.").

Tatneft's subpoenas seek sensitive information that Tatneft has not shown to be relevant under Rule 69. They purport to seek information about the finances of Ukraine but define "Ukraine" to include numerous separate entities and non-parties to the dispute. Among those targeted by the subpoenas are Ukraine's "representatives," "assigns," nineteen separate entities labeled in a conclusory manner as "State Controlled Entities," and "all other Persons acting or purporting to act for or on Ukraine's behalf, *whether or not authorized to do so*." Ex. A at 10, Notice of Subpoenas (emphasis added).

This expansive definition bears little resemblance to the definition of "State" in Section 201 of the Restatement (Third) of Foreign Relations Law of the United States, which provides that "a state is an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities." Restatement (Third) of Foreign Relations Law of the United States, § 201 (1987). It also far exceeds the bounds of the definition of "foreign state" in Section 1603 of the Foreign Sovereign Immunities Act, or FSIA.

Ukraine has an intrinsic, inherent right to say who it is and who it is not. When Ukraine's statehood and identity is being litigated in a foreign court, especially by a Russian company with

close ties to the Russian government, it cannot remain a passive bystander. Especially in the current geopolitical context, a Russian company with close ties to the Russian government should not be permitted to dictate the parameters of Ukraine's legal identity according to its whims. Instead, Ukraine has a right to insist that its identity be defined consistent with the Restatement and the FSIA, as cited above, and with customary international law as reflected in the ILA Draft Articles on State Responsibility and the U.N. Convention on Jurisdictional Immunities.

To go beyond these conceptions of statehood and surmount the separate juridical status of the third parties included in its definition of Ukraine, Tatneft would bear the burden of showing that each third party is merely an alter ego of Ukraine. *See EM Ltd. v. Banco Cent. de la República Arg.*, 800 F.3d 78, 90 (2d Cir. 2015). This burden is a heavy one. Although the alter ego doctrine can overcome the presumption that a duly incorporated instrumentality is separate from the state that incorporated it, "both Bancec and the FSIA legislative history caution against too easily overcoming the presumption of separateness." *Id.* Thus, the presumption of separateness may be overcome only if "(1) the instrumentality 'is so extensively controlled by its owner that a relationship of principal and agent is created'; or (2) the recognition of an instrumentality's separate legal status would work a 'fraud or injustice.'" *Id.* (quoting *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629 (1983). For separate juridical status to work "fraud or injustice," the foreign state must use the agency or instrumentality to commit a "'classic' abuse of corporate form." *Letelier v. Republic of Chile*, 748 F.2d 790, 794 (2d Cir. 1984). Simply labeling third parties as "identified controlled entities" and including them in the definition of "Ukraine" in a subpoena is not enough.

Indeed, the breadth of Tatneft's definition of "Ukraine" is extraordinary: Any Federal Express courier delivering this motion to quash would satisfy the definition of Ukraine. It follows,

under Tatneft's subpoenas, that a financial institution with which the courier has a bank account would be under a continuing obligation to disclose the courier's bank account and transactional information indefinitely—although Ukraine did not choose and may not even know the courier's identity and the courier's funds cannot be used in satisfaction of any debt of Ukraine.  It is no answer that the Federal Express courier would not have Ukraine's assets in his or her bank account to satisfy the judgment in favor of Ukraine, nor that Tatneft and the courier can later agree or disagree about whether his or her assets can be used to satisfy the judgment against Ukraine.  What matters is that the courier should not be included in the definition of "Ukraine" and his or her bank accounts should not be searched in the first place.

With no reason to conflate the nineteen allegedly "Identified Controlled Entities" and an unspecified number of "other Persons" with Ukraine or to think that their assets could be used in execution of a judgment against Ukraine, discovery into their assets does not aid execution. Enforcing Tatneft's subpoenas before any showing has been made that the third parties included in Tatneft's definition of Ukraine could be liable for the judgment would impermissibly shift the burden of proof and would put the cart before the horse.  It would be a judicial abdication of all authority to supervise and limit the personal scope of post-judgment discovery.  If Tatneft's *ipse dixit* is enough and there is no limit on Tatneft's ability to force the third-party subpoena recipients to search through the records of legally separate entities as if they were "Ukraine," then there is no reason Tatneft could not have sought full information about the bank accounts and financial transactions of Lockheed Martin, Boeing, or Northrop Grumman.  Tatneft would not have had to make *any* showing that these parties are "Ukraine."  It would simply have been entitled to whatever information it demanded, as long as it purported to think there was a chance the information could be used to collect the judgment against Ukraine.  It would make no difference whether these

14

companies had any information about Ukraine, as properly defined.  The subpoena recipients would be required to search through their records and produce the requested information to Tatneft, and the relevance of that information could only be disputed post-discovery in the context of an attachment proceeding.  Discovery that is not supported by a *prima facie* showing of relevance cannot be justified by the opportunity to dispute relevance in a later attachment or execution proceeding any more than a police search that is not supported by probable cause can be justified by the opportunity to suppress evidence in a later criminal proceeding.  Post-judgment discovery may be broad, but it must still be "in aid of" execution of the judgment.

In prior proceedings, Tatneft's requests concerning third parties have been upheld due to confusion about their nature.  Tatneft has successfully argued that it is entitle to discovery *from* third parties that possess information about a judgment debtor's assets, obscuring the fact that it is in fact seeking discovery *about* third parties without any showing that an expansive definition of Ukraine is reasonably calculated to lead to information about "the judgment debtors, their assets or suspected transfers of their assets."  *Jacobson*, 2007 WL 1989260 at *2.  Even if Tatneft had shown that the third parties are reasonably likely to have information about Ukraine's assets, it has never shown that its requests are targeted to obtain this information.  Rather than targeting information about assets that may belong to Ukraine, Tatneft has insisted on defining the third parties to be Ukraine and seeking comprehensive information about third-party assets as though they were the assets of Ukraine.

**B.  Ukraine's national interests outweigh any probative value of Tatneft's discovery.**

In routine commercial cases, courts weigh the probative value of discovery against the privacy interests of the party opposing discovery.  *Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P.*, 2014 WL 5420225, at *6 (S.D.N.Y. Oct. 24, 2014).  In cases where a foreign sovereign is a party

or has an interest in the litigation, however, courts may encounter a range of other interests that are qualitatively different and deserving of greater weight.  Thus, the Supreme Court has instructed district courts supervising discovery to "take care to demonstrate due respect . . . for *any sovereign interest* expressed by a foreign state."  *See Aerospatiale*, 482 U.S. at 546 (emphasis added). Tatneft's overbroad definition of Ukraine results in demands for voluminous information that has little demonstrated probity, if any.  On the other hand, Ukraine has provided substantial concrete evidence to demonstrate its "real and defined interest" in the confidentiality of information requested by Tatneft, *see Schloemer*, 274 F.R.D. at 25, and to illustrate the type of "clearly defined, specific and serious injury" that it would face if Tatneft's subpoenas are enforced, *see Parnon Energy*, 2013 WL 5882921 at *2.

*First*, enforcement of Tatneft's subpoenas would undermine strategic industries that are essential to Ukraine's physical and economic security and that have already been targeted for attacks by Russia.  Tatneft has targeted third parties that have key roles in these industries without making any attempt to show that they are agencies or instrumentalities of Ukraine, much less that they are Ukraine's alter egos.   For example, Tatneft defines "Ukraine" to include "SC Ukroboronprom, a strategic manufacturer of weapons and military hardware in Ukraine consolidating enterprises in the strategic sectors of Ukraine's national defense industry," "SE Ukrkosmos, which maintains satellite communications in Ukraine that are necessary to gather intelligence and to coordinate movements of military personnel and supplies," and "SE Ukrainian Aviation and Transport Enterprise, an enterprise owing dozens of helicopters forming a unified aviation security and protection system in Ukraine that are also used to patrol Ukraine's state borders."  Reznikov Decl. ¶ 8.  Other entities included in Tatneft's definition of Ukraine include important energy and infrastructure companies.  *See, e.g.*, Ex. A at 10 (listing NJSC Naftogaz of

Ukraine, Naftogaz Trading Europe S.A., the National Nuclear Energy Generating Company of Ukraine, PJSC Centrenergo, State Enterprise Plant Electrotyazhmash, JSC Ukrainian Railways, State Enterprise Ukrainian Sea Ports Authority, and PJSC Ukrainian Danube Shipping Company).

These companies work in critical industries that are known to be strategically targeted by Russian cyber-attacks. *See, e.g.*, Reznikov Decl. ¶ 38. For reasons already explained, there is "a very practical and realistic threat" that the information demanded by Tatneft "will find its way into the hands of the Russian Federation," which will use it to harm Ukraine. *Id.* ¶ 17. Among other things, this information would allow Russia to evaluate and exploit the "economic vulnerabilities" of companies engaged in work of national importance, consistent with its prior efforts to disrupt similar work. *See id.* ¶¶ 9, 38. The disclosure of sensitive information that could be used to harm these companies is a matter of national concern for Ukraine and not simply a private matter of inconvenience to third parties.

*Second*, enforcement of Tatneft's subpoenas would undermine the efforts of third parties with important roles in the stability and viability of Ukraine's monetary, banking, and financial system. For example, the National Bank of Ukraine is one of several financial institutions that are separate entities from Ukraine and have not been shown to be liable for the judgment but are nonetheless included in Tatneft's definition of "Ukraine." *See* Ex. A at 10 (listing the National Bank of Ukraine, JSC CB PrivatBank, JSC State Export-Import Bank of Ukraine, JSB UkrGasBank, and JSC State Savings Bank of Ukraine); Shevchenko Decl. ¶¶ 9–13 (concluding that each financial institution has separate legal personality and is not liable for any obligation of the State of Ukraine).

The harm in disclosing comprehensive information about the finances and financial activities of these third parties is detailed at length in the Declaration of Kyrylo Shevchenko, who

is both the Governor of the National Bank of Ukraine—Ukraine's central bank, whose chief function is to ensure Ukraine's economic stability—and a member of the National Security and Defense Council of Ukraine.  Shevchenko Decl. ¶¶ 1, 11.  In his view, Tatneft's demands fit into and are part of "a broader strategy of economic, political and military aggression by the Russian Federation against Ukraine."  *Id.* at ¶ 34.

For example, Mr. Shevchenko explains that the subpoenas demand information about accounts and intermediaries on whom Ukraine relies in order to meet its payment obligations toward international lenders and bondholders in a timely manner.  *Id.* at ¶ 24.  If Russia were to obtain this information, it could use it compromise Ukraine's access to these accounts and intermediaries, delaying required payments and potentially triggering "cross-defaults across Ukraine's sovereign debt."  *Id.*  Russia has a history of interfering with Ukraine's efforts to repay its debts and undermining the Ukrainian hryvna, and it could use the requested information about Ukraine's debts to time hostile measures that undermine the hryvna's value when Ukraine's debt repayment obligations are most demanding, further increasing the risk of default.  *Id.* ¶ 32.  It could also use the requested information about Ukraine's plans for purchasing sovereign debt to strategically time measures to inflate the price of Ukraine's sovereign debt and otherwise interfere with Ukraine's monetary policy.  *Id.* ¶ 33.  Such activities could further Russia's efforts to devalue the hryvna, which would have "severe consequences" on "enterprises operating in strategic fields" of the economy like energy and infrastructure, which have significant levels of foreign indebtedness.  *Id.* at ¶ 26.  As concluded by the Governor of the National Bank of Ukraine, who is largely responsible for the nation's economic stability, enforcement of Tatneft's subpoenas would undermine "Ukraine's financial condition and ability to access the international capital markets on commercial acceptable terms, trigger a downgrade of Ukraine's credit ratings and negatively affect

the trading price, liquidity and demand for its debt security," and create a risk of default on sovereign debt. *Id.* at ¶ 27.

The broad consensus that disclosure of such information may be harmful is further underscored by a variety of foreign bank secrecy laws that may also be applicable.[10]  Without any showing of relevance by Tatneft, there is no reason to undertake the risk that Russia will obtain sensitive information of this type and use it to evaluate and exploit the financial or supply-chain vulnerabilities of third parties that are important to Ukraine's physical and economic security.

Ukraine's interests in the nation's physical and economic security far outweigh any modest probative value of information about the assets of third parties, which have not been shown to have any relevance to the needs recognized by Rule 69.  The risks that flow from Tatneft's overbroad definition of Ukraine are particularly disproportional to the needs of the litigation because Tatneft's subpoenas already have an alternative way of tracing assets that may belong to Ukraine: Document Request 1 requires information about every account "beneficially held in whole or in part by UKRAINE, for which UKRAINE is a signatory, or through which funds are transferred by or to UKRAINE." Ex. A at 7.  This is sufficient to identify any transactions by which third parties may have gained information about Ukraine's assets or by which Ukraine may have attempted to hide its property, without resorting to an arbitrary, sweepingly broad, and legally unjustified definition of "Ukraine."

---

[10] For example, in France, bank secrecy is established in articles L. 511-33, L. 511-34, L. 571-4 of the Monetary and Financial Code (*Code Monétaire et Financier*), and its violation is punished under article 226-13 of the French Criminal Code by one year of imprisonment and a fine of 15000 euro.  In Switzerland, bank secrecy is enshrined in article 47 of the Swiss Federal Act of November 8, 2020, on Banks and Savings Banks, which punishes the violation of bank secrecy by up to three years of imprisonment or a fine, and the enrichment through the violation of bank secrecy by up to five years of imprisonment or a fine.  In Luxembourg, bank secrecy is established in article 41 of the Luxembourg law of April 5, 1993 on the Financial Sector.  The violation of bank secrecy is punished under article 458 of the Luxembourg Criminal Code by imprisonment from eight days to six months and a fine from 500 euro to 5000 euro.

Tatneft's unjustified definition of "Ukraine" is directly or indirectly incorporated into each of its document requests. But it is not reasonably "calculated to assist in collecting on a judgment" against Ukraine as required by Rule 69. *See NML*, 695 F.3d at 207. And it results in discovery whose probative value is far outweighed by Ukraine's national interests.

### C. The subpoenas place a disproportionate burden on the sovereign interests of Ukraine and are invasive to sovereign dignity, more than necessary to satisfy the judgment in this case.

Because "foreign sovereigns . . . [are] entitled to a degree of grace and comity," courts "closely consider . . . sovereign interests in managing discovery, and . . . prioritize discovery of those documents that are unlikely to prove invasive of sovereign dignity." *Aurelius Cap. Master, Ltd. v. Republic of Argentina*, 589 F. App'x 16, 18 (2d Cir. 2014). Comity requires that a sovereign's concerns about discovery receive "the most careful consideration," pursuant to what has been accurately described as an *ad hoc* approach that accounts for all the circumstances of the case. *Aerospatiale*, 482 U.S. at 546; *id.* at 554 (Blackmun, J., concurring in part and dissenting in part). Moreover, a court must quash or modify a subpoena that "requires disclosure of privileged or other protected matter," "subjects a person to undue burden," or "fails to allow a reasonable time to comply." Fed. R. Civ. P. 45(d)(3)(A). A court may also quash or modify a subpoena "to protect a person subject to or affected by a subpoena" if it requires disclosing a trade secret or other confidential research, development, or commercial information. Fed. R. Civ. P. 45(d)(3)(B)(i).

It has already been shown that Tatneft's requests for information about the assets and financial activities of third parties implicates Ukraine's sovereign interest in the nation's physical and economic security. It should also be clear that the same interests are implicated by Tatneft's requests for information about the assets and financial activities of Ukraine itself. For example, information about Ukraine's military and defense funding and spending is extraordinarily sensitive

because it could be "used to evaluate Ukraine's defense capabilities with the view to identify vulnerabilities, to plan offensive measures that account for Ukraine's defense capabilities and exploit its weaknesses, and to interfere with Ukraine's peaceful efforts to sustain its interests in the sphere of national defense and territorial integrity, including by identifying, intimidating, and harming companies and individuals, including soldiers, intelligence agents, and informants, with important roles in Ukraine's national defense." Reznikov Decl. ¶ 10. Similarly, information about bank accounts belonging to Ukraine's diplomatic and consular missions are used to engage in sovereign activities that can have extraordinarily sensitive foreign relations implications at a time when Ukraine's geopolitical situation makes strong foreign relations particularly important.

Tatneft's subpoenas also implicate comity interests both because they conflict with a variety of Ukrainian laws and because they undermine the sovereign interests that are reflected by those laws.[11] For example, the Chief Compliance Officer of the State Savings Bank of Ukraine, who is also an Adviser to the Minister of Justice of Ukraine, determined after a review of Tatneft's discovery requests that a full response would necessarily "disclose information in the possession of the [National Bank of Ukraine] and other Ukrainian Banks protected by the Ukrainian bank secrecy law that requires Ukrainian banks to safeguard and guarantee the secrecy of information about the banks accounts and transactions of the banks' customers." Mudra Decl. ¶ 13. Ukrainian law protects this information with stringently enforced criminal, civil, and other sanctions. *Id.* ¶¶ 15–19. This analysis has been confirmed by the Mr. Shevchenko, who, as Governor of the

---

[11] They also implicate the secrecy laws of numerous other jurisdictions around the world, though the vast breadth of Tatneft's subpoenas, combined with their February 10, 2022 compliance deadline and Tatneft's timing of the subpoenas when Ukraine's resources were already overstretched by the cumulation of other procedural deadlines, made it impossible for Ukraine to obtain foreign expert reports. If Ukraine's motion is denied, it will fall to the subpoena recipients to determine what information they can provide without subjecting themselves to liability under other foreign laws. However, widespread recognition that information of the type demanded by Tatneft should be protected underscores the importance of the interests that are protected by Ukraine's secrecy laws and asserted in this brief.

National Bank of Ukraine, oversees regulation of Ukrainian banks. Shevchenko Decl. ¶ 10. He reviewed Tatneft's discovery requests and determined that they required disclosure of information protected by Ukrainian laws against disclosure of bank secrets, including information about correspondent bank accounts and potential insider information about bond and securities offerings—laws that carry significant penalties and that have no exceptions that would allow disclosure in this case. *Id.* ¶¶ 14–23, 29.

Where there is a conflict between a contemplated discovery order and the law of a foreign nation, comity requires an analysis that balances five factors: "(1) the importance to the investigation or litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means to securing the information; and (5) the balance of national interests." *CE Int'l Res. Holdings, LLC v. S.A. Mins. Ltd. P'ship*, 2013 WL 2661037, at *8 (S.D.N.Y. June 12, 2013).

This analysis confirms that the subpoenas are inappropriate. First, as explained above, much of the requested information is not important to the litigation because the subpoenas are not appropriately "tailored to seek only information regarding assets that could realistically be seized by plaintiffs." *See Aurelius*, 2013 WL 857730 at *3. Second, the subpoenas are inadequately specific. As discussed above, they are overbroad because they seek information concerning third parties. Third, to the extent the requested information comes from around the world and originates outside the United States, this weighs against requiring its disclosure. Fourth, Tatneft has never denied that it has alternative means, such as the Hague Convention, for obtaining the information it seeks. Fifth, Ukraine's national interests are clearly substantiated by the evidence discussed above, whereas "the Banks' status as non-parties does attenuate the United States interest in

enforcing discovery obligations."  *See Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 157 (S.D.N.Y. 2011).  For all these reasons, the interests of comity counsel against enforcement of the subpoenas.

In the interests of comity, Ukraine's national security and applicable Ukrainian and foreign secrecy laws should be given higher priority than a Russian oil company's alleged entitlement to worldwide discovery of sensitive information of a type known to be desired by Russia.  Especially in light of Tatneft's close relationship with Russia and Russia's escalating aggression against Ukraine, Tatneft's subpoenas should be quashed or at least narrowed.

### D.  The subpoenas should be quashed, or at least narrowed to account, for the limits of Rule 69 and the sovereign interests asserted by Ukraine.

The breadth and generality of the third-party subpoenas, consistent with the sweeping discovery requests served on Ukraine, indicate that Tatneft has not identified any potentially attachable property of Ukraine, is not targeting information about specific assets, and is engaged in a simple fishing expedition, at best.  The subpoenas should be quashed because they seek irrelevant information reaching beyond the scope of Rule 69 and because they place an undue burden on the interests of Ukraine that is not proportional to the needs of the case.

If the Court does not see fit to quash the subpoenas entirely and require Tatneft to serve new subpoenas that attempt to accommodate Ukraine's interests and the purposes of Rule 69, Ukraine respectfully submits that the arguments above show that the subpoenas should at least be narrowed in light of the Second Circuit's instruction that district courts should "closely consider . . . sovereign interests in managing discovery, and . . . prioritize discovery of those documents that are unlikely to prove invasive of sovereign dignity."  *Aurelius*, 589 F. App'x at 18. Ukraine's proposed limits are supported by its sovereign interests and the limits of Rule 69, and

they are especially justified in light of Tatneft's questionable need to avoid seeking payment from Ukraine without discovery.

At a minimum, the subpoenas should be narrowed to exclude third parties that are not part of Ukraine as properly defined and for which Tatneft has not satisfied its burden of proving relevance to the judgment against Ukraine under Rule 69 or, at a minimum:

i.   SC Ukroboronprom, SE Ukrkosmos, SE Ukrainian Aviation and Transport Enterprise, and State Aviation Enterprise Ukraine, because they are involved in the defense industry and have particular importance to Ukraine's interest in the nation's physical security;

ii.  The National Bank of Ukraine, because it is engaged in sovereign activities and has particular importance to Ukraine's interest in the nation's "monetary stability, as well as the stability of the banking system of Ukraine," Shevchenko Decl. ¶ 11; and

iii. NJSC Naftogaz of Ukraine, Naftogaz Trading Europe S.A., the National Nuclear Energy Generating Company of Ukraine, PJSC Centrenergo, State Enterprise Plant Electrotyazhmash, JSC Ukrainian Railways, State Enterprise Ukrainian Sea Ports Authority, and PJSC Ukrainian Danube Shipping Company, because they have particular importance to Ukraine's energy and infrastructure industries, which have strategic significance for Ukraine's national defense and have been targeted for attacks by Russia.

Similarly, all document requests should be narrowed to allow withholding of sensitive, non-public information the disclosure of which would be "invasive of sovereign dignity," *see Aurelius*, 589 F. App'x at 18:

iv.   Information concerning military, diplomatic, and consular accounts, which are particularly important to Ukraine's interests in self-defense and amicable foreign relations;

v.   Information about central banking and bond activities used to implement Ukraine's monetary policy, because they are important to Ukraine's interest in the nation's economic security;

vi.   Information that is or could be designated as a state secret under Ukrainian law, under principles of comity and because it is privileged or otherwise protected as information "the disclosure of which may cause damage to the national security of Ukraine"; and

vii.   Information that is protected by other applicable laws, including commercial secrecy or bank secrecy laws of Ukraine or any other relevant jurisdiction, under principles of comity and because the information is privileged or otherwise protected.

Finally, the geographic scope of the subpoenas should be narrowed, at least initially, to assets within the court's territorial jurisdiction or within the United States.  *See, e.g.*, *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 603 F. Supp. 2d 1, 2 & n.2 (D.D.C. 2009) (describing "bifurcated discovery plan" seeking first to determine the immunity of any property within the court's territorial jurisdiction).  This would provide an opportunity to see whether Tatneft's needs can be satisfied without a need to address foreign bank secrecy laws and would narrow the volume of sensitive information concentrated in a single place, making Tatneft and Tatneft's counsel a less valuable target of Russian intelligence.

Ukraine reserves the right to further elaborate on the ways in which Tatneft's subpoenas can or should be narrowed as the proceedings advance.

Ukraine expressly reserves foreign sovereign immunity from attachment and execution, as envisaged by the FSIA, Vienna Convention on Diplomatic Relations, Vienna Convention on Consular Relations, and all other applicable law.

## III.   CONCLUSION

For these reasons, Ukraine respectfully requests an Order from the Court quashing or modifying Tatneft's third-party subpoenas.


Dated: February 8, 2022                    Respectfully submitted,

                                           s/ Maria Kostytska
                                           Maria Kostytska (New York Bar # 4380101)
                                           Winston & Strawn LLP
                                           68 rue du Faubourg Saint Honoré
                                           Paris 75008, France
                                           (331) 53648282
                                           (331) 53648220 (fax)
                                           MKostystka@winston.com
                                           *Counsel for Ukraine*