IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SUBPOENAS SERVED ON JSC STATE EXPORT-IMPORT BANK OF UKRAINE; BANK POLSKA KASA OPIEKI SA; DEUTSCHE BUNDESBANK; RESERVE BANK OF AUSTRALIA; AB SEB BANKAS; SEB SECURITIES, INC.; BANK OF MONTREAL; BMO FINANCIAL CORP.; BMO CAPITAL MARKETS CORP.; THE BANK OF NEW YORK MELLON CORPORATION; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS FORTIS SA/NV; BNP PARIBAS USA, INC.; BNP PARIBAS; CITIBANK N.A.; CITIGROUP INC.; CITIGROUP GLOBAL MARKETS LTD.; COMMERZBANK AG; COMMERZ MARKETS LLC; CREDIT SUISSE (SWITZERLAND) LTD.; CREDIT SUISSE AG; CREDIT SUISSE (USA), INC.; DANSKE BANK A/S; DANSKE MARKETS INC.; DEUTSCHE BANK TRUST COMPANY AMERICAS; DEUTSCHE BANK TRUST CORPORATION; DEUTSCHE BANK AG; DNB BANK ASA; DNB CAPITAL LLC; DNB MARKETS, INC.; HSBC BANK PLC; HSBC NORTH AMERICA HOLDINGS INC.; JPMORGAN CHASE BANK N.A.; JPMORGAN CHASE & CO.; J.P. MORGAN SECURITIES PLC; J.P. MORGAN SECURITIES LLC; MUFG BANK, LTD.; MUFG AMERICAS HOLDING CORPORATION; MUFG SECURITIES AMERICAS INC.; RAIFFEISEN BANK INTERNATIONAL, AG; RB INTERNATIONAL MARKETS (USA) LLC; SANTANDER BANK POLSKA S.A.; STANDARD CHARTERED BANK PLC; STANDARD CHARTERED BANK (HONG KONG) LTD.; STANDARD CHARTERED SECURITIES (NORTH AMERICA) LLC; UBS SWITZERLAND AG; UBS AMERICAS INC.; UBS AG; UBS AMERICAS HOLDINGS LLC; UNICREDIT BANK AG; AND UNICREDIT CAPITAL MARKETS LLC: | Misc. Case No. 1:22-mc-00036 ———————————— (Arising from Case No. 1:17-cv-00582-CKK in the United States District Court for the District of Columbia, pending on petition for rehearing and rehearing *en banc* in Case No. 20-7091 in the United States Court of Appeals for the District of Columbia Circuit) **SECOND DECLARATION OF OLEKSII REZNIKOV IN SUPPORT OF UKRAINE'S MOTION TO QUASH SUBPOENAS** |

UKRAINE,

     Petitioner,

  -against-

PAO TATNEFT,

     Respondent.

I, Oleksii Reznikov, declare as follows:

1.    I am the Minister of Defense of Ukraine. I have served in this capacity since November 4, 2021, where I have been responsible for policymaking concerning Ukraine's national security in the spheres of military and defense, and development of military capability of Ukraine. Since March 19, 2020, I have been a member of Ukraine's National Security and Defense Council, the coordinating body concerning the issues pertaining to the national security and defense of Ukraine, and currently am a member of its Military Cabinet.

2.    In the course of my professional career, I have practiced as a lawyer, served at various positions in the local government of the City of Kyiv and at all-Ukraine government level, and as a member of the Kyiv city council. Since September 2019, I have been a member of the Ukraine's delegation at the Trilateral Contact Group, the group seeking to settle the ongoing military conflict between the Russian Federation and Ukraine by diplomatic means, and since May 2020 served as First Deputy Head of the Ukrainian delegation there.

3.    This declaration is based on my personal, firsthand knowledge, experience, and expertise obtained including while serving as the Minister of Defense of Ukraine, Deputy Premier Minister – the Minister for Reintegration of the Temporary Occupied Territories of Ukraine, the member of the National Security and Defense Council of Ukraine and otherwise.

4.    Nothing in my declaration should be taken as a waiver of any privilege or right on the part of Ukraine. For the avoidance of doubt, nothing in my declaration should be taken as amounting to acceptance of jurisdiction or a waiver of the sovereign immunity of Ukraine, including the immunity of its officials and its property under the Foreign Sovereign Immunities Act.

5.     Ukrainian law defines Ukraine's national security as the state of its sovereignty, territorial integrity, democratic constitutional order and other national interests of Ukraine protected from the occurrence of the events, tendencies or factors, constituting real or potential threats to it, which make or may make impossible or more difficult safeguarding national values of Ukraine and realization of Ukraine's interests, including the most vital interests of an individual, society and Ukraine as a State, its dynamic democratic development as well as safe life sustenance and wellbeing of its citizens.[1] National security therefore has many angles and, to be more specific, military, foreign-policy, state, economic, energy, information, environmental, cyber security, civil security and protection, border protection, intelligence and counter-intelligence and many others.

6.     Having due regard to the above, I am of the firm belief that disclosure of the information by Ukraine in response to PAO Tatneft's document requests and interrogatories, and by the financial institutions in response to PAO Tatneft's subpoenas, will inevitably cause extreme and irreparable harm to Ukraine's national security which magnitude and far-reaching implications cannot be overestimated.

7.     I understand from the Ministry of Justice of Ukraine that discovery requests have been served on Ukraine in D.C. District Court Case No. 1:17-cv-00582. I also understand from the Ministry of Justice of Ukraine that subpoenas have also been served on a number of financial institutions in Southern District of New York Case No. 1:21-mc-00376. Most recently, I was informed by the Ministry of Justice of Ukraine that on January 25, 2022, Tatneft served about 52 additional subpoenas, in addition to about 25 initial subpoenas, on financial institutions. I am of the firm belief that at least the following, which are by no means the only, requests are so broadly worded that they certainly include within their scope highly sensitive information the disclosure

---

[1] Law of Ukraine No. 2469-VIII "On the National Security of Ukraine" dated June 21, 2018, Article 1.

of which would significantly undermine the national security and defense of Ukraine. More specifically security in the sphere of military, state, economy, integrated border management, energy, information and national intelligence will be affected to say the least.

8.     This concern is heightened by Tatneft's inaccurately broad definition of "Ukraine," which I understand includes a long list of specifically identified third parties—such as, for example, SC Ukroboronprom, a strategic manufacturer of weapons and military hardware in Ukraine consolidating enterprises in the strategic sectors of Ukraine's national defense industry, SE Ukrkosmos, which maintains satellite communications in Ukraine that are necessary to gather intelligence and to coordinate movements of military personnel and supplies, SE Ukrainian Aviation and Transport Enterprise, an enterprise owing dozens of helicopters forming a unified aviation security and protection system in Ukraine that are also used to patrol Ukraine's state borders, and State Aviation Enterprise Ukraine, an enterprise owning a helicopter and aircrafts used to fly by senior-level governmental officials and the President of Ukraine in particular, and innumerable other third parties in a catch-all provision for all "agencies, instrumentalities, ministries, political subdivisions, representatives, State Controlled Entities, alter-egos, and assigns, and all other Persons acting or purporting to act for or on Ukraine's behalf, whether or not authorized to do so."

        a. In the D.C. case, Interrogatory 1 directs Ukraine, "Identify any Accounts maintained outside the territory of Ukraine in whole or in part in the name of UKRAINE, beneficially held in whole or in part by UKRAINE, for which UKRAINE is a signatory, or through which funds are transferred by or to UKRAINE." Relatedly, Document Requests 1 through 3 direct Ukraine to produce documents "sufficient to identify all Accounts maintained outside the

territory of Ukraine in whole or in part in the name of UKRAINE, beneficially held in whole or in part by UKRAINE, for which UKRAINE is a signatory, or through which funds are transferred by or to UKRAINE," "sufficient to identify the current account balance, currency, and as-of date for all Accounts identified in response to Interrogatory No. 1," and "sufficient to identify the transaction history for all Accounts identified in response to Interrogatory No. 1, beginning from January 1, 2019."

b. Similarly, in the New York case, Document Request 1 requires production of "[a]ll Documents and Communications Concerning any Accounts maintained outside the territory of Ukraine in whole or in part in the name of UKRAINE, beneficially held in whole or in part by UKRAINE, for which UKRAINE is a signatory, or through which funds are transferred by or to UKRAINE, either in New York or any of Your branches outside New York." Relatedly, Document Requests 2 and 3 require production of "Documents sufficient to identify the current account balance, currency, transaction history, and as-of date for all Accounts identified in response to Document Request No. 1" and ""[a]ll Documents and Communications evidencing or Concerning UKRAINE's ownership interests in any Accounts identified in response to Document Request No. 1."

c. Examples of the sensitive information within the scope of these discovery requests include the extent of Ukraine's military funding and expenditures, account information for every person or company that has been the recipient of Ukrainian military and defense spending and receivables under the supply

5

contract, including personnel suppliers of military and defense equipment and technology, and the dates and amounts of all such payments.  This would shed light on Ukraine's defense capabilities and disclose the entire network of companies and individuals involved in supporting Ukraine's national defense, including substantial amounts of non-public information, thereby posing a real danger to Ukraine's military, state and national intelligence security.

d.  In the D.C. case, Interrogatory 2 directs Ukraine, "Identify any commercial or standby letters of credit in which UKRAINE is listed as the applicant or beneficiary, including but not limited to invoices and bills of lading related to the letter of credit, for which any part of the underlying transaction is to involve assets or parties located in whole or in part outside the territory of Ukraine." Relatedly, Document Request 4 directs Ukraine to produce documents "[c]oncerning all commercial or standby letters of credit in which UKRAINE is listed as the applicant or beneficiary, including but not limited to invoices and bills of lading related to the letter of credit, for which any part of the underlying transaction is to involve assets or parties located in whole or in part outside the territory of Ukraine."

e.  These discovery requests include sensitive, non-public information such as invoices and bills of lading that would disclose the nature and amount of Ukraine's military equipment and technology and documents that would identify the business counterparts like on which SC Ukroboronprom (and its subsidiary enterprises) SE Ukrkosmos depend to fulfill their vital roles in

6

maintaining Ukraine's defense industry and Ukraine's satellite communications, the financial health of these entities.

f. In the D.C. case, Interrogatory 3 directs Ukraine, "Identify any outstanding loans (including repurchase agreements) for which UKRAINE is listed as the borrower or guarantor, including but not limited to information regarding the purpose of the loan and all collateral that was used to secure the loan, for which the loan proceeds are to be paid or received in whole or in part outside the territory of Ukraine." Relatedly, Document Request 5 directs Ukraine to produce documents "[c]oncerning outstanding loans for which UKRAINE is listed as the borrower or guarantor, including but not limited to information regarding the purpose of the loan and all collateral that was used to secure the loan, for which the loan proceeds are to be paid or received in whole or in part outside the territory of Ukraine."

g. These discovery requests include sensitive, non-public information that would disclose the extent and sources of Ukraine's military funding and the cash flows through which SC Ukroboronprom helps to maintain Ukraine's defense industry and through which SE Ukrkosmos maintains Ukraine's satellite communications.

h. In the D.C. case, Interrogatory 4 directs Ukraine, "Identify any asset or property of any kind whatsoever located in whole or in part outside the territory of Ukraine, which UKRAINE owns directly or indirectly, in whole or in part, as sole owner or jointly with others, either of record or beneficially, including without limitation as a partner, general or limited, limited liability member,

fiduciary, and as an equity or debt holder, or demand deposit holder, or to which UKRAINE has asserted a claim." Relatedly, Document Requests 6 and 7 direct Ukraine to produce documents "sufficient to identify any asset or property of any kind whatsoever, located in whole or in part outside the territory of Ukraine, which UKRAINE owns directly or indirectly, in whole or in part, as sole owner or jointly with others, either of record or beneficially, including without limitation as a partner, general or limited, limited liability member, fiduciary, and as an equity or debt holder, or demand deposit holder" and documents "[c]oncerning any asset or property of any kind whatsoever, located in whole or in part outside the territory of Ukraine, to which UKRAINE has asserted a claim, including Documents sufficient to identify any party outside UKRAINE against which UKRAINE has made such a claim."

i. These discovery requests include sensitive, non-public information, for example, such as the nature and disposition of intelligence assets outside of Ukraine, thereby affecting Ukraine's security in the sphere of defense, intelligence and counter-intelligence.

9.      To sum up, these discovery requests and subpoenas seek disclosure of sensitive, non-public information about the extent of Ukraine's military funding and expenditures, the sources of Ukraine's military funding, and the recipients of Ukraine's military expenditures, which would in turn shed light on the nature and strength of Ukraine's defense capabilities. They also include sensitive, non-public information about the assets, financial health, and economic vulnerabilities of key players with roles related to Ukraine's national defense, such asSC

Ukroboronprom, SE Ukrkosmos, SE Ukrainian Aviation and Transport Enterprise, and State Aviation Enterprise Ukraine.

10.     Should the requested information in response to PAO Tatneft's discovery requests and subpoenas fall in the hands of an adversary – which is especially important when it comes to the Russian Federation that could at any point plot an attack against Ukraine again, as I explain below in detail – it will no doubt be used to evaluate Ukraine's defense capabilities with the view to identify vulnerabilities, to plan offensive measures that account for Ukraine's defense capabilities and exploit its weaknesses, and to interfere with Ukraine's peaceful efforts to sustain its interests in the sphere of national defense and territorial integrity, including by identifying, intimidating, and harming companies and individuals, including soldiers, intelligence agents, and informants, with important roles in Ukraine's national defense.

11.     The sensitivity of much of this information has been formally recognized through the legal process for classifying it as a state secret, the unauthorized disclosure of which by persons trusted trigger severe penalties under Ukrainian criminal law of up to 8 years of imprisonment.[2]

12.     For the sake of clarity, I would like to specifically dwell on the correlation between information which disclosure may affect Ukraine's national security and secret information.

13.     In essence, any information classified as a state secrecy, if disclosed, may adversely impact Ukraine's national security. This does not however mean that all information affecting national security is classified as a state secret or that disclosure of nonclassified information cannot damage Ukraine's interest in the sphere of national security and defense. The process for classifying state secrets is cumbersome to be applied to all information that is sensitive and meets the legal requirements to be eligible for information that may negatively affect Ukraine's national

---

[2] Criminal Code of Ukraine, Article 328.

interests. Thus, there is a substantial body of sensitive information which disclosure will affect Ukraine's national interests that are protected in large part by the good judgment of those to whom the information is entrusted, supplemented at times by contract provisions, laws concerning bank or commercial secrecy, and other legally enforceable obligations, or by being classified as information for internal use only.

14.     The Ministry of Defense of Ukraine takes the confidentiality of sensitive, non-public information that even theoretically may harm Ukraine's interests and security extremely seriously, whether or not the piece of information is formally classified as a state secret. We take strong precautionary measures to prevent breaches of security.

15.     I know from my experience as the Minister of Defense of Ukraine, the member of the National Security and Defense Council of Ukraine as well as from my prior occupations as Deputy Premier Minister – the Minister for Reintegration of the Temporary Occupied Territories of Ukraine and the member of the Trilateral Contact Group that Russia proactively seeks to obtain sensitive information concerning Ukraine's national security and when obtained routinely uses that information against Ukraine. Russia proactively has targeted information like that requested by Tatneft in a variety of ways, including by offering positive and negative incentives to encourage private individuals and companies to share information and by hacking private individuals and companies in whom Ukraine has confided.

16.     I know from my experience as a Minister of Defense, as well as from my prior professional experiences including as an attorney, that it is extraordinarily difficult to identify the source of a leak and frequently it is not possible to identify the source at all. It is difficult to prove forensically how common it is for the Russian Federation to obtain information from a Russian company or a U.S. law firm using positive or negative incentives, or cyber-attacks. In my field,

security decisions must be made based on the information that is available. Where significant volumes of highly sensitive information, the disclosure of which, whether inadvertent or intentional, will entail extremely serious consequences for Ukraine's national security and defense, is concentrated in one entity or in the hands of a few persons—especially if they are outside of Ukraine and when such concentration of information is well known to the hostile state or states— the risk of leakage elevates exponentially.

17.     Based on the evidence and information that is available to me as the Minister of Defense of Ukraine and member of the Military Cabinet of the National Security and Defense Council of Ukraine, there is a very practical and realistic threat that information provided to Tatneft, or even to Tatneft's outside counsel in the United States, will find its way into the hands of the Russian Federation and where it will be used to undermine Ukraine national security and defense.

18.     Such conclusion is reinforced given Russia's historic pattern of aggression towards Ukraine, the recent escalation of its threatening behavior and cyber-attacks with which Ukraine is being regularly hit.

19.     To begin with, Ukraine has been facing direct Russian military aggression since February 20, 2014, when the unmarked regular Russian military troops illegally crossed the Ukrainian borders in the area of the Kerch Strait and together with the Russian armed forces based in the territory of Ukrainian Crimea Peninsula based on the bilateral agreement between Ukraine and Russia were deployed to block Ukrainian military units.[3] This was the beginning of an undeclared war the Russian Federation wages against Ukraine since then. The said acts of direct

---

[3] *See* Resolution of the Verkhovna Rada of Ukraine "On the Statement of the Verkhovna Rada of Ukraine "On Repelling Armed Aggression of the Russian Federation and Overcoming Its Consequences" No. 337-VIII dated 21 April 2015 (available at https://zakon.rada.gov.ua/laws/show/337-19#Text).

military aggression resulted in an illegal temporary occupation of Crimea by the Russian Federation that continues to date.[4]

20.     The second phase of the continuous aggression that the Russian Federation pursues against Ukraine has launched in or about April 2014, when the Russia-backed armed troops, controlled, managed and financed by and from the Russian Federation, proclaimed in the Eastern regions of Ukraine the so-called "Donetsk People's Republic" (on April 7, 2014) and "Luhansk People's Republic" (on April 27, 2014),[5] which Ukraine treats as terrorist organizations.

21.     Since April 2014, Ukraine has launched the anti-terrorist operation in the Eastern part of Ukraine with the view to free the occupied territories of Ukraine, which by now has been ongoing for almost 8 years.[6]

22.     During these years, Ukraine backed by the international community has made numerous attempts to stabilize the situation in the temporarily occupied Eastern territories of Ukraine, seeking a diplomatic solution with the Russian Federation. For these purposes, the Trilateral Contact Group on Ukraine (also known as the Trilateral Contract Group for the peaceful settlement of the situation in Eastern Ukraine) was established consisting of the representatives from Ukraine (as noted above, since 2019 I was one of them), the Russian Federation, and the Organization for Security and Co-operation in Europe ("OSCE").[7] The efforts of the Trilateral

---

[4] *Idem.*

[5] *Idem.*

[6] *See* Decree of the President of Ukraine "On the Decision of the National Security and Defense Council of Ukraine of 13 April 2014 "On Urgent Measures to Overcome the Terrorist Threat and Preserving the Territorial Integrity of Ukraine" dated 14 April 2014 No. № 405/2014 and Article 1 of the Law of Ukraine "On Temporary Measures for the Period of the Anti-Terrorist Operation" No. 1669-VII dated 2 September 2014 (available at https://zakon.rada.gov.ua/laws/show/1669-18#Text).

[7] Ministry of Foreign Affairs of Ukraine, "On the meetings of the participants of the Trilateral Contact Group on implementation of the Peace Plan of the President of Ukraine" (June 9, 2014) (available at https://mfa.gov.ua/news/1575-shhodo-zasidany-uchasnikiv-tristoronnyoji-kontaktnoji-grupi-z-realizaciji-polozheny-mirnogo-planu-prezidenta-ukrajini in Ukrainian and Russian).

Contact Group on Ukraine resulted in signing the first Minsk Accords on September 5, 2014.[8] It mainly consists of undertakings to a ceasefire along the existing line of contact, which Russia never respected. By February 2015, fighting had intensified to a level that led to renewed calls for a ceasefire and ultimately led to the second Minsk Accords (known as Minsk II) signed on February 12, 2015.[9] The Russian-led forces, however, continue to ignore the reached agreements up until the date of this declaration.[10]

23.    The illegal nature of the temporary occupation of Crimea and certain districts of Donetsk and Lugansk regions of Ukraine is internationally recognized.[11]

24.    The acts of aggression that the Russian Federation pursues against Ukraine has left over 14,000 causalities and over 30,000 injured.[12] More than 1.43 million residents of Crimea and Donbas are now internally displaced persons after being forced to leave their homes.[13] Moreover, it has made the Russian Federation and its companies subject to international sanctions.[14]

---

[8] OSCE press-release, "Chairperson-in-Office welcomes Minsk agreement, assures President Poroshenko of OSCE support" (Sept. 5, 2014) (available at https://www.osce.org/cio/123245).

[9] OSCE press-release, "OSCE Chairperson-in-Office gives full backing to Minsk package" (Febr. 12, 2015) (available at https://www.osce.org/cio/140196).

[10] *See* Ministry of Defense of Ukraine, "Update on the situation in the Joint Forces Operation area as of 07.00 January 18, 2022" (available at https://www.mil.gov.ua/en/news/2022/01/18/update-on-the-situation-in-the-joint-forces-operation-area-as-of-07-00-january-18-2022/).

[11] *See* UN News, "Backing Ukraine's territorial integrity, UN Assembly declares Crimea referendum invalid" (Mar. 27, 2014) (available at https://news.un.org/en/story/2014/03/464812-backing-ukraines-territorial-integrity-un-assembly-declares-crimea-referendum#.UzgPNqLRUdw); United Nations General Assembly Resolution 68/262 "Territorial integrity of Ukraine", adopted on 27 March 2014 (A/RES/68/262) (available at https://undocs.org/en/A/RES/68/262); United Nations General Assembly Resolution 76/70 "Problem of the militarization of the Autonomous Republic of Crimea and the city of Sevastopol, Ukraine, as well as parts of the Black Sea and the Sea of Azov", adopted on 9 December 2021 (A/RES/76/70) (available at https://undocs.org/en/A/RES/76/70); European Parliament resolution of 15 January 2015 on the situation in Ukraine (2014/2965(RSP)) (available at: https://www.europarl.europa.eu/doceo/document/TA-8-2015-0011_EN.html) ; Joint statement of the NATO-Ukraine Commission (May 13, 2015) (available at https://www.nato.int/cps/en/natohq/official_texts_119425.htm?selectedLocale=en).

[12] *See* Ukraine's permanent mission to the UN, "Russian Aggression" (available at https://ukraineun.org/en/ukraine-and-un/russian-aggression/).

[13] *Idem*.

[14] *See* BBC News, "Ukraine crisis: Russia and sanctions" (Dec. 19, 2014) (available at https://www.bbc.com/news/world-europe-26672800). *See* U.S. Department of State Archive on Ukraine and Russia Sanctions (available at https://2009-2017.state.gov/e/eb/tfs/spi/ukrainerussia/index.htm) ; U.S. Department of

25. Disclosure of the requested information would be especially harmful for Ukraine's national security interests at the times when the current geopolitical situation has been aggravating since late 2021 and has raised tensions to the level of military hostilities and plotted cyber-attacks.

26. It is a matter of public knowledge that Russia exacerbates its military escalation against Ukraine. According to the data of the Main Intelligence Directorate of the Ministry of Defense of Ukraine, as of November 21, 2021 "Russia has amassed over 92,000 troops near Ukraine's borders and is preparing for an attack in late January and early February."[15]

27. The data collected by Ukrainian intelligence agencies on the estimated number of troops pulled to the Ukrainian border by Russia corresponds to the data collected by the European and American intelligence agencies. The Head of the Main Intelligence Directorate of the Ministry of Defense of Ukraine, Mr. Budanov, is convinced that this invasion will be far more devastating than all the preceding events of the conflict since 2014.[16]

28. As I mentioned during the question hour to the Ukrainian government on December 3, 2021, **the probability of a large-scale escalation by Russia exists**.[17]   Already early in

---

Treasury "Ukraine-/Russia-related Sanctions" (available at https://home.treasury.gov/policy-issues/financial-sanctions/sanctions-programs-and-country-information/ukraine-russia-related-sanctions);     Council     Decision 2014/386/CFSP of 23 June 2014 concerning restrictive measures in response to the illegal annexation of Crimea and Sevastopol (available at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A02014D0386-20210623); Council Decision 2014/145/CFSP of 17 March 2014 concerning restrictive measures in respect of actions undermining or threatening the territorial integrity, sovereignty and independence of Ukraine (available at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A02014D0145-20211213) ; Council Regulation (EU) No 692/2014 of 23 June 2014 concerning restrictive measures in response to the illegal annexation of Crimea and Sevastopol (available at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:02014R0692-20141220); Council Regulation (EU) No 269/2014 of 17 March 2014 concerning restrictive measures in respect of actions undermining or threatening the territorial integrity, sovereignty and independence of Ukraine (available at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A02014R0269-20211213).

[15] Ukrinform, "Russia Has Concentrated More Than 92,000 Troops near Ukraine's Borders and Is Preparing for an Attack That Could Begin in Late January or Early February 2022" (Nov. 21, 2021) (available at https://www.ukrinform.ua/rubric-polytics/3354813-rosia-zoseredila-ponad-92-tisaci-vijskovih-bila-kordoniv-ukraini-nacalnik-gur-mou.html).

[16] *Idem.*

[17] *See* Slovo i Dilo, "Escalation on the Part of Russia is Possible at the End of January - Reznikov" (Dec. 3, 2021) (available at https://www.slovoidilo.ua/2021/12/03/novyna/polityka/imovirna-eskalacziya-boku-rosiyi-mozhe-buty-sichnya-reznikovhttps://www.slovoidilo.ua/2021/12/03/novyna/polityka/imovirna-eskalacziya-boku-rosiyi-mozhe-

14

December 2021, the total number of troops on the territory of Russia, as well as in the temporarily occupied Ukrainian territories that could be used for escalation, increased and was estimated at 94,300 troops.[18] Russia has already begun the military exercise near the Ukraine's border and intensified its reconnaissance. Tanks and armored vehicles have been reinforced with groupings in the Bryansk and Smolensk Regions.[19] Since December 2021, the number of Russian troops near the border has increased. According to the latest intelligence data, Russia has currently **about 130,000 troops near the border with Ukraine**, which is 20,000 more than in December.

29.     On December 24, 2021, the Head of the State Security Service of Ukraine, Mr. Bakanov, emphasized that "the hybrid war [was] becoming more and more intense and [was] acquiring new forms, because the Russian special services [had] strengthened the units working against Ukraine technically and in terms of personnel" and concluded that Russia's "subversive activity will grow."[20] Indeed, Russia continued to bolster its forces in the temporarily occupied Crimea.[21] At the end of December, 122,000 Russian servicemen have already been deployed at a 200-km distance, and another 143,500 at a 400-km distance to the Ukrainian border.[22]

30.     The escalation of the situation already caused international tension and involved the United States, the NATO and the European Union.

---

buty-sichnya-reznikov). *See also* Interfax-Ukraine, "Some 94,300 Russian Troops Deployed on Russia's Territory, Ukraine's Temporary Occupied Territories May be Involved in Escalation – Reznikov" (Dec. 3, 2021) (available at https://en.interfax.com.ua/news/general/783780.html).

[18] *See* Interfax-Ukraine, "Some 94,300 Russian Troops Deployed on Russia's Territory, Ukraine's Temporary Occupied Territories May be Involved in Escalation – Reznikov" (Dec. 3, 2021) (available at https://en.interfax.com.ua/news/general/783780.html).

[19] *Idem.*

[20] The President of Ukraine, "President at Meeting in SBU: Security of Ukraine is Major Priority of the State Now" (Dec. 24, 2021) (available at https://www.president.gov.ua/en/news/prezident-na-zasidanni-kolegiyi-sbu-bezpeka-ukrayini-nini-na-72253).

[21] *See* Ukrainian Truth, "Images Published by Reuters Show that Russia Continues to Build up Forces near Ukraine" (Dec. 24, 2021) (available at https://www.pravda.com.ua/news/2021/12/24/7318547/).

[22] *See* Ukrinform, "NSDC Secretary Says 122,000 Russian Troops Massed near Ukraine Border" (Dec. 22, 2021) (available at https://www.ukrinform.net/rubric-defense/3373760-nsdc-secretary-says-122000-russian-troops-massed-near-ukraine-border.html).

31.     On January 12, 2022, the Director of the U.S. Central Intelligence Agency William Burns met with the Ukrainian President Mr. Zelensky in Ukraine regarding the "looming threat" of Russian invasion of Ukraine.[23]

32.     On January 18, 2022, the escalation and possible launch of an attack by the Russian Federation against Ukraine was pointed out by the U.S. Department of State Senior Official, who noted that "President Putin created this crisis by amassing 100,000 Russian troops along Ukraine's borders", which includes "moving Russian forces into Belarus over the weekend".[24] According to the U.S. Department of State Senior Official, "[t]his is neither an exercise nor normal troop movement", it is rather "a show of strength designed to cause or give false pretext for a crisis as Russia plans for a possible invasion", which is "extremely dangerous".[25] The U.S. Department of State Senior Official concluded that "[w]e are now at a stage where Russia could, at any point, launch an attack on Ukraine."[26]

33.     On January 19, 2022, the US Secretary of State Antony Blinken, in his speech at the US embassy in Kyiv during his visit to Kyiv, warned that Russia could launch a new attack on Ukraine at "very short notice."[27]

34.     Furthermore, on January 19, 2022, it is reported that the Biden-Harris Administration is weighing new options, including providing more arms to Ukraine to resist a

---

[23] *See* Paul LeBlanc, "Bipartisan US Senate delegation meets with Ukrainian President as Russian invasion threat looms", CNN (Jan 17, 2022) (available at https://edition.cnn.com/2022/01/17/politics/ukraine-russia-us-senators-meeting/index.html).

[24] US Department of State, "A Senior State Department Official on the Secretary's Upcoming Travel to Ukraine and Germany. Special briefing" (Jan. 18, 2022) (available at https://www.state.gov/a-senior-state-department-official-on-the-secretarys-upcoming-travel-to-ukraine-and-germany/).

[25] *Idem*.

[26] *Idem*.

[27] Simon Lewis, "Blinken tells Ukraine he will keep working to avert Russian attack", Reuters (Jan. 19, 2022) (available at https://www.reuters.com/world/europe/blinken-says-russian-attack-ukraine-could-come-very-short-notice-2022-01-19/).

Russian occupation, to try to raise the costs for Russian President Vladimir Putin should he decide to invade the country.[28] The discussions, described by multiple sources familiar with them, reflect a sense of pessimism in the administration following last week's diplomatic talks with Russian officials that yielded no breakthroughs and as Russia has continued to raise its force levels in the last few days.[29]

35.     On January 27, 2022, U.S. President Joe Biden, in his telephone conversation with Ukraine's President Volodymyr Zelenskiy, warned that there is a possibility that Russiacould invade Ukraine in February.[30]

36.     On January 31, 2022, the Secretary-General of NATO, Jens Stoltenberg, while commenting on the joint military exercises of Russia and Belarus, which Russia announced would take place in the territory of Belarus from February 10 to 20, 2022[31], emphasized that there "is a serious risk that exercises like the exercise that is scheduled in Belarus can be used as a disguise for a military action, invasion of Ukraine, because that has happened before. That was actually what happened back in 2014, when they annexed the Crimea, and also when they went into and took control over Donbass in parts of eastern Ukraine. So, Russia has used military exercises before as a disguise, as a cover."[32] The NATO Secretary General concluded that "the military buildup that continues," "all the different exercises that are planned in and around Ukraine," "the

---

[28] *See* Natasha Bertrand, Jim Sciutto, Katie Bo Williams, Barbara Starr and Alex Marquardt, "US weighs more military support for Ukraine to resist Russia if it invades" (Jan. 19, 2022) (available at https://edition.cnn.com/2022/01/18/politics/us-military-support-ukraine-russia/index.html).
[29] *Idem*.

[30] *See* BBC News, "Ukraine crisis: Biden warns Russia may invade next month" (Jan. 28, 2022) (available at https://www.bbc.com/news/world-europe-60164537).

[31] *See* Bloomberg, "Russia to Move Forces to Belarus for Military Drills Next Month" (Jan. 18, 2022) (available at https://www.bloomberg.com/news/articles/2022-01-18/russia-to-move-forces-to-belarus-for-military-drills-next-month)

[32] *See* Washington Post, "Transcript: World Stage: Crisis in Ukraine with NATO Secretary General Jens Stoltenberg" (Jan. 31, 2022) (available at https://www.washingtonpost.com/washington-post-live/2022/01/31/transcript-world-stage-crisis-ukraine-with-nato-secretary-general-jens-stoltenberg/).

threatening rhetoric" where Russia makes demands to the West and threatens "military-technical consequences" if the West does meet its demands, and "the track record of Russia using force against Ukraine before" – all of that taken together "make this a serious threat we have to take very seriously."[33]

37.     What is more, Russia is also using a series of quasi-military measures to provoke Ukraine's internal destabilization, disrupt and demoralize. In particular, Ukraine has been repeatedly targeted by the cyber-attacks since 2014, when Moscow occupied Crimea and kickstarted the acts of aggression in the eastern Donbas region. About 288,000 cyber-attacks took place in the first 10 months of 2021, according to official figures, with 397,000 in 2020.[34]

38.     The attacks have also been directed at critical infrastructure. In winter 2015, suspected Russian hackers took out parts of the country's power grid, which led to almost a quarter of a million Ukrainians losing power and heat, which repeatedly happened in 2016.[35]

39.     In 2017, suspected Russian hackers unleashed the NotPetya virus targeting banks, newspapers and leading companies.[36]

40.     All available evidence points to the ongoing cyber-attacks originating from Russia, as a manifestation of the undeclared cyber war against Ukraine. One of the latest massive cyber-attacks on Ukraine occurred on January 14, 2022.[37]   Hackers launched a global attack on the websites of the Cabinet of Ministers, the Ministry of Defense, the Ministry of Foreign Affairs, the

---

[33] *Idem.*

[34] *See* Luke Harding, "Ukraine hit by 'massive' cyber-attack on government websites", The Guardian (Jan 14, 2022) (available at

[35] *Idem*.

[36] *Idem*.

[37] *See* State Service of Special Communication and Information Protection of Ukraine, "Yuri Shchygol: Specialists of the State Security Service Investigate the Cyber-Attack on the Websites of Government Agencies to Understand the Entire Chain of Its Implementation" (Jan. 14, 2022) (available at https://cip.gov.ua/ua/news/yurii-shigol-fakhivci-derzhspeczv-yazku-doslidzhuyut-kiberataku-na-saiti-derzhavnikh-organiv-shob-zrozumiti-ves-lancyuzhok-yiyi-realizaciyi).

Ministry of Agriculture, the Ministry of Veterans Affairs, the State Emergency Service, the Ministry of Energy, as well as the public services websites and application *Diya* (translated as "Action").[38] Hackers left messages posted on the Ministry of Foreign Affairs' website threatening Ukrainians that "[a]ll information about you has become public" and to "be afraid and expect the worst" and warning that "[t]his is for your past, present and future."[39]

41.    I believe that this cyber-attack was aimed at the destabilization of the situation in Ukraine and was part of a hybrid war, which was started by Russia back in 2014.

42.    The Secretary of the National Security and Defense Council of Ukraine, Mr. Danilov, concluded that Ukraine faced "continuous" Russian cyber-attacks and other attempts to destabilize the country since Moscow temporarily occupied Crimea and orchestrated a proxy separatist hybrid war in Donbass. "Domestic destabilization is the immediate objective" of Russia prior to unleashing a potential deeper military incursion, he said, "firstly through cyber warfare, triggering an energy crisis and information warfare".[40]

43.    Furthermore, on January 14, 2022, Jen Psaki, the U.S. White House spokeswoman, has alleged that Russia has already positioned saboteurs in Ukraine to carry out a "false flag" operation to use as a pretext for a Russian attack, which Washington says could begin in the coming month.[41] The allegation was echoed by the U.S. Pentagon spokesman, John Kirby, who said that

---

[38] *See* Forbes, "Hackers Attacked Ukrainian Government Websites. The Possible Reason Is a Vulnerability in the Content Management System. What You Need to Know" (Jan. 14, 2022) (available at https://forbes.ua/news/khakeri-v-atakuvali-ukrainski-uryadovi-sayti-ne-pratsyuyut-sayti-minoboroni-mzs-dsns-dii-14012022-3212).

[39] *Idem.*

[40] *Idem.*

[41] *See* Julian Borger and Luke Harding "US claims Russia planning 'false-flag' operation to justify Ukraine invasion", The Guardian (Jan. 14, 2022) (available at https://www.theguardian.com/world/2022/jan/14/us-russia-false-flag-ukraine-attack-claim).

Russia was preparing "an operation designed to look like an attack on ... Russian-speaking people in Ukraine, again as an excuse to go in."[42]

44.      All the above shows that Ukrainian-Russian relations have been in a "hot" conflict for almost eight years. Russia has not slowed down. Quite the contrary, it systematically continues exerting its political, diplomatic, and military pressure on Ukraine. Disclosure of the requested information in such circumstances will be extremely harmful to Ukraine's national security interests and defense as the requested information can be used to evaluate Ukraine's defense capabilities, to plan offensive measures that account for Ukraine's defense capabilities and exploit its weaknesses, and to interfere with Ukraine's efforts to sustain its national defense efforts, including by identifying, intimidating, and harming companies and individuals, including soldiers, intelligence agents, and informants, with important roles in Ukraine's national defense.

45.      Thus, disclosure of the sensitive information sought by the Tatneft discovery requests and subpoenas threatening the national security of Ukraine would be contrary to Ukrainian law and would jeopardize Ukraine's national interests. It is my strongly held view that the Russian Federation through Tatneft is exploiting the U.S. justice system and legal mechanisms available under the American law in order to extract sensitive information from Ukraine, while at the same time showing no respect to the foundations of the international legal order. Therefore, it is my strong conviction that the information sought by Tatneft from Ukraine itself and from the American banks, once it falls in the hands of the Russian Federation, will undoubtedly be used for purposes above and well beyond the enforcement of an arbitral award. I can infer from Tatneft's behavior in the proceedings, as it was relayed to me by the Ministry of Justice of Ukraine, Tatneft is interested in obtaining of the sensitive information from Ukraine not less than it is being

---

[42] *Idem.*

interested in the actual enforcement of the arbitral award. PAO Tatneft's discovery requests and subpoenas are far broader and far more intrusive than necessary to collect on a circa $170 million judgment. They appear to be a mere pretext to obtain disclosure of information of great importance to Ukraine's national security. They appear to be driven by a more far-reaching interstate agenda at times of geopolitical tensions rising to the level of military hostilities.

46.     I hereby request that my testimony set forth in this declaration be taken into consideration and that all possible legal measures be enforced to quash or substantially reduce the scope of Tatneft's subpoenas to the information that is necessary to enforce the D.C. District Court judgment against Ukraine properly defined and to assure the maximum level of protection of the information that may be transmitted to Tatneft and to significantly limit Tatneft's use of this information for purposes of the enforcement of the judgment only.

47.     The concerns I have raised about harms to the national security of Ukraine are made in good faith based on my understanding of the relevant facts.

48.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 2 February 2022.

Oleksii Reznikov

**ЗАКОН УКРАЇНИ**

**Про національну безпеку України**

**№ 2469-VIII від 21.06.2018**

**Розділ I**

**ЗАГАЛЬНІ ПОЛОЖЕННЯ**

**Стаття 1. Визначення термінів**

. . .

6) загрози національній безпеці України - явища, тенденції і чинники, що унеможливлюють чи ускладнюють або можуть унеможливити чи ускладнити реалізацію національних інтересів та збереження національних цінностей України;

. . .

9) національна безпека України - захищеність державного суверенітету, територіальної цілісності, демократичного конституційного ладу та інших національних інтересів України від реальних та потенційних загроз;

10) національні інтереси України - життєво важливі інтереси людини, суспільства і держави, реалізація яких забезпечує державний суверенітет України, її прогресивний демократичний розвиток, а також безпечні умови життєдіяльності і добробут її громадян;

. . .

[*Free translation from Ukrainian*]

# LAW OF UKRAINE

## On National Security of Ukraine

## No. 2469-VIII of June 21, 2018

### Title I

### GENERAL PROVISIONS

**Article 1. Definition of terms**

…

6) threats to national security of Ukraine – events, tendencies and factors, which make impossible or more difficult, or may make impossible or more difficult the implementation of national interests and safeguard of national values of Ukraine;

…

9) national security of Ukraine – a state of protection of the sovereignty, territorial integrity, democratic constitutional order and other national interests of Ukraine from real or potential threats;

10) national interests of Ukraine - vital interests of an individual, society and the state, the implementation of which insures the state sovereignty of Ukraine, its dynamic democratic development as well as safe life sustenance and wellbeing of its citizens;

…

# КРИМІНАЛЬНИЙ КОДЕКС УКРАЇНИ

## Закон № 2341-III від 05.04.2001

**Стаття 328. Розголошення державної таємниці**

1. Розголошення відомостей, що становлять державну таємницю, особою, якій ці відомості були довірені або стали відомі у зв'язку з виконанням службових обов'язків, за відсутності ознак державної зради або шпигунства -

карається позбавленням волі на строк від двох до п'яти років з позбавленням права обіймати певні посади чи займатися певною діяльністю на строк до трьох років або без такого.

2. Те саме діяння, якщо воно спричинило тяжкі наслідки, -

карається позбавленням волі на строк від п'яти до восьми років.

[*Free translation from Ukrainian*]

**CRIMINAL CODE OF UKRAINE**

**Law No. 2341-III of 5 April 2001**

**Article 328. Disclosure of State Secrecy**

1. Disclosure of information constituting a state secret by a person to whom such information was entrusted or became known in connection with the performance of official duties, in the absence of evidence of treason or espionage -

shall be punishable by imprisonment for a term of two to five years with deprivation of right to hold certain positions or engage in certain activities for a term of up to three years or without such deprivation of right.

2. The same act, if it entailed grave consequences -

shall be punishable by imprisonment for a term of five to eight years.



# *П О С Т А Н О В А*
## *Верховної Ради України*

### Про Заяву Верховної Ради України "Про відсіч збройній агресії Російської Федерації та подолання її наслідків"

**(Відомості Верховної Ради (ВВР), 2015, № 22, ст.153)**

Верховна Рада України **постановляє:**

1. Схвалити текст Заяви Верховної Ради України "Про відсіч збройній агресії Російської Федерації та подолання її наслідків" (додається).

2. Постанова набирає чинності з дня її прийняття.

**Голова Верховної Ради**
**України**                                         **В.ГРОЙСМАН**

**м. Київ**
**21 квітня 2015 року**
**№ 337-VIII**

# ЗАЯВА
# ВЕРХОВНОЇ РАДИ УКРАЇНИ

## Про відсіч збройній агресії Російської Федерації та подолання її наслідків

Підтверджуючи Постанову Верховної Ради України від 27 січня 2015 року № 129-VIII, якою Російську Федерацію визнано державою-агресором, Верховна Рада України констатує таке.

1. Збройна агресія Російської Федерації проти України розпочалася 20 лютого 2014 року, коли були зафіксовані перші випадки порушення Збройними Силами Російської Федерації всупереч міжнародно-правовим зобов'язанням Російської Федерації порядку перетину державного кордону України в районі Керченської протоки та використання нею своїх військових формувань, дислокованих у Криму відповідно до Угоди між Україною і Російською Федерацією про статус та умови перебування Чорноморського флоту Російської Федерації на території України від 28 травня 1997 року, для блокування українських військових частин. На початковій стадії агресії особовий склад окремих російських збройних формувань не мав розпізнавальних знаків.

27 лютого 2014 року збройні підрозділи спеціального призначення Головного розвідувального управління Генерального штабу Збройних Сил Російської Федерації захопили будівлі Ради міністрів та Верховної Ради Автономної Республіки Крим. Водночас відбулося створення і озброєння іррегулярних збройних формувань найманців з числа місцевих жителів, якими керували офіцери спецслужб і Збройних Сил Російської Федерації, а Чорноморський флот Російської Федерації заблокував українські порти, де знаходилися кораблі Військово-Морських Сил України. За цих обставин лідер партії "Русское единство" Сергій Аксьонов у незаконний спосіб проголосив себе головою Ради міністрів Автономної Республіки Крим та закликав Президента Російської Федерації "забезпечити мир і спокій в Криму". У відповідь на цей заклик Президент Російської Федерації, порушуючи як міжнародне право, так і чинну українсько-російську договірно-правову базу, звернувся до Ради Федерації Федеральних зборів Російської Федерації, яка своєю постановою від 1 березня 2014 року, протиправно легалізуючи ці порушення, надала згоду на використання на території України Збройних Сил Російської Федерації. Як наслідок, це призвело до збройного захоплення і воєнної окупації невід'ємної частини України - Автономної Республіки Крим та міста Севастополя.

Нелегітимно сформована в умовах російської воєнної окупації виконавча влада Автономної Республіки Крим 16 березня 2014 року провела псевдореферендум про входження Автономної Республіки Крим та міста Севастополя до складу Російської Федерації. Сумнівні результати "референдуму" не були визнані жодною країною світу, крім Російської Федерації. Це підтверджується Резолюцією Генеральної Асамблеї ООН 68/262 від 27 березня 2014 року "Територіальна цілісність України".

17 березня 2014 року Верховна Рада Автономної Республіки Крим, розпущена постановою Верховної Ради України, всупереч цьому проголосила Крим незалежною державою. 18 березня 2014 року самозвані представники Автономної Республіки Крим та міста Севастополя підписали з Президентом Російської Федерації Владіміром Путіним "Договір про прийняття до Російської Федерації Республіки Крим і створення у складі Російської Федерації нових суб'єктів". У такий протиправний спосіб відбулася незаконна і поспішна оборудка для того, щоб створити позірність правомірності збройного вторгнення Російської Федерації та незаконної анексії частини території України.

Друга фаза збройної агресії Російської Федерації проти України розпочалася у квітні 2014 року, коли контрольовані, керовані і фінансовані спецслужбами Російської Федерації озброєні бандитські формування проголосили створення "Донецької народної республіки" (7 квітня 2014 року) та "Луганської народної республіки" (27 квітня 2014 року).

Протягом травня 2014 року самозвані лідери "ДНР" та "ЛНР", серед яких було багато громадян Російської Федерації, у неконституційний спосіб провели фіктивні референдуми про відокремлення цих нелегітимних утворень від України. Під приводом і з метою їхньої підтримки на територію України були заслані розвідувально-диверсійні групи, які очолювали кадрові офіцери Головного розвідувального управління Генерального штабу Збройних Сил Російської Федерації, парамілітарні формування російського козацтва та укомплектований чеченцями - громадянами Російської Федерації батальйон "Восток", а також задіяні такі озброєні групи найманців як "Русский сектор" та "Оплот". За їхньої участі відбулося захоплення адміністративних будівель у багатьох населених пунктах Донецької та Луганської областей, здійснено збройні напади на частини українських Сухопутних військ та літаків Повітряних сил Збройних Сил України, а саме:

6 червня біля міста Слов'янська Донецької області був збитий літак Ан-30, який виконував спостережувальний політ, внаслідок чого п'ять членів екіпажу загинули;

14 червня терористи обстріляли із зенітної установки та великокаліберного кулемета військово-транспортний літак Іл-76 Повітряних Сил Збройних Сил України, який здійснював посадку в аеропорту "Луганськ". Внаслідок обстрілу загинуло 40 десантників та дев'ять членів екіпажу;

24 червня біля міста Слов'янська терористи збили український військовий вертоліт Мі-8, внаслідок чого загинули дев'ять військовослужбовців;

7 серпня внаслідок атаки терористів були збиті український вертоліт Мі-8 в районі Савур-Могили та винищувач МіГ-29 поблизу міста Єнакієве;

17 липня 2014 року поблизу міста Торез Донецької області російським зенітно-ракетним комплексом "Бук" було збито пасажирський літак Boeing 777 авіакомпанії "Малайзійські авіалінії", який здійснював переліт за рейсом Амстердам - Куала-Лумпур. Внаслідок катастрофи загинуло 283 пасажири і 15 членів екіпажу.

Іррегулярні збройні формування, задіяні Російською Федерацією у агресивній війні проти України, систематично підкріплювалися російськими найманцями з числа звільнених у запас військовослужбовців Збройних Сил Російської Федерації та постачанням зброї і військової техніки, включаючи танки, артилерійські системи, протитанкові засоби та сучасні зенітно-ракетні комплекси.

У липні 2014 року підрозділи Збройних Сил України почали зазнавати систематичних обстрілів, які велися з території Російської Федерації за допомогою артилерійських систем та реактивних систем залпового вогню "Град", а також нападів регулярних підрозділів Збройних Сил Російської Федерації. Це підтверджувалося численними затриманими військовослужбовцями Збройних Сил Російської Федерації.

Третя фаза збройної агресії Російської Федерації розпочалася 27 серпня 2014 року масовим вторгненням на територію Донецької та Луганської областей регулярних підрозділів Збройних Сил Російської Федерації, зокрема, військовослужбовців 9-ї окремої мотострілецької бригади, 76-ї та 98-ї дивізій повітряно-десантних військ Збройних Сил Російської Федерації. Задіяння регулярних Збройних Сил Російської Федерації у збройній агресії проти України супроводжувалося поширенням серед населення України агітаційних листівок, в яких, зокрема, був такий заклик: "За жодних обставин не чиніть перепон пересуванню російських військ (техніка та особовий склад)".

На засіданні Ради Безпеки ООН, яке відбулося 29 серпня у зв'язку з агресією Російської Федерації проти України, делегація України заявила: "Росія розпочала безпосереднє воєнне вторгнення на материкову частину України із застосуванням своїх регулярних збройних сил". Після надзвичайного засідання комісії Україна - НАТО, скликаного 29 серпня 2014 року на прохання України, Генеральний секретар НАТО А. Расмуссен кваліфікував вторгнення Збройних Сил Російської Федерації через східний і південно-східний українсько-російський державний кордон як "серйозну ескалацію збройної агресії Росії проти України".

Незважаючи на досягнення Мінських домовленостей (Мінський протокол від 5 вересня 2014 року, Мінський меморандум від 19 вересня 2014 року і Мінський "Комплекс заходів від 12 лютого 2015 року"), учасником яких є російська сторона і які спрямовані на припинення викликаного російською агресією збройного конфлікту, Російська Федерація з більшою або меншою інтенсивністю продовжує збройну агресію проти України. З моменту підписання 5 вересня 2014 року Мінського протоколу Збройні Сили Російської Федерації та іррегулярні підрозділи російських найманців захопили Донецький аеропорт, місто Дебальцеве та інші населені пункти, розширивши контрольовану ними територію України у Донецькій та Луганській областях більше ніж на 500 квадратних кілометрів. Постачання російських окупаційних сил відбувається, зокрема, за допомогою так званих "гуманітарних конвоїв", які регулярно скеровуються Російською Федерацією на територію України шляхом несанкціонованого перетину українсько-російського державного кордону всупереч чинному законодавству України та міжнародним правилам, встановленим Міжнародним Комітетом Червоного Хреста, що ставить під сумнів гуманітарний характер таких конвоїв. Під виглядом виконання Мінського "комплексу заходів" від 12 лютого 2015 року російська сторона здійснює перегрупування своїх збройних підрозділів, важких озброєнь, концентрацію їх на Артемівському, Волноваському, Донецькому, Маріупольському напрямках, а також постійно тримає біля українсько-російського кордону численне угруповання своїх регулярних Збройних Сил.

З огляду на це заяви російського керівництва про непричетність Російської Федерації до збройної агресії проти України є необґрунтованими і неспроможними. Силові дії Російської Федерації, що тривають з 20 лютого 2014 року, є актами збройної агресії відповідно до пунктів "a", "b", "c", "d" та "g" статті 3 Резолюції 3314 (XXIX) Генеральної Асамблеї ООН "Визначення агресії" від 14 грудня 1974 року.

Масштабна, тривала концентрація Збройних Сил Російської Федерації поблизу державного кордону України, прискорена мілітаризація Кримського півострова, регулярна навчання збройних сил поблизу кордонів України та на території Криму з проведенням бойових стрільб, розглядаються Україною як неприхована загроза силою, що суперечить Принципу 4 статті 2 Статуту ООН, зобов'язанню Російської Федерації відповідно до пункту 2 Меморандуму про гарантії безпеки у зв'язку з приєднанням України до Договору про нерозповсюдження ядерної зброї від 5 грудня 1994 року.

2. Вчинивши збройну агресію проти України, Російська Федерація грубо порушила свої зобов'язання, встановлені такими міжнародними актами:

Статут ООН, відповідно до якого держави-члени повинні розв'язувати будь-які спори мирними засобами та утримуватися у своїх міжнародних відносинах від погрози силою або її застосування (частини 3 і 4 статті 2);

Гельсінський Заключний акт Наради з безпеки та співробітництва в Європі, підписаний 1 серпня 1975 року, відповідно до якого її держави-учасниці визнають непорушними кордони всіх держав в Європі та утримуються від будь-яких дій, спрямованих на захоплення частини або всієї території будь-якої держави-учасниці (частина 1, розділ III);

Меморандум про гарантії безпеки у зв'язку з приєднанням України до Договору про нерозповсюдження ядерної зброї від 5 грудня 1994 року, який зафіксував зобов'язання Російської Федерації, Сполученого Королівства Великої Британії та Північної Ірландії і Сполучених Штатів Америки:

поважати незалежність і суверенітет та чинні кордони України;

утримуватися від погрози силою чи застосування сили проти територіальної цілісності чи політичної незалежності України;

ніколи не використовувати жодну їхню зброю проти України, крім цілей самооборони або в будь-який інший спосіб згідно зі Статутом Організації Об'єднаних Націй;

Договір про дружбу, співробітництво і партнерство між Україною і Російською Федерацією, ратифікований обома сторонами 14 січня 1998 року, згідно з яким Україна та Російська Федерація відповідно до положень Статуту ООН і зобов'язань за Заключним актом Наради з безпеки і співробітництва в Європі поважають територіальну цілісність одна одної і підтверджують непорушність кордонів, що існують між ними (стаття 2).

Російська Федерація здійснює збройну агресію проти України, супроводжуючи це цинічними і протиправними вимогами щодо зміни конституційного ладу України та відмови України від обраного цивілізаційного курсу, орієнтованого на співпрацю з ЄС та НАТО з перспективою повного членства в цих організаціях. Вперше такі вимоги, які є відвертим втручанням у внутрішні справи іншої держави, сформулював Міністр закордонних справ Російської Федерації Сергій Лавров 5 березня 2014 року під час переговорів у Лондоні з державним секретарем США Джоном Керрі, виклавши основні вимоги Російської Федерації, а саме:

відмова від підписання Україною Угоди про Асоціацію з ЄС;

відмова від вступу до НАТО;

відтермінування президентських виборів з 25 травня 2014 року;

розробка нової Конституції України;

федералізація України;

надання російській мові статусу другої державної мови.

Відтоді Російська Федерація у різний спосіб продовжує нав'язувати Україні такі вимоги.

3. Наслідком збройної агресії Російської Федерації проти України стала нелегітимна воєнна окупація і подальша незаконна анексія території Автономної Республіки Крим та міста Севастополя - невід'ємної складової державної території України, воєнна окупація значної частини державної території України у Донецькій та Луганській областях.

Загарбання українських територій супроводжується незаконним привласненням державного майна України в Автономній Республіці Крим та місті Севастополі, а також тотальним знищенням інфраструктури і промислових підприємств у Донецькій та Луганській областях.

Зокрема, Україні була заподіяна матеріальна шкода внаслідок "націоналізації" Російською Федерацією землі, державних та приватних об'єктів нерухомості, приватних підприємств, портів та рекреаційних об'єктів, що знаходяться на території Автономної Республіки Крим та міста Севастополя. Після акту незаконної анексії Російська Федерація незаконно користується корисними копалинами та континентальним шельфом, споживає воду та електричну енергію на анексованій території, що завдає Україні матеріальних збитків. Шкода, яку заподіяла Російська Федерація внаслідок незаконної анексії та агресії, полягає також у не отриманих Україною та українськими підприємствами прибутках. Внаслідок незаконної націоналізації майна в Автономній Республіці Крим та місті Севастополі, а також незаконної конфіскації і знищення майна в Донецькій та Луганській областях терористичними угрупованнями, які підтримуються Російською Федерацією, зменшилися надходження до державного бюджету України, відбулося відчутне скорочення інвестиційних надходжень та зменшення обсягів іноземного кредитування українських підприємств.

Російська Федерація своїми протиправними діями заподіяла також нематеріальної шкоди Україні, порушуючи права громадян України в Автономній Республіці Крим та місті Севастополя, в Донецькій та Луганській областях, зокрема: право на життя, на повагу до честі і гідності, заборону катування, перебування в рабстві або підневільному стані, право на свободу і особисту недоторканність, право на справедливий суд, право не бути покараним без суду, право на повагу до приватного і сімейного життя, право на свободу думки, совісті і релігії.

Жертвами збройної агресії Російської Федерації стало мирне населення, зокрема жінки та діти. Відповідно до даних ООН внаслідок збройної агресії Російської Федерації було вбито 65 дітей, а 159 отримали поранення.

Під час збройної агресії Російської Федерації проти України були вчинені численні воєнні злочини та злочини проти людяності. Зокрема, 13 січня 2015 року контрольовані Російською Федерацією озброєні формування найманців неподалік міста Волновахи розстріляли автобус з мирними жителями. За повідомленнями авторитетних правозахисних організацій, засобів масової інформації та численних свідчень очевидців, особовий склад створених і контрольованих Російською Федерацією озброєних формувань найманців, спецназу та підрозділів регулярних частин її Збройних Сил під час російської збройної агресії проти України чинив такі злочини: навмисні вбивства, тортури та нелюдське поводження; навмисне заподіяння сильних страждань та серйозних тілесних ушкоджень і шкоди здоров'ю; незаконне, безпідставне та великомасштабне знищення та привласнення майна, не викликане воєнною необхідністю; навмисне позбавлення військовополоненого чи іншої особи, що знаходиться під захистом, права на справедливий суд; захоплення заручників; умисний напад на цивільне населення чи окремих цивільних осіб, які не беруть безпосередньої участі у воєнних діях; умисні напади на цивільні об'єкти, тобто об'єкти, які не є воєнними цілями; неналежне використання прапора парламентерів, прапора чи воєнних знаків розрізнення та форми противника або ООН, а також емблем, встановлених Женевськими Конвенціями, що спричинило смерть чи заподіяло шкоду людині; зазіхання на людську гідність, зокрема образливе та принизливе ставлення. Зазначені і подібні злочини відповідно до статті 8 Римського статуту Міжнародного кримінального суду кваліфікуються як воєнні злочини і мають наслідком міжнародну кримінальну відповідальність осіб, причетних до їх скоєння.

Поряд з цим повідомлялося, що в окупованому Криму та на Сході України мали місце такі злочини: ув'язнення, викрадення або інше жорстоке позбавлення фізичної свободи та порушення основоположних норм міжнародного права, насильне переміщення населення,

переслідування будь-якої ідентифікованої групи чи спільноти з політичних, расових, етнічних, культурних, релігійних чи інших мотивів, несумісних з міжнародним правом. Зазначені і подібні злочини відповідно до статті 7 Римського статуту кваліфікуються як злочини проти людяності і також мають наслідком міжнародну кримінальну відповідальність осіб, незалежно від того, скоїли вони їх під час війни чи у мирний час.

Грубі та масові порушення прав людини, спричинені збройною агресією Російської Федерації, перетворили сотні тисяч українських громадян на біженців, серед яких більш як 60 відсотків з-понад одного мільйона людей становлять жінки та діти.

4. Відповідно до норм міжнародного права, зокрема пункту 4 статті 2 Статуту Організації Об'єднаних Націй, розділу I Декларації про принципи міжнародного права, що стосуються дружніх відносин і співробітництва між державами відповідно до Статуту Організації Об'єднаних Націй, ухваленій 24 жовтня 1970 року Резолюцією Генеральної Асамблеї ООН 2625 (XXV), статті 5 Резолюції 3314 (XXIX) від 14 грудня 1974 року "Визначення агресії", статей 5, 6, 7, 8 та 8-біс Статуту Міжнародного кримінального суду, збройна агресія Російської Федерації проти України є тяжким міжнародним злочином і його скоєння має наслідком міжнародно-правову відповідальність.

Україна як держава, яка безпосередньо постраждала від збройної агресії, має право на повернення всіх анексованих і окупованих всіх українських територій, відшкодування всієї заподіяної їй шкоди та притягнення осіб, винних у здійсненні збройної агресії та скоєнні воєнних злочинів і злочинів проти людяності, до кримінальної відповідальності.

I фактично, і юридично збройна агресія Російської Федерації проти України триватиме до повного відведення з території України всіх підрозділів Збройних Сил Російської Федерації, включно з підтримуваними нею найманцями, та повного відновлення територіальної цілісності України.

Верховна Рада України, діючи як представницький орган Українського народу, який є єдиним джерелом влади в Україні та має виключне право визначати і змінювати конституційний лад України:

засуджує відмову Російської Федерації припинити акти застосування збройної сили та погрози застосування сили проти України;

підтримує рішучість Президента України, Уряду України, Збройних Сил України та добровольчих збройних формувань України продовжувати спротив збройній агресії Російської Федерації;

відкидає як несумісні з Конституцією України і міжнародним правом будь-які вимоги Російської Федерації, спрямовані на втручання в внутрішні справи України, зокрема вимоги щодо федералізації України, зміни статусу української мови як єдиної державної мови та відмови України від свободи вибору курсу свого цивілізаційного розвитку;

вимагає від Російської Федерації:

1) невідкладно звільнити усіх військовополонених, заручників та незаконно утримуваних громадян України;

2) терміново вивести з території України всі військові формування Збройних Сил Російської Федерації та припинити будь-яку підтримку терористичних організацій на Сході України;

3) безумовно виконувати Мінські домовленості щодо відновлення повного контролю над державним кордоном з боку Уряду України, а також стосовно забезпечення постійного моніторингу на українсько-російському державному кордоні та верифікації з боку ОБСЄ зі створенням зони безпеки у прикордонних районах України і Російської Федерації; забезпечити дотримання режиму державного кордону на всій лінії українсько-російського державного кордону;

4) негайно повернути анексовані території Автономної Республіки Крим та міста Севастополя під контроль України;

5) повністю відшкодувати всю заподіяну збройною агресією шкоду в обсязі, визначеному у підготовленій Кабінетом Міністрів України консолідованій претензії України до Російської Федерації;

6) негайно припинити незаконне (без згоди України) переміщення з території Російської Федерації через державний кордон України вантажів під приводом надання "гуманітарної допомоги" населенню окремих районів Донецької і Луганської областей України;

7) відвести від українсько-російського кордону Збройні Сили Російської Федерації;

8) притягнути до кримінальної відповідальності та покарати осіб, винних у плануванні, підготовці, початку та здійсненні агресії проти України та скоєнні воєнних злочинів і злочинів проти людяності. У разі відмови Російської Федерації покарати винних Україна залишає за собою право звернутися, відповідно до Постанови Верховної Ради України від 4 лютого 2015 року № 145-VIII "Про Заяву Верховної Ради України "Про визнання Україною юрисдикції Міжнародного кримінального суду щодо скоєння злочинів проти людяності та воєнних злочинів вищими посадовими особами Російської Федерації та керівниками терористичних організацій "ДНР" та "ЛНР", які призвели до особливо тяжких наслідків та масового вбивства українських громадян", до Міжнародного кримінального суду з клопотанням розпочати розслідування ситуації, яка була викликана збройною агресією Російської Федерації проти України і триває з 20 лютого 2014 року;

висловлює вдячність Українському народу та всій волонтерській спільноті за безкорисливу, щиру та ефективну підтримку Збройних Сил України та збройних добровольчих формувань України;

заявляє про своє прагнення до остаточного мирного врегулювання за столом переговорів відповідно до міжнародного права всіх спричинених збройною агресією Російської Федерації наслідків;

вітатиме розгортання на території України міжнародної операції з підтримання миру та безпеки.

У разі відмови Російської Федерації від припинення збройної агресії проти України Верховна Рада України закликає міжнародне співтовариство до посилення санкцій щодо Російської Федерації як держави-агресора та прискорення надання Україні розширеної фінансової допомоги і постачання зброї з огляду на те, що, протидіючи російській збройній агресії, Україна стала на захист об'єднаної демократичної Європи та всього вільного світу.

Публікації документа

- **Голос України** від 29.04.2015 — № 77
- **Офіційний вісник України** від 08.05.2015 — 2015 р., № 34, стор. 51, стаття 1003, код акта 76644/2015
- **Відомості Верховної Ради України** від 29.05.2015 — 2015 р., № 22, стор. 1219, стаття 153



[*Free translation from Ukrainian*]

p. 1

[*coat of arms of Ukraine*]

# RESOLUTION

## of the Verkhovna Rada of Ukraine

**On the Statement of the Verkhovna Rada of Ukraine "On Repelling the Armed Aggression of the Russian Federation and Overcoming Its Consequences"**

**(Bulletin of the Verkhovna Rada (BVR), 2015, N°22, p.153)**

The Verkhovna Rada of Ukraine **enacts**:

1. To approve the text of the Statement of the Verkhovna Rada of Ukraine "On Repelling the Armed Aggression of the Russian Federation and Overcoming Its Consequences" (attached).

2. The Resolution enters into force on the day of its enactment.

**Head of the Verkhovna Rada of Ukraine**                    **V. GROISMAN**

**Kyiv**
**April 21, 2015**
**N° 337-VIII**

p. 2

## STATEMENT
## OF THE VERKHOVNA RADA OF UKRAINE

### "On Repelling the Armed Aggression of the Russian Federation and Overcoming Its Consequences"

Confirming the Resolution of the Verkhovna Rada of Ukraine of January 27, 2015 No.129-VIII, by which the Russian Federation was recognized the state-aggressor, the Verkhovna Rada of Ukraine acknowledges the following.

1.      The armed aggression of the Russian Federation against Ukraine started on 20 February 2014, when the first cases of violation of the rules of crossing the state border of Ukraine near the Kerch Strait by the Armed Forces of the Russian Federation against its international obligations and deployment of its military forces dislocated in Crimea, pursuant to the Agreement between Ukraine and the Russian Federation on the status and conditions of presence of the Black Sea Fleet of the Russian Federation on the territory of Ukraine of May 28, 1997, for the blockage of Ukrainian military facilities were observed. On the initial stage of the aggression, the contingent of several Russian military units did not have any distinguishing marks.

On February 27, 2014, military special purpose units of the Main Intelligence Directorate of the General Staff of the Armed Forces of the Russian Federation captured the buildings of the Council of Ministers and High Council of the Autonomous Republic of Crimea. At the same time, creation and armament of irregular military units of mercenaries from local citizens, commanded by officers of the intelligence services and Armed Forces of the Russian Federation, took place, and the Black Sea Fleet of the Russian Federation blocked Ukrainian ports where the ships of Ukrainian Navy were located. In this context, the leader of the party "Russian Unity" Sergiy Aksionov illegally proclaimed himself Head of the Council of Ministers of the Autonomous Republic of Crimea and urged the President of the Russian Federation "to ensure peace and calm in Crimea". In response to this call, the President of the Russian Federation in violation of international law and agreements between Ukraine and Russia in force, addressed the Federation Council of the Federal Assembly of the Russian Federation, which by its resolution dated March 1, 2014, illegally validating these violations, gave its consent to deployment of the Armed Forces of the Russian Federation on the territory of

Ukraine. In consequence, it resulted in armed seizure and military occupation of an integral part of Ukraine – the Autonomous Republic of Crimea and the city of Sevastopol.

On March 16, 2014, the executive authority of the Autonomous Republic of Crimea, which was illegally formed under Russian military occupation, conducted a so-called referendum on integration of the Autonomous Republic of Crimea and the city of Sevastopol into the Russian Federation. Doubtful results of the "referendum" have not been recognized by any country in the world other than the Russian Federation. It is confirmed by the Resolution of the UN General Assembly 68/262 dated March 27, 2014 "Territorial Integrity of Ukraine".

On March 17, 2014, the High Council of the Autonomous Republic of Crimea, despite its dissolution by the Resolution of the Verkhovna Rada of Ukraine, proclaimed the independency of Crimea. On March 18, 2014, self-proclaimed representatives of the Autonomous Republic of Crimea and the city of Sevastopol signed with the President of the Russian Federation Vladimir Putin the "Agreement on Acceptance of the Republic of Crimea into the Russian Federation and Creation of New Subjects in the Structure of the Russian Federation". In such a way was implemented a quick illegal dealing in order to create an image of legality of the armed intrusion of the Russian Federation and illegal annexation of the part of Ukrainian territory.

The second phase of the armed aggression of the Russian Federation against Ukraine launched in April 2014, when controlled, managed, and financed by the intelligence services of the Russian Federation armed troops proclaimed creation of the "Donetsk People's Republic" (on April 7, 2014) and "Lugansk People's Republic" (April 27, 2014).

During May 2014, self-proclaimed leaders of "DPR" and "LPR", between whom there were many citizens of the Russian Federation, conducted fictitious referendums in unconstitutional way on separation of these illegitimate formations from Ukraine. With the excuse and goal of their support, reconnaissance and sabotage groups lead by officers of the Main Intelligence Directorate of the General Staff of the Armed Forces of the Russian Federation, paramilitary units of Russian Cossacks, a battalion "East" comprised of Chechens - nationals of the Russian Federation were sent on the territory of Ukraine, and armed groups of mercenaries such as "Russian Sector" and "Oplot" were deployed. With their participation, seizure of administrative buildings in many communities of Donetsk and Lugansk regions, attacks on Land Forces units and Air Forces airplanes were conducted, precisely:

On June 6, near Slovyansk in Donetsk Region an airplane An-30 conducting an observing flight was shot down, and as a result five crew members died;

On June 14, terrorists fired an anti-aircraft gun and a large-caliber machine gun at a military transport aircraft Il-76 of the Air Forces of Ukrainian Armed Forces, which was landing in "Lugansk" airport. The firing caused the death of 40 paratroopers and nine crew members;

On June 24, terrorists shot down Ukrainian military helicopter Mi-8 near Slovyansk, and as a result 9 soldiers died;

On August 7, as a result of a terrorist attack, Ukrainian helicopter Mi-8 was shot down near Savur-Mogyla, and a fighter aircraft MiG-29 was shot down near Enakievo;

p. 3

On July 17, 2014, a passenger aircraft Boeing-777 of "Malaysia Airlines", performing a flight Amsterdam – Kuala-Lumpur, was shot down near Torez of Donetsk region by Russian anti-aircraft missile system "Bouk". This catastrophe provoked death of 283 passengers and 15 crew members.

The irregular military units deployed by the Russian Federation in the aggressive war against Ukraine were systematically reinforced by Russian mercenaries comprised of reserve servicemen of the Armed Forces of the Russian Federation and supply of weapons and military equipment, including tanks, artillery systems, anti-tank weapons and modern anti-aircraft missile systems.

In July 2014, subdivisions of the Armed Forces of Ukraine started to experience systematic artillery attacks coming from the territory of the Russian Federation by artillery systems and multiple-launch rocket systems "Grad" and also attacks by regular divisions of the Armed Forces of the Russian Federation. It was evidenced by numerous detained servicemen of the Armed Forced of the Russian Federation.

The third phase of the armed aggression of the Russian Federation started on August 27, 2014 by massive intrusion on the territory of Donetsk and Lugansk regions of regular subdivisions of the Armed Forces of the Russian Federation, namely the servicemen of 9th separate motorized rifle brigade, 76th and 98th divisions of the Airborne Forces of the Armed Forces of the Russian Federation. The deployment of the regular Armed Forces of the Russian Federation in the armed aggression against Ukraine was accompanied by a spread of propaganda leaflets amongst the population of Ukraine, containing, among other things, the

following message: "Under no circumstances you shall obstruct the movement of Russian troops (equipment and manpower)".

During the session of the UN Security Council, which took place on August 29 due to the aggression of the Russian Federation against Ukraine, Ukrainian delegation stated that: "Russia began the direct intrusion on Ukrainian mainland deploying its regular armed forces". After the emergency meeting of the Commission Ukraine – OTAN, that was called at the request of Ukraine on August 29, 2014, the Secretary General of OTAN A. Rasmussen qualified the intrusion of the Armed Forced of the Russian Federation through the east and south-east state border between Ukraine and Russia as a "serious escalation of the armed aggression of Russia against Ukraine".

Despite the conclusion of Minsk agreements (Minsk Protocol of September 5, 2014, Minsk Memorandum of September 19, 2014 and Minsk "Complex of Measures of February 15, 2015"), to which Russian side is a party, and which are directed towards cessation of the armed conflict provoked by the Russian aggression, the Russian Federation continues with more or less intensity the armed aggression against Ukraine. Since the signature of Minsk Protocol on September 5, 2014, the Armed Forces of the Russian Federation and irregular subdivisions of Russian mercenaries seized Donetsk airport, Debaltseve, and other localities expanding Ukrainian territory under their control in Donetsk and Lugansk regions for more than $500km^2$. Provision of Russian occupation forces takes places namely through so-called "humanitarian convoys", which are regularly directed by the Russian Federation on the territory of Ukraine by an unsanctioned passage of Ukraine-Russia state border against the legislation of Ukraine in force and international rules adopted by the International Red Cross Committee, putting a doubt on humanitarian nature of such convoys. Under the guise of implementation of Minsk "complex of measures" of February 12, 2015, Russian side performs rearrangement of its armed subdivisions and heavy equipment, their concentration on Artemivsk, Volnovakha, Donetsk and Mariupol directions, and also constantly keeps a massive alignment of its regular Armed Forces near Ukraine-Russia border.

Considering this, the statements of Russian authorities as to noninvolvement of the Russian Federation in the armed aggression against Ukraine are not justified and worthless. The use of force by the Russian Federation since February 20, 2014, represents the acts of the armed aggression in accordance with paragraphs "a", "b", "c", "d", and "g" of article 3 of the Resolution 3314 (XXIX) of the UN General Assembly "Definition of Aggression" of February 14, 1974.

The massive ongoing concentration of the Armed Forces of the Russian Federation near Ukrainian state border, accelerated militarization of the Crimea peninsula, regular trainings of the armed forces near Ukrainian border and on the territory of Crimea accompanied by battlefield gunnery are considered by Ukraine as an outright threat of force, which violates Principle 4 of article 2 of the UN Charter and the Russian Federation's obligations in accordance with clause 2 of the Memorandum on Security Assurances in Connection with Ukraine's Accession to the Treaty on the Non-Proliferation of Nuclear Weapons of December 5, 1994.

. . .

p. 7

Publication of the document:

- Voice of Ukraine of 29.04.2015 – No. 77
- Official Bulletin of Ukraine of 08.05.2015 – 2015, No. 34, p. 51, art. 1003, code of the act 76644/2015
- Bulletin of the Verkhovna Rada of Ukraine of 29.05.2015 – 2015, No. 22, p. 1219, art. 153

[*QR code*]



## *Указ*
## *Президента України*

### Про рішення Ради національної безпеки і оборони України від 13 квітня 2014 року "Про невідкладні заходи щодо подолання терористичної загрози і збереження територіальної цілісності України"

Відповідно до статей 107 та 112 Конституції України **п о с т а н о в л я ю**:

1. Увести в дію рішення Ради національної безпеки і оборони України від 13 квітня 2014 року "Про невідкладні заходи щодо подолання терористичної загрози і збереження територіальної цілісності України" (додається, таємно).

2. Контроль за виконанням рішення Ради національної безпеки і оборони України, введеного в дію цим Указом, покласти на Секретаря Ради національної безпеки і оборони України.

3. Цей Указ набирає чинності з дня його опублікування.

**Виконуючий обов'язки
Президента України,
Голова Верховної Ради
України**                                                                      **О.ТУРЧИНОВ**

**м. Київ
14 квітня 2014 року
№ 405/2014**

Публікації документа

- **Офіційний вісник Президента України** від 14.04.2014 — 2014 р., N° 14, стор. 3, стаття 745



[*Free translation from Ukrainian*]

p. 1

[*coat of arms of Ukraine*]

## *Decree*

## *of the President of Ukraine*

# On the Decision of the National Security and Defense Council of Ukraine of 13 April 2014 "On Urgent Measures to Overcome the Terrorist Threat and Preserving the Territorial Integrity of Ukraine"

Pursuant to articles 107 and 112 of the Constitution of Ukraine I decree:

1. To bring into force the decision of the National Security and Defense Council of Ukraine of April 13, 2014 "On urgent measures to overcome a terrorist threat and preserve the territorial integrity of Ukraine" (attached, confidential).
2. The control over implementation of the decision of the National Security and Defense Council of Ukraine brought into force by the present Decree shall be conducted by the Secretary of the National Security and Defense Council of Ukraine.
3. This Decree enters into force on the day of its publication.

**Acting President of Ukraine,
Head of the Verkhovna Rada of
Ukraine**                                    **O. TURCHINOV**

**Kyiv
April 14, 2014
No. 405/2014**

Publication of the document

- Official Bulletin of the President of Ukraine of 14.04.2014 – 2014 p., No.14, p. 3, article 745

[*QR code*]

Official translation
Last modification: 26.05.21 11:14:40



# LAW OF UKRAINE

## On Temporary Measures for the Anti-Terrorist Operation Period

**(The Official Bulletin of the Verkhovna Rada of Ukraine (BVR), 2014, No. 44, Article 2040)**

{As amended by Laws
No. 189-VIII of 12 February 2015, BVR, 2015, No. 16, Article 112
No. 222-VIII of 2 March 2015, BVR, 2015, No. 23, Article 158
No. 911-VIII of 24 December 2015, BVR, 2016, No. 5, Article 50
No. 922-VIII of 25 December 2015, BVR, 2016, No. 9, Article 89
No. 1114-VIII of 19 April 2016, BVR, 2016, No. 22, Article 452
No. 1365-VIII of 17 May 2016, BVR, 2016, No. 25, Article 500
No. 1731-VIII of 3 November 2016, BVR, 2016, No. 51, Article 840
No. 1774-VIII of 6 December 2016, BVR, 2017, No. 2, Article 25
No. 1986-VIII of 23 March 2017, BVR, 2017, No. 18, Article 223
No. 2266-VIII of 21 December 2017, BVR, 2018, No. 14, Article 77
No. 2473-VIII of 21 July 2018, BVR, 2018, No. 30, Article 239
No. 371-IX of 12 December 2019, BVR, 2020, No. 14, Article 84}

This Law defines temporary measures to provide support to business entities performing activity on the territory of the anti-terrorist operation and people who are living in the area of the anti-terrorist operation or moved from it during its implementation.

**Article 1.** Definitions

The period of the anti-terrorist operation is the time between the date of entry into force of the Decree of the President of Ukraine "On the Decision of the National Security and Defense Council of Ukraine of 13 April 2014 "On Urgent Measures to Overcome the Terrorist Threat and Preserve the Territorial Integrity of Ukraine" dated 14 April 2014 No. 405/2014 and the date of enactment of the Decree of the President of Ukraine on the completion of the anti-terrorist operation or military actions within the territory of Ukraine.

The territory of the anti-terrorist operation in the territory of Ukraine, where settlements defined in the list approved by the Cabinet of Ministers of Ukraine are located and where the anti-terrorist operation was conducted, which was initiated under the Decree of the President of Ukraine "On the Decision of National Security and Defense Council of Ukraine of 13 April 2014 "On Urgent Measures to Overcome the Terrorist Threat and Preserve the Territorial Integrity of Ukraine" dated 14 April 2014 No. 405/2014.

**Article 2.** The moratorium on the fulfilment of contractual obligations and the accrual of penalties and fines on the principal amount of debt under the credit and other contractual obligations

*{Title of Article 2 as revised by Law No. 1731-VIII of 3 November 2016}*

For the duration of the anti-terrorist operation, it is prohibited to charge the citizens of Ukraine who are registered and permanently reside in or resettled in the period starting from 14 April 2014 from localities defined in the list approved by the Cabinet of Ministers of Ukraine where the anti-terrorist operation was conducted, penalties and/or fines on the principal amount of debt under credit agreements and loan agreements dated from 14 April 2014. The same shall apply to legal entities and individual entrepreneurs who conduct (conducted) their economic activities within the territory of localities defined in the list approved by the Cabinet of Ministers of Ukraine where the anti-terrorist operation was conducted.

Banks and other financial institutions, as well as creditors, are obliged to cancel the penalties and/or fines accrued on the principal amount of debt under credit agreements and loan agreements during the period of the anti-terrorist operation for persons specified in this Article.

Provisions of parts one and two of this Article shall not apply to the accrual of penalties and/or fines on the principal amount of debt under credit agreements and loan agreements concluded with legal entities and individual entrepreneurs located within the territory of anti-terrorist operation, except for localities from the lists provided for in part four of Article 4 of this Law, if such agreements are concluded after 1 January 2018 or to which, by agreement of the parties, changes were made after 1 January 2018 to extend the term for the fulfilment of obligations and/or reduce the amount of interest or punitive sanctions.

*{Article 2 has been supplemented with a new part under Law No. 2266-VIII of 21 December 2017}*

For temporarily displaced higher education institutions and temporarily displaced scientific institutions to fulfil credit and other contractual obligations (except for agreements on the provision of educational services) that arose before moving to the territory controlled by the Ukrainian authorities in connection with the anti-terrorist operation, a moratorium is introduced for the period of the anti-terrorist operation.

*{Article 2 has been supplemented with under Law No. 1731-VIII of 3 November 2016}*

For the duration of the anti-terrorist operation, it is prohibited to charge penalties and/or fines on the principal amount of debt owed by temporarily displaced higher education institutions and temporarily displaced scientific institutions under credit and other agreements (except for agreements on the provision of educational services) that have not ceased, starting from the date of publication of the order to change their location by the central executive authority in the field of education and science.

*{Article 2 has been supplemented with under Law No. 1731-VIII of 3 November 2016}*

A temporarily displaced higher educational institution or a temporarily displaced scientific institution shall not be liable for the obligations undertaken on their behalf in the territory where the state authorities temporarily do not exercise their powers, from the date of publication of the order to change their location by the central executive authority in the field of education and science.

*{Article 2 has been supplemented with under Law No. 1731-VIII of 3 November 2016}*

**Article 3.** Moratorium on inspections by bodies and officials authorised by law to bring about state supervision (control) in the field of economic activity.

Bodies and officials authorised by law to bring about state supervision (control) in the field of economic activity during the period and within the territory of the anti-terrorist operation are temporally prohibited from conducting scheduled and unscheduled inspections of business entities performing activity within the territory of the anti-terrorist operation, except for unscheduled inspections of business entities, which are classified as high-risk business entities according to the criteria approved by the Cabinet of Ministers of Ukraine for assessing the level of risk arising from economic activity.

**Article 4.** The peculiarities of state registration of legal entities and individual entrepreneurs.

For persons who have registered and moved from the territory of the anti-terrorist operation during the period of its execution, the registration of an individual entrepreneur shall be carried out by state registrars at the address of temporary residence without the requirement for state registrars of registration services of territorial bodies of the Ministry of Justice of Ukraine in oblasts and Kyiv city to have a place of residence at the place of registration.

*{Part 1 of Article 4 as amended by Law No. 1365-VIII of 17 May 2016}*

Establish that registration related to changing the location of legal entities and place of residence of individual entrepreneurs, whose location/place of residence is the territory of the anti-terrorist operation, shall be applied to legal entities and individual entrepreneurs by state registrars of registration services of territorial bodies of the Ministry of Justice of Ukraine in oblasts and Kyiv city.

During the period of the anti-terrorist operation, it is prohibited to carry out registration related to changing the composition of founders (participants) and directors of legal entities located in settlements where state authorities temporarily do not exercise their powers and in settlements located on the contact line.

*{Part 3 of Article 4 as revised by Law No. 1365-VIII of 17 May 2016}*

The list of settlements where state authorities temporarily do not exercise their powers and the list of settlements located on the contact line shall be approved by the Cabinet of Ministers of Ukraine that ensures their timely updates.

*{Article 4 has been supplemented with Part 4 under Law No. 1365-VIII of 17 May 2016}*

During the anti-terrorist operation in settlements located on the contact line where state authorities exercise their powers, registration related to changing the composition of founders (participants) and directors may be carried out for legal entities under public law and registration related to changing the composition of founders (participants) and directors may be carried out for legal entities under private law given that paperback documents were submitted personally by founders (participants) and the director of such legal entity under private law.

*{Article 4 has been supplemented with Part 5 under Law No. 1365-VIII of 17 May 2016}*

The peculiarities of the dissolution of legal entities located within the territory of the anti-terrorist operation shall be determined by the Cabinet of Ministers of Ukraine and shall be effective until its termination.

*{Article 4 has been supplemented with Part 6 under Law No. 1774-VIII of 6 December 2016}*

**Article 5.** Validity of permit documents

Licences and permit documents issued to business entities operating in the territory of the anti-terrorist operation, which expired during the period of its execution, shall be considered to have extended their effect for the time of anti-terrorist operation.

**Article 5[1].** Peculiarities of the activity of displaced higher education institutions

Temporarily displaced higher education institutions and temporarily displaced scientific institutions shall operate in settlements in the territory controlled by Ukrainian authorities. The location of temporarily displaced education institutions and temporarily displaced scientific institutions shall be determined by their founder(s) in consideration of training programs for students of such higher education institutions and regional needs.

Temporarily displaced higher education institutions and temporarily displaced scientific institutions have the right to use the property conveyed to them based on the economic management right for participation in civil relations, including for conducting financial and economic activities, according to the purposes of their conclusion and within the limits of their civil legal capacity. The scope of powers to manage property that has been conveyed to the economic management of temporarily displaced higher education institutions and temporarily displaced scientific institutions may be expanded in comparison with the rights temporarily granted by this Law and other regulatory acts until the time when the temporarily occupied territory returns under the general jurisdiction of Ukraine or until the date of enactment of the Decree of the President of Ukraine on the completion of

the anti-terrorist operation or military operations within the territory of Ukraine. This provision does not apply to the powers to alienate property classified as key assets by temporarily displaced higher education institutions or temporarily displaced scientific institutions.

Temporarily displaced higher education institution, temporarily displaced scientific institution, as well as their employees, are not responsible for the condition of property located within the temporarily occupied territory or in settlements within the territory where state authorities temporarily do not exercise their powers, from the first day of the temporary occupation or from the announcement day of the anti-terrorist operation until the day when such a higher educational institution or scientific institution returns to its previous location, but no later than six months from the date of the temporarily occupied territory's return under the general jurisdiction of Ukraine or the date of enactment of the Decree of the President of Ukraine on the completion of the anti-terrorist operation or military operations within the territory of Ukraine, except in cases when property shortage, loss, or damage are caused through their fault which is proved according to the procedure established by law.

The state contributes to the restoration of the facilities and resources of temporarily displaced higher education institutions and temporarily displaced scientific institutions.

The founder(s) of temporarily displaced higher education institutions and temporarily displaced scientific institutions in state and municipal ownership contribute to the provision of premises located in their management sphere for the organisation of the educational process and/or accommodation of students and employees of such higher education institutions and establishments.

Employees of temporarily displaced higher education institutions and temporarily displaced scientific institutions who did not start performing their duties at the new location of the higher education institution or scientific institution within two months from the date of publication of the order on the temporary relocation of a higher education institution and scientific institution of the central executive authority in the field of education and science, are considered to have refused to transfer to a job in another area, with the application of the consequences provided for in clause 6, part 1, Article 36 of the Labour Code of Ukraine.

Temporarily displaced higher education institutions and temporarily displaced scientific institutions whose archival documents have remained in the temporarily occupied territory or in settlements where state authorities temporarily do not exercise their powers are allowed to issue certificates confirming work experience and information about training periods based on diplomas, identification documents, certificates, letters of confirmation and other documents that may bear evidence to the existence of such relations.

*{The Law has been supplemented with Article 5$^1$ under Law No. 1731-VIII of 3 November 2016}*

**Article 6.** Exemption from payment for using land plots in state and municipal ownership

Exempt business entities from the payment for using land plots that are in state and municipal ownership in the settlements according to the lists provided by part 4 of Article 4 of this Law.

*{The text of Article 6 as amended by Law No. 1365-VIII of 17 May 2016}*

**Article 7.** Cancelling rental charges for using state and municipal ownership and concessive payment for the right to create (build) and/or control (use) the state and municipal property

Cancel the rental charges for using state and municipal property and concessive payment for the right to create (build) and/or control (use) the state and municipal property by business entities situated in the settlements according to lists provided by part 4 of Article 4 of this Law.

*{The text of Article 7 as amended by Law No. 1365-VIII of 17 May 2016; Article 7 as amended by Law No. 1986-VIII of 23 March 2017}*

**Article 8.** Moratorium on penalties for late payment for housing and utility services

Cancel the penalty for late payment for housing and utility services (water supply, gas, electricity, heating, water disposal, upkeep and maintenance of housing and surrounding grounds, garbage collection, elevators), charged from Ukrainian citizens living in the settlements, defined in the lists approved by the Cabinet Ministers of Ukraine, where the anti-terrorist operation was conducted, which started following the Decree of the President of Ukraine "On the Decision of the National Security and Defense Council of Ukraine of 13 April 2014 "On Urgent Measures to Overcome the Terrorist Threat and Preserve the Territorial Integrity of Ukraine" dated 14 April 2014 No. 405/2014, from 14 April 2014 and until the end of the anti-terrorist operation. Funds charged from the citizens of Ukraine as the penalty for late payment for housing and utility services in the period from 14 April 2014 and until the end of the anti-terrorist operation will be set off against future payments for housing and utility services.

**Article 9.** Measures to preserve mortgaged property

During the term of this Law, in relation to mortgaged immovable property located within the territory of the anti-terrorist operation, owned by citizens of Ukraine (including individual entrepreneurs) or legal entities – small and medium-sized businesses, the effect of Article 37 (regarding the implementation of the mortgagee's right to acquire ownership of the mortgage subject), Article 38 (regarding the implementation of the mortgagee's right to sell the object), Article 40 (regarding the eviction of residents from residential buildings and premises transferred to the mortgage, for which there is a court decision on foreclosure on such objects), Articles 41, 43–47 (regarding the sale of the mortgaged object at public auction) of the Law of Ukraine "On mortgage" shall be suspended.

Provisions of the first part of this article, except for the suspension of Article 40 (regarding the eviction of residents from residential buildings and premises transferred to the mortgage, for which there is a court decision on foreclosure on such objects) of the Law of Ukraine "On mortgage", shall not apply to real estate of individual entrepreneurs, legal entities – small and medium-sized businesses, located within the territory of the anti-terrorist operation, except for settlements in the lists provided for in part four of Article 4 of this Law, mortgaged to ensure the fulfilment of obligations under

agreements concluded after 1 January 2018 or agreements to which, after 1 January 2018, by agreement of the parties, changes were made in terms of extending the deadlines for fulfilling obligations and/or reducing the amount of interest, penalties.

*{Article 9 has been supplemented with part two under Law No. 2266-VIII of 21 December 2016}*

**Article 9[1].** Ensuring the exercise of the right to inherit

If the last place of residence of the testator is located within the settlement where the state authorities temporarily do not exercise or do not fully exercise their powers, as approved by the decision of the Cabinet of Ministers of Ukraine, the place of inheritance opening shall be the place where the first application was filed, which indicates the expression of the will towards the inherited property, heirs, executors of the will, persons interested in the protection of the inherited property or creditors' claims.

If the place of residence of the testator is unknown, and the real estate or the principal part thereof, in the absence of real estate – the principal part of the movable property – is located in the territory provided for in part one of this Article, the place of opening of the inheritance shall be the place where the first application was filed, which indicates the expression of the will towards the inherited property, heirs, executors of the will, persons interested in the protection of the inherited property or creditors' claims.

An inheritance case is subject to registration in the Inheritance Register according to the procedure approved by the Cabinet of Ministers of Ukraine.

*{The Law has been supplemented with Article 9[1] under Law No. 189-VIII of 12 February 2015}*

**Article 9[2].** Ensuring the exercise of the right to education

The State shall create additional facilities for admission to higher education institutions, passing the state final examination and obtaining an official certificate on complete general secondary education by persons whose place of residence is the territory of the anti-terrorist operation (for the period of its implementation).

For persons whose place of residence is the territory of the anti-terrorist operation (for the period of its implementation), the central executive authority in charge of shaping state policy in the field of education shall determine the procedure for passing the state final examination and obtaining an official certificate on complete general secondary education, as well as the conditions for admission to study at higher education institutions located within the territory of Luhansk and Donetsk oblasts (where oblast military-civil administrations exercise their powers) and higher education institutions evacuated from the territory of the anti-terrorist operation (for the period of its implementation) and the temporarily occupied territory.

*{The Law has been supplemented with Article 9[2] under Law No. 1114-VIII of 19 April 2016}*

**Article 9[3].** The peculiarities of registering identity documents and documents confirming the citizenship of Ukraine for citizens who live in the area of the anti-terrorist operation and/or the implementation of measures to ensure national security and defence, repel and suppress the armed aggression of the Russian Federation in Donetsk and Luhansk oblasts or citizens who moved from such areas during the period of the relevant operation and/or implementation of these measures

Identity documents and documents confirming the citizenship of Ukraine for citizens who live in the area of the anti-terrorist operation and/or the implementation of measures to ensure national security and defence, repel and suppress the armed aggression of the Russian Federation in Donetsk and Luhansk oblasts shall be registered by the central executive authority implementing the state policy in the field of migration (immigration and emigration), at the place of application of a person or their legal representative to authorised bodies exercising their powers in the oblast where the anti-terrorist operation is being conducted and/or measures are being taken to ensure national security and defence, repel and suppress the armed aggression of the Russian Federation in Donetsk and Luhansk oblasts.

Identity documents and documents confirming the citizenship of Ukraine for citizens who have moved from the area of the anti-terrorist operation and/or the implementation of measures to ensure national security and defence, repel and suppress the armed aggression of the Russian Federation in Donetsk and Luhansk oblasts shall be registered by the central executive authority implementing the state policy in the field of migration (immigration and emigration) at the actual place of the person's residence or stay.

To enter information about the place of residence into identity documents and documents confirming the citizenship of Ukraine, citizens who reside (resided) in the area of the anti-terrorist operation and/or the implementation of measures to ensure national security and defence, repel and suppress the armed aggression of the Russian Federation in Donetsk and Luhansk oblasts or citizens who moved from such area during the period of the relevant operation and/or the implementation of these measures, the information from the State Voter Register may be used.

*{The Law has been supplemented with Article 9[3] under Law No.371-IX of 12 December 2019}*

**Article 10.** Confirmation of force-majeure circumstances

During the validity of this Law, the certificate from the Chamber of Commerce and Industry of Ukraine shall serve as the only appropriate and sufficient document confirming the commencement of circumstances of insuperable force (force majeure) that emerged within the territory of the anti-terrorist operation as grounds for exemption from liability for non-performance (improper performance) of obligations.

**Article 11.** Final and transitional provisions

1. This Law shall come into force on the day following the day of its publication and shall become void six months after the end of the anti-terrorist operation, except for clause 4 of Article 11 "Final and transitional provisions" of this Law.

2. The effect of this law shall apply to the period of conducting the anti-terrorist operation and six months after the date of its termination.

3. Laws and other regulatory acts of Ukraine shall only be applicable to the extent that they do not contradict this Law.

4. To amend the following Laws of Ukraine:

*{Subclause 1, clause 4 of Article 11 has lost effect under Law No. 2473-VIII of 21 June 2018}*

2) in the Law of Ukraine "On the Chambers of Commerce and Industry in Ukraine" (The Official Bulletin of the Verkhovna Rada of Ukraine, 1998, No. 13, Article 52; 2002, No. 16, Article 114; 2010, No. 34, Article 486; 2011, No. 41, Article 413; 2014, No. 5, Article 62; No. 24, Article 885):

a) paragraph three, part three of Article 14 shall be revised to read as follows:

"confirms force majeure circumstances (circumstances of insuperable force), as well as trade and port customs adopted in Ukraine at the request of business entities and individuals;"

b) to be supplemented with Article 14 **1** that reads as follows:

"**Article 14[1].** The issue of certificates on force majeure (circumstances of insuperable force)

1. The Chamber of Commerce and Industry of Ukraine and its authorised regional chambers of commerce and industry shall confirm force majeure circumstances (circumstances of insuperable force) and issue a certificate on the same within seven days from the date of the application filed by the business entity at cost price. A certificate on force majeure (circumstances of insuperable force) for small businesses shall be issued free of charge.

2. Force majeure circumstances (circumstances of insuperable force) are extraordinary and unavoidable circumstances that objectively make it impossible to fulfil the obligations stipulated in the terms of the agreement (contract, treaty, etc.), obligations under legislative and other regulatory acts, namely the threat of war, armed conflict or a serious threat of such conflict, including but not limited to enemy attacks, blockades, military embargoes, actions of the foreign enemy, general military mobilisation, military actions, declared and undeclared war, actions of public enemy, indignation, acts of terrorism, sabotage, piracy, riots, invasion, blockade, revolution, mutiny, insurrection, mass riots, curfew, expropriation, forced seizure, seizure of enterprises, requisition, public demonstration, siege, strike, accident, illegal actions of third parties, fire, explosion, long interruptions in transport, regulated by the terms of relevant decisions and acts of state authorities, closure of sea straits, embargo, ban (restraint) on exports/imports, etc., and caused by exceptional weather conditions and natural disaster, and namely epidemic, strong storm, cyclone, windstorm, tornado, hurricane, flood, snow accumulation, silver thaw, hail, frost, freezing of the sea, straits, ports, passes, earthquake, lightning, fire, drought, subsidence and landslide, other natural disasters, etc.;"

3) in **paragraph one**, part Two of Article 3 of the Law of Ukraine "On Regulation of Barter Operations in the Sphere of Foreign Economic Activity" (The Official Bulletin of the Verkhovna Rada of Ukraine, 1999, No. 5–6, Article 44), the words "circumstances of insuperable force or force majeure" shall be replaced with the words "force majeure circumstances (circumstances of insuperable force)";

4) **Part One** of Article 14 of the Law of Ukraine "On Accounting and Financial Reporting in Ukraine" (The Official Bulletin of the Verkhovna Rada of Ukraine, 1999, No. 40, Article 365; 2011, No. 36, Article 362) shall be supplemented with paragraph two that reads as follows:

"Within the framework of the implementation of measures provided for by the Law of Ukraine "On Temporary Measures for the Anti-Terrorist Operation Period", business entities operating in the territory of the anti-terrorist operation, for the period of its implementation, shall be exempt from liability for non-compliance with the deadlines provided for the submission of financial reporting;"

*{Subclause 5, clause 4 of Article 11 has lost effect under Law No. 222-VIII of 2 March 2015}*

6) paragraph five, part Two of Article 35 of the Law of Ukraine "On State Registration of Legal Entities and Individual Entrepreneurs" (The Official Bulletin of the Verkhovna Rada of Ukraine, 2003, No. 31–32, Article 263; 2011, No. 46, Article 512) shall be deleted;

7) Article 4[1] of the Law of Ukraine "On the Permit System in the Field of Economic Activity" (The Official Bulletin of the Verkhovna Rada of Ukraine, 2005, No. 48, Article 483 with subsequent amendments) shall be supplemented with part fourteen that reads as follows:

"14. Permit documents issued to business entities operating in the territory of the anti-terrorist operation are considered to have extended their validity period for the time of the anti-terrorist operation, which fact shall be entered in the Permit Document Register within three days."

*{Subparagraph 8, paragraph 4 of Article 11 has been deleted under Law No. 911-VIII of 24 December 2015}*

*{Subparagraph 1, paragraph 4 of Article 11 has lost effect under Law No. 2473-VIII of 25 June 2018}*

5. Within ten days from the date of publication of this Law, the Cabinet of Ministers of Ukraine shall:

within its competence, ensure adoption of regulatory legal acts resulting from this Law;

approve the list of localities in the territory of which the anti-terrorist operation initiated under the Decree of the President of Ukraine "On the Decision of the National Security and Defense Council of Ukraine of 13 April 2014 "On Urgent Measures to Overcome the Terrorist Threat and Preserve the Territorial Integrity of Ukraine" dated 14 April 2014 No. 405/2014, from 14 April 2014 until its completion;

adopt the final list within ten days from the date of the end of the anti-terrorist operation;

bring its regulatory acts in line with this Law;

ensure that ministries and central executive authorities of Ukraine develop and review their regulatory acts implied in this Law.

6. Within ten day from the enactment of this Law, the National Bank of Ukraine shall:

bring their regulatory acts in compliance with Article 2 of this Law;

give appropriate orders to all banks in the territory of Ukraine, regardless of the form of ownership, to ensure compliance with Article 2 of this Law.

7. Recommend that the National Bank of Ukraine takes measures to ensure the security and safety of financial resources of business entities operating in the territory of the anti-terrorist operation, and persons living in the area of the anti-terrorist operation, by the possibility of making non-cash payments and receiving cash in an extensive network of ATMs and cash withdrawal points of partner banks without payment of the commission.

**President of Ukraine**                                             **P. POROSHENKO**

**City of Kyiv**
**2 September 2014**
**No. 1669-VII**

## Publications of document

- **Голос України** on October 14, 2014 — № 197
- **Урядовий кур'єр** on October 22, 2014 — № 195
- **Офіційний вісник України** on October 24, 2014 — 2014, № 83, page 7, article 2350, код акта 74279/2014
- **Відомості Верховної Ради України** on October 31, 2014 — 2014, № 44, page 2972, article 2040



# Щодо засідань учасників тристоронньої контактної групи з реалізації положень мирного плану Президента України (укр./рос.)

Опубліковано 09 червня 2014 року о 18:52

Учасники тристоронньої контактної групи з реалізації положень мирного плану Президента України у складі представників України, Російської Федерації та ОБСЄ 8 і 9 червня провели три засідання.

В результаті проведеної роботи сторони дійшли спільного розуміння щодо ключових етапів виконання згаданого плану та переліку першочергових завдань, досягнення яких сприятиме деескалації ситуації в Донецькій і Луганській областях України.

Учасники тристоронньої контактної групи домовилися про продовження зустрічей у цьому форматі.

\*\*\*

**Относительно заседаний участников трехсторонней контактной группы по реализации положений мирного плана Президента Украины**

Участники трехсторонней контактной группы по реализации положений мирного плана Президента Украины в составе представителей Украины, Российской Федерации и ОБСЕ 8 и 9 июня провели три заседания.

В результате проведенной работы стороны пришли к общему пониманию по ключевым этапам выполнения упомянутого плана и перечня первоочередных задач, достижение которых будет способствовать деэскалации ситуации в Донецкой и Луганской областях Украины.

Участники трехсторонней контактной группы договорились о продолжении встреч в этом формате.

[*Free translation from Ukrainian*]

## On the Meetings of the Participants of the Trilateral Contact Group on the Implementation of the Peace Plan of the President of Ukraine

Published on June 9, 2014 at 18:52

The participants of the trilateral contact group on the implementation of the provisions of the peace plan of the President of Ukraine, composed of the representatives of Ukraine, the Russian Federation and OSCE, held three meetings on 8 and 9 June.

The conducted work resulted in a common understanding between the parties on the key stages of the implementation of the said plan and the list of priority tasks, the achievement of which will facilitate the de-escalation of the situation in the Donetsk and Luhansk regions of Ukraine.

The participants of the trilateral contact group agreed to continue the meetings in this format.

*** 

[*Russian version of the same text*]



# Chairperson‑in‑Office welcomes Minsk agreement, assures President Poroshenko of OSCE support

BERN     5 September 2014

BERN, 5 September 2014 - OSCE Chairperson-in-Office and Swiss Foreign Minister Didier Burkhalter welcomed today's agreement in Minsk on a ceasefire and on launching a political process to resolve the crisis. Emphasizing the opportunity to finally reverse the logic of escalation, he said that this conflict had caused far too much bloodshed and misery already and urged all sides to implement today's commitments. Burkhalter also commended the work of the Trilateral Contact Group and thanked his Special Representative Ambassador Heidi Tagliavini for her untiring work.

In a meeting in Wales this afternoon, the Chairperson-in-Office assured President Petro Poroshenko of Ukraine that the OSCE within its mandate would do everything possible to assist Ukraine in implementing the agreement. He also said that the Swiss Chairmanship would continue to support and actively contribute to diplomatic efforts to further de-escalate the crisis.

In a preceding session with NATO foreign ministers and heads of European security organizations on the crisis in and around Ukraine and its implications for European security at large, Burkhalter had already announced that the Special Monitoring Mission would now significantly expand, adapt to changing needs, and recruit more specialists for tasks such as ceasefire monitoring and border monitoring. He also said that the Swiss Chairmanship was ready to immediately appoint a successor to Ambassador Wolfgang Ischinger as Special Representative of the Chairperson-in-Office to assist inclusive national dialogue in Ukraine if requested by the Ukrainian authorities. In his statement, Burkhalter made the case for sticking with co-operative security even at this time of heightened tension and said that sanctions and defensive measures to reassure allies and partners render diplomacy ever more important.

# Contacts

**Communication and Media Relations Section**
OSCE Secretariat
Phone: + 43 676 71 74 592
press@osce.org



# OSCE Chairperson-in-Office gives full backing to Minsk package

BELGRADE          12 February 2015



*OSCE Chairperson, Serbia's Foreign Minister Ivica Dačić (OSCE/Micky Kroell)*

BELGRADE, 12 February 2015 - The OSCE Chairperson-in-Office, Serbia's Foreign Minister Ivica Dačić, welcomed the results of the Summit in Minsk and gave his full support to the package of measures for the implementation of the September 2014 *Minsk agreements* agreed by the Trilateral Contact Group.

"I encourage all sides to seize the opportunity that this package presents to cease hostilities and ease tensions, which would enable us to reach our common goal of restoring peace in eastern Ukraine. The tireless work of the leaders of France, Germany, Russia and Ukraine, which resulted in this package being adopted, is yet another reminder of what can be accomplished through joint efforts."

"I call on all sides to fully implement this package with the aim of de-escalating the conflict and putting an end to civilian casualties. This will create the conditions needed to resolve this crisis through political means and to reach a feasible and sustainable solution on the basis of international law and OSCE commitments," said Dačić.

"Let me also express my gratitude to the Trilateral Contact Group and my Special Representative, Ambassador Heidi Tagliavini, whose role in maintaining contact between all sides and thereby paving the way to an agreement has proven to be indispensable," he added.

"The OSCE is ready to do everything it can within its mandate to facilitate full implementation of the agreed measures. I expect that the Special Monitoring Mission in Ukraine will continue to play a central role in these efforts," he concluded.

# Contacts

**Communication and Media Relations Section**
OSCE Secretariat
Phone: + 43 676 71 74 592
press@osce.org



Українською



official web site

Search

HOME        NEWS        LEADERS        HOTLINES        FOR MEDIA        PUBLIC APPEALS

CONTACTS

# Update on the situation in the Joint Forces Operation area as of 07.00 January 18, 2022

2022-01-18 07:15:00 | **ID: 66070**

Glory to Ukraine!

The Armed Forces of the Russian Federation continue to ignore the agreements reached within the frameworks of the Trilateral Contact Group.

During the past day, January 17, 2022, the Ukrainian Defence Forces recorded 1 ceasefire violations committed by the Russian occupation forces.

In the vicinity of PISKIV the enemy troops fired grenade launchers.

There were no casualties.

Positions of the Ukrainian Defence Forces remain.

As of 07.00 January 18, 2022, there were no ceasefire violations committed by the Russian occupation forces.

The Joint Forces retain full control over the situation in their operation area and continue accomplishing their combat missions of defeating and deterring the Russian armed aggression.

Together for Victory!

Glory to Ukraine!

---

**LATEST NEWS**

Update of the situation in the Joint Forces Operation area as of 11.00 January, 20 2022

4 hours ago

President took part in honoring the memory of soldiers who died for Ukraine's independence

4 hours ago

[Donetsk airport defenders commemoration ceremony to take place on 21 January](#)

5 hours ago

['Cyborgs' endured it, concrete did not: Today, on January 20, we commemorate the defenders of the Donetsk airport](#)

7 hours ago

[Update on the situation in the Joint Forces Operation area as of 07.00 January 20, 2022](#)

8 hours ago

[Update on the situation in the Joint Forces Operation area as of 17.00 January 19, 2022](#)

Yesterday at 17:00

[Update of the situation in the Joint Forces Operation area as of 11.00 January, 19 2022](#)

Yesterday at 11:15

© 2001—2022 MoD of Ukraine


render: 0.3059 s
§ 66070.



# UN News (/en/)
Global perspective Human stories

# Backing Ukraine's territorial integrity, UN Assembly declares Crimea referendum invalid



**UN Photo/Eskinder Debebe (file)** │ A wide view of the temporary General Assembly.

**27 March 2014**

**In a vote that reaffirmed Ukraine's unity and territorial integrity, the United Nations General Assembly today adopted a measure underscoring that the mid-March referendum in Crimea that led to the peninsula's annexation by Russia "has no validity" and that the parties should "pursue immediately a peaceful resolution of the situation."**

By a vote of 100 in favour to 11 against, with 58 abstentions, the 193-member Assembly called (http://www.un.org/Docs/journal/asp/ws.asp?m=a/68/l.39) on all States, international organizations and specialized agencies not to recognize any alteration of the status of the Autonomous Republic of Crimea and the city of Sevastopol on the basis of the 16 March referendum "and to refrain from any action or dealing that might be interpreted as recognizing any such altered status."

Action in the Assembly follows months of ratcheting tensions in Ukraine triggered by the Government's decision last November not to sign an agreement on broader European integration. The capital, Kiev, erupted in violent demonstrations and street clashes in late

January, culminating in the removal by Parliament of President Viktor Yanukovych.

Tensions continued to mount in the Crimea region, where Russian troops and armoured vehicles were deployed in February and a secession referendum was later held, in which, according to the UN, Crimean authorities announced that close to 97 per cent of those who voted did so in favour of the region joining Russia.

Subsequently, Crimea declared its independence, which in turn was recognized by Russia. In the immediate aftermath of those events, President Vladimir Putin signed a treaty to make Crimea part of Russia, while the Government in Kiev committed to never accept Crimea's independence or annexation.

Throughout, the UN has continued to press for a diplomatic solution to the crisis, with Secretary-General Ban Ki-moon, Deputy Secretary-General Jan Eliasson and other senior officials having visited the region, including Moscow and Crimea, over the past three weeks.

The UN Security Council (https://www.un.org/securitycouncil/)   convened seven sessions on the situation in Ukraine, and at its eighth meeting, Russia, one of the 15-nation body's permanent members, blocked action by voting against a draft resolution that would have urged countries not to recognize the results of the referendum in Crimea.

The non-binding text adopted by the Assembly today contained similar language, underscoring that the referendum held in Crimea has no validity and cannot form the basis for any alteration of the status of Crimea or of the city of Sevastopol. It calls on all States to "desist and refrain" from actions aimed at the partial or total disruption of Ukraine's national unity and territorial integrity, "including any attempts to modify Ukraine's borders through the threat or use of force or other unlawful means."

Finally, the Assembly resolution makes explicit reference to the primacy of the UN Charter (http://www.un.org/en/charter-united-nations/index.html)   's call for the preservation of the unity and territorial integrity of all UN Member States, and also recalls the 1994 Memorandum on Security Assurances in Connection with Ukraine's Accession to the Treaty on the Non-Proliferation of Nuclear Weapons, the 1997 Treaty on Friendship, Cooperation and Partnership between Ukraine and Russian, and other bilateral agreements between Ukraine and Russia.

♦ Receive daily updates directly in your inbox - **Subscribe here** (https://news.un.org/en/content/un-newsletter-subscribe?utm_source=UN News&utm_medium=email&utm_campaign=un_news_newsletter) to a topic.

♦ Download the UN News app for your **iOS** (https://itunes.apple.com/us/app/un-news-reader/id496893005?mt=8) or **Android** (https://play.google.com/store/apps/details?id=org.un.mobile.news&hl=en) devices.

**UKRAINE (/EN/TAGS/UKRAINE)**

United Nations                                                                    A/RES/68/262



**General Assembly**

Distr.: General
1 April 2014

---

**Sixty-eighth session**
Agenda item 33 (*b*)

# Resolution adopted by the General Assembly on 27 March 2014

[*without reference to a Main Committee (A/68/L.39 and Add.1)*]

### 68/262.  Territorial integrity of Ukraine

*The General Assembly*,

*Reaffirming* the paramount importance of the Charter of the United Nations in the promotion of the rule of law among nations,

*Recalling* the obligations of all States under Article 2 of the Charter to refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any State, and to settle their international disputes by peaceful means,

*Recalling also* its resolution 2625 (XXV) of 24 October 1970, in which it approved the Declaration on Principles of International Law concerning Friendly Relations and Cooperation among States in accordance with the Charter of the United Nations, and reaffirming the principles contained therein that the territory of a State shall not be the object of acquisition by another State resulting from the threat or use of force, and that any attempt aimed at the partial or total disruption of the national unity and territorial integrity of a State or country or at its political independence is incompatible with the purposes and principles of the Charter,

*Recalling further* the Final Act of the Conference on Security and Cooperation in Europe, signed in Helsinki on 1 August 1975, the Memorandum on Security Assurances in Connection with Ukraine's Accession to the Treaty on the Non-Proliferation of Nuclear Weapons (Budapest Memorandum) of 5 December 1994,[1] the Treaty on Friendship, Cooperation and Partnership between Ukraine and the Russian Federation of 31 May 1997[2] and the Alma-Ata Declaration of 21 December 1991,

*Stressing* the importance of maintaining the inclusive political dialogue in Ukraine that reflects the diversity of its society and includes representation from all parts of Ukraine,

---

[1] A/49/765, annex I.
[2] A/52/174, annex I.

13-45517



Please recycle 

*Welcoming* the continued efforts by the Secretary-General and the Organization for Security and Cooperation in Europe and other international and regional organizations to support de-escalation of the situation with respect to Ukraine,

*Noting* that the referendum held in the Autonomous Republic of Crimea and the city of Sevastopol on 16 March 2014 was not authorized by Ukraine,

1.     *Affirms* its commitment to the sovereignty, political independence, unity and territorial integrity of Ukraine within its internationally recognized borders;

2.     *Calls upon* all States to desist and refrain from actions aimed at the partial or total disruption of the national unity and territorial integrity of Ukraine, including any attempts to modify Ukraine's borders through the threat or use of force or other unlawful means;

3.     *Urges* all parties to pursue immediately the peaceful resolution of the situation with respect to Ukraine through direct political dialogue, to exercise restraint, to refrain from unilateral actions and inflammatory rhetoric that may increase tensions and to engage fully with international mediation efforts;

4.     *Welcomes* the efforts of the United Nations, the Organization for Security and Cooperation in Europe and other international and regional organizations to assist Ukraine in protecting the rights of all persons in Ukraine, including the rights of persons belonging to minorities;

5.     *Underscores* that the referendum held in the Autonomous Republic of Crimea and the city of Sevastopol on 16 March 2014, having no validity, cannot form the basis for any alteration of the status of the Autonomous Republic of Crimea or of the city of Sevastopol;

6.     *Calls upon* all States, international organizations and specialized agencies not to recognize any alteration of the status of the Autonomous Republic of Crimea and the city of Sevastopol on the basis of the above-mentioned referendum and to refrain from any action or dealing that might be interpreted as recognizing any such altered status.

*80th plenary meeting*
*27 March 2014*

———————