IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SUBPOENAS SERVED ON JSC STATE EXPORT-IMPORT BANK OF UKRAINE; BANK POLSKA KASA OPIEKI SA; DEUTSCHE BUNDESBANK; RESERVE BANK OF AUSTRALIA; AB SEB BANKAS; SEB SECURITIES, INC.; BANK OF MONTREAL; BMO FINANCIAL CORP.; BMO CAPITAL MARKETS CORP.; THE BANK OF NEW YORK MELLON CORPORATION; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS FORTIS SA/NV; BNP PARIBAS USA, INC.; BNP PARIBAS; CITIBANK N.A.; CITIGROUP INC.; CITIGROUP GLOBAL MARKETS LTD.; COMMERZBANK AG; COMMERZ MARKETS LLC; CREDIT SUISSE (SWITZERLAND) LTD.; CREDIT SUISSE AG; CREDIT SUISSE (USA), INC.; DANSKE BANK A/S; DANSKE MARKETS INC.; DEUTSCHE BANK TRUST COMPANY AMERICAS; DEUTSCHE BANK TRUST CORPORATION; DEUTSCHE BANK AG; DNB BANK ASA; DNB CAPITAL LLC; DNB MARKETS, INC.; HSBC BANK PLC; HSBC NORTH AMERICA HOLDINGS INC.; JPMORGAN CHASE BANK N.A.; JPMORGAN CHASE & CO.; J.P. MORGAN SECURITIES PLC; J.P. MORGAN SECURITIES LLC; MUFG BANK, LTD.; MUFG AMERICAS HOLDING CORPORATION; MUFG SECURITIES AMERICAS INC.; RAIFFEISEN BANK INTERNATIONAL, AG; RB INTERNATIONAL MARKETS (USA) LLC; SANTANDER BANK POLSKA S.A.; STANDARD CHARTERED BANK PLC; STANDARD CHARTERED BANK (HONG KONG) LTD.; STANDARD CHARTERED SECURITIES (NORTH AMERICA) LLC; UBS SWITZERLAND AG; UBS AMERICAS INC.; UBS AG; UBS AMERICAS HOLDINGS LLC; UNICREDIT BANK AG; AND UNICREDIT CAPITAL MARKETS LLC: <br><br> UKRAINE, <br><br>        Petitioner, <br><br>    -against- <br><br> PAO TATNEFT, <br><br>        Respondent. | Misc. Case No. 1:22-mc-00036 <br> _____ <br><br> (Arising from Case No. 1:17-cv-00582-CKK in the United States District Court for the District of Columbia) <br><br> **DECLARATION OF KYRYLO SHEVCHENKO IN SUPPORT OF UKRAINE'S MOTION TO QUASH OR MODIFY SUBPOENAS** |

I, Kyrylo Shevchenko, declare as follows:

1.      I am the Governor of the National Bank of Ukraine (the "NBU"), which is the central bank of Ukraine. I have served in this capacity since July 2020. In addition to the general management and supervision of the NBU, I am personally responsible for control and supervision of, among other matters, the risk management, security and state secrecy departments of the NBU. I am also a member of the National Security and Defense Council of Ukraine, which is the coordinating state body in matters pertaining to national security and defense under the President of Ukraine.

2.      I have worked in the financial sector in Ukraine for the last twenty-seven years. In 2009-2010, as well as in 2014, I worked as the First Deputy Chairman, and from May 2015 to July 2020 as the Chairman of the Management Board of JSB UkrGasBank. My experience also includes positions in the management boards of several private financial institutions, as well as positions of the Chairman of the State Mortgage Institution from 2006 to 2009 and the Advisor to the Prime Minister of Ukraine in 2009.

3.      This declaration is based on my personal knowledge, experience, and expertise, including as a banking expert familiar with relevant Ukrainian laws, regulations and practices.

4.      I have given this declaration in Ukrainian. English translation of my declaration from Ukrainian into English was arranged by Winston & Strawn LLP.

5.      Nothing in my declaration should be taken as a waiver of any privilege or right on the part of Ukraine. For the avoidance of doubt, nothing in my declaration should be taken as amounting to acceptance of jurisdiction or a waiver of the sovereign immunity of Ukraine, including the immunity of the NBU as the central bank of Ukraine, its officials and its property under the Foreign Sovereign Immunities Act.

6.      As I have been informed by Ministry of Justice officials, Ukraine is a participant in parallel U.S. federal court proceedings:  in the District of Columbia as a respondent and in New York as a third party.

7.      I understand from the Ministry of Justice that Tatneft has served discovery requests on Ukraine in D.C. District Court case 1:17-cv-00582-CKK.  I also understand from the Ministry of Justice of Ukraine that Tatneft has served about 25 subpoenas on a number of financial institutions in Southern District of New York case 1:21-mc-00376.  Most recently, I was informed by the Ministry of Justice of Ukraine that on January 25, 2022, Tatneft served about 52 additional subpoenas, in addition to about 25 initial subpoenas, on financial institutions.

8.      I have reviewed the Document Requests 1-7 in the latest wave of subpoenas in detail and note several considerations about their scope.

9.      From the contents of the subpoena, I understand that the discovery requests may ultimately affect the NBU as the central bank of Ukraine, as well as several financial institutions in Ukraine, including JSC CB PrivatBank, JSC State Export-Import Bank of Ukraine, JSB UkrGasBank, JSC State Savings Bank of Ukraine (Oschadbank) (the "Ukrainian Banks") under the pretext that all of them, being defined as "Identified State Controlled Entities", fall into the definition of the term "Ukraine".

10.      In my capacity as the Governor of the NBU, which is also the regulator of the above Ukrainian Banks, I cannot agree that the proposed definition of the term "Ukraine" is appropriate, and that it is legally or practically possible to fulfil all the Document Requests.

11.      The key function of the NBU is to ensure the stability of the Ukrainian currency, the monetary stability, as well as the stability of the banking system of Ukraine.[1]  Thus, the

---

[1]   Constitution of Ukraine, Article 99; Law of Ukraine No. 679-XIV "On the National Bank of Ukraine" dated May 20, 1999, Article 6.

economic stability of the State of Ukraine depends on the NBU. Among other matters, the NBU receives regular updates on the sovereign debt and related payments from the Ukrainian Government, which is used by the NBU to analyze and monitor Ukraine's balance of payments, monetary processes, and monetary market.[2]

12.     The NBU has the status of a standalone entity under Ukrainian law.[3] Ukrainian law specifically excludes the liability of the NBU for any obligations of the Ukrainian state bodies or Ukrainian financial institutions (including the Ukrainian Banks).[4] Accordingly, the NBU may not be viewed as falling within the term "Ukraine" in this proceeding.

13.     As to the Ukrainian Banks, each of them has a separate legal personality and is structurally and functionally separate from the State of Ukraine.[5] Based on my experience of managerial roles in JSB UkrGasBank and JSC State Savings Bank of Ukraine (Oschadbank), the Ukrainian Banks have independent corporate bodies in place, as any other commercial banks, including their own separate management and supervisory boards. Ukrainian law equally excludes the liability of the Ukrainian Banks for any obligations of the State of Ukraine and the NBU as it does for any other commercial banks in Ukraine.[6] Therefore, the Ukrainian Banks equally may not be viewed as falling with the term "Ukraine" in this proceeding.

---

[2]   Law of Ukraine No. 679-XIV "On the National Bank of Ukraine" dated May 20, 1999, Articles 52 and 57.
[3]   Law of Ukraine No. 679-XIV "On the National Bank of Ukraine" dated May 20, 1999, Article 4.
[4]   Law of Ukraine No. 679-XIV "On the National Bank of Ukraine" dated May 20, 1999, Article 4.
[5]   Articles of Association of JSC State Export-Import Bank of Ukraine, clauses 23 and 24 (available at: https://www.eximb.com/assets/files/download/statut-2020.pdf); Articles of Association of JSB UkrGasBank, clause 2.3 (available at: https://www.ukrgasbank.com/upload/file/statyt_2020.pdf); Articles of Association of JSC CB PrivatBank, clauses 20-23 (available at: https://static.privatbank.ua/files/Statut_11.09.2019.pdf.pdf); Articles of Association of JSC State Savings Bank of Ukraine (Oschadbank), clauses 21-24 (available at: https://www.oschadbank.ua/uploads/0/887-statut_at_oschadbank201119.pdf).
[6]   Law of Ukraine No. 2121-III "On Banks and Banking Activity" dated December 7, 2000, Article 5.

14.     <u>Disclosure under Document Requests 1-3</u>. Based on my professional experience, the information requested in Document Requests 1-3 is protected by the Ukrainian laws on state secrecy and/or bank secrecy.

15.     The scope of Document Requests 1-3 appears to be so broadly formulated so as to include *any* information about *any* assets (including *any* documents) held by Ukraine (very broadly defined) on *any* accounts in *any* jurisdiction outside of Ukraine. In fact, such catch-all wording may be interpreted to include practically any information, whether sensitive or not.  One instance falling under the scope of Document Requests 1-3 may be the information on the whereabouts of the <u>international reserves of Ukraine</u>, which are held by the NBU, as the central bank of Ukraine, in foreign banks and financial instruments.

16.     The international reserves of Ukraine are currently covering 4.1 months of future imports, which is a prerequisite for Ukraine to meet its commitments and for the Government and the NBU to make their current transactions.[7] Hence, as a member of the National Security and Defense Council of Ukraine, I note that any information about these assets is highly sensitive in terms of state secrecy,[8] and the practical implications of its disclosure could cause significant damage to the Ukrainian economy.

17.     The information requested in Document Requests 1-3 also covers data on various bank accounts (such as accounts receivable, contract receivables, receivables of any kind, brokerage accounts, deposit accounts, and correspondent accounts) and account balances held, as I understand, by the NBU and other Ukrainian Banks in foreign banks, as well as information about transactions of the banks' customers. In particular, correspondent accounts in the financial

---

[7]   See NBU official website (January 6, 2022) (available at: https://bank.gov.ua/en/news/all/u-2021-rotsi-mijnarodni-rezervi-ukrayini-zrosli-do-mayje-31-mlrd-dol-ssha).
[8]   Law of Ukraine No. 3855-XII "On State Secrecy" dated January 21, 1994, Article 8(1)(2).

institutions located in the United States are used by the Ukrainian Banks for processing payments in U.S. dollars on behalf of all their clients. Therefore, the above information is intrinsically covered by the bank secrecy.[9]

18.    In my opinion, it is impossible to comply with Document Requests 1-3 without violating the Ukrainian bank secrecy rules.

19.    First of all, all banks operating in Ukraine, as well as the NBU itself, are bound to safeguard and guarantee bank secrecy, and are expressly prohibited to disclose information protected by bank secrecy.  Ukrainian law establishes strict criminal, civil and other sanctions for the disclosure of information protected by bank secrecy.[10]

20.    In this context, Ukrainian law strictly limits the scope of persons who may access the information protected by the bank secrecy. This limitation applies not only to commercial banks operating in Ukraine, but also to the NBU. Specifically, the information constituting bank secrecy may generally be disclosed upon the approval of the client or on the basis of a Ukrainian court order. There is also an exhaustive list of Ukrainian state bodies that may approach the banks with requests for disclosure of the information constituting bank secrecy in exceptional cases, when disclosure of such information is required for the purposes of the investigations in criminal proceedings, as well as in the sphere of budget and finance, preventing and counteracting to

---

[9]  The concept of bank secrecy is broad under Ukrainian law and covers, inter alia, information about (i) the clients' bank accounts, including correspondent accounts of the banks opened with the NBU, (ii) the transactions performed in favor, on behalf of or by the clients, and (iii) information on client's commercial activities or commercial secrets, any project, inventions, product samples, and other commercial information etc. See Law of Ukraine No. 2121-III "On Banks and Banking Activity" dated December 7, 2000, Article 60.

[10]  Law of Ukraine No. 2121-III "On Banks and Banking Activity" dated December 7, 2000, Article 61(1); Rules on preservation, protection, use and disclosure of bank secrecy (approved by the NBU Resolution No 267 dated July 14, 2006) (available at: https://zakon.rada.gov.ua/laws/show/z0935-06#Text); Civil Code of Ukraine, Article 1076 (1).

legalization (laundering) of the proceeds from crime, financing of terrorism, compliance with tax laws etc.[11]

21.   There is no mechanism under Ukrainian law which would enable disclosure of the information protected by bank secrecy to a foreign court on the basis of a foreign court order (unless the relevant foreign court order is properly recognized and becomes effective in the territory of Ukraine).[12]

22.   Secondly, even assuming for the sake argument that specific Ukrainian state organs could consent to the disclosure of information as per Document Requests 1-3 in respect of *their own* Accounts, such consent in any event would not extend to any *other* legally distinct persons, which are currently included into the overbroad definition of the term "Ukraine". As explained in paras. 12-13 above, the NBU and the Ukrainian Banks are separate and legal distinct entities, and the competent Ukrainian state organ named in this litigation cannot possibly consent to disclosure of information on behalf of the NBU and the Ukrainian Banks. Similarly, "Ukraine" cannot be equated with all other third parties improperly captured by the term "Identified State Controlled Entities," so consent to disclosure by the aforementioned competent Ukrainian state organ is out of the question, as explained further in para. 27 below.

23.   Ukrainian law establishes sanctions not only for the disclosure but also for the improper use of the disclosed information. Any persons whose conduct contributed to such illegal disclosure or use of the protected and privileged information that caused damages either to the

---

[11]  Law of Ukraine No. 2121-III "On Banks and Banking Activity" dated December 7, 2000, Article 62.

[12]  A recent amendment to Article 62-2 of the Law of Ukraine "On Banks and Banking Activity" provided for the right of the NBU to disclose information protected by bank secrecy to foreign authorities, including foreign courts, but this discretion only applies when disclosure is necessary for the fulfillment of the functions of the NBU (the primary function being to ensure the stability of the Ukrainian currency) and/or protection of the interests of the NBU.  Law of Ukraine No. 2121-III "On Banks and Banking Activity" dated December 7, 2000, Article 62-2.

bank or its client, may be criminally liable, as well as bear civil liability to compensate for any such damages and also moral injury.[13] This is particularly true in respect of the disclosure of transactions on correspondent accounts held by the Ukrainian Banks with the financial institutions located in the United States. The transactions on such correspondent accounts are performed by the Ukrainian Banks in favor of a very large pool of their various Ukrainian clients, who have no connection whatsoever to the present proceeding and who never gave consent to the disclosure. Representative offices and branches of the Ukrainian Banks abroad are equally subject to the Ukrainian bank secrecy rules. Accordingly, disregard of the Ukrainian bank secrecy rules by the financial institutions located in the United States, representative offices or branches of the Ukrainian Banks, as well as the Ukrainian Banks themselves, may lead to numerous claims by the banks' clients caused by the improper disclosure of the information protected by bank secrecy, as well as criminal liability.[14]

24.     _Disclosure under Document Requests 4-7._ It is my opinion as the Governor of the NBU that the discovery requests and subpoenas in this proceeding seek the disclosure of sensitive, non-public information on the particular accounts (Document Requests 1-3) and intermediaries (Document Request 4) used by Ukraine in connection with the attraction, servicing and repayment of its sovereign debt.  Ukraine relies on unrestricted access to such accounts and prompt assistance from the intermediaries to honor its payment obligations towards international lenders and bondholders in a timely manner. If information about such intermediaries or accounts is disclosed to third parties (including the Russian Federation, as explained in paras. 36-40 below), any interference with these intermediaries or accounts made or attempted by a third party would create

---

[13]  Law of Ukraine No. 2121-III "On Banks and Banking Activity" dated December 7, 2000, Article 61; Civil Code of Ukraine, Article 1076 (2).
[14]  Law of Ukraine No. 2121-III "On Banks and Banking Activity" dated December 7, 2000, Article 61; Civil Code of Ukraine, Article 1076 (2); Criminal Code of Ukraine, Articles 231 and 232.

risks for the relevant settlements made by Ukraine with its international lenders and bondholders. Should any of the affected funds be compromised during the transfer, this would result in Ukraine's failure to pay the relevant amounts to its international lenders or bondholders and ultimately trigger cross-defaults across Ukraine's sovereign debt. Any of such events would lead to dire consequences for Ukraine's economy and financial stability.

25.     Furthermore, the discovery requests and subpoenas seek the disclosure of sensitive, non-public and excessive information on the past and expected issuances of securities by Ukraine (Document Requests 4-5) and related capital transfers (Document Request 6-7). Any disclosure of such information could potentially affect the price or trading of the relevant securities of Ukraine or other external debt of Ukraine. As such, this would ultimately restrict Ukraine's ability to access international capital markets on commercially acceptable terms, and put severe pressure on Ukraine's economy, foreign exchange reserves and general financial stability. Ukraine already experienced such difficulties following the illegal occupation and attempted annexation of the Crimea by Russia in 2014. In particular, Ukraine was able to access affordable financing from international capital markets only following the provision of loan guarantees by the United States.[15]

26.     The concern described immediately above is heightened by the inaccurately broad definition of the term "Ukraine", as I have already noted in respect of the NBU and the Ukrainian Banks, which also includes the Identified State Controlled Entities (namely, major state-owned enterprises operating in strategic fields of economy such as oil and gas (JSC Naftogaz of Ukraine), aviation (State Aviation Enterprise Ukraine) and infrastructure (JSC Ukrainian Railways)). Many of those entities have significant levels of foreign currency indebtedness and continue to

---

[15]  See Official website of US Embassy in Ukraine (June 3, 2016) (available at: https://ua.usembassy.gov/u-s-signs-loan-guarantee-agreement-ukraine/).

experience difficulty refinancing such liabilities or accessing new financing. As a result, such entities also would be adversely affected by Ukraine's restricted access to international capital markets, and this would have severe consequences on the affected fields of economy.

27.     It should be noted that Ukraine is highly reliant on external sources for financing its State Budget and servicing its existing external debt. In particular, according to the information of the Ministry of Finance of Ukraine,[16] in 2022, UAH 126.8 billion (or c. USD 4.4 billion) is due for the repayment and servicing of Ukraine's external debt and 431.8 billion (or c. USD 15.1 billion) for Ukraine's domestic debt. To be able to make such payments, Ukraine will need to refinance all or at least some of those amounts via new borrowings. As per Ukraine's State Budget for the year 2022,[17] Ukraine anticipates making UAH 151.2 billion (approx. USD 5.3 billion) of external and UAH 420 billion (approx. USD 14.7 billion) of domestic borrowings.

28.     Further, according to the Medium-Term Debt Management Strategy approved by the Cabinet of Ministers of Ukraine for the years 2021-2024,[18] Ukraine identified that its primary objective is "*to secure the required financing at the lowest possible cost, while containing risks.*" The Strategy also established that "*in order to ensure that Ukraine meets its existing debt obligations, the country will require sustainable access to the capital markets in the upcoming years and continuous control over its refinancing risk.*" Given that Ukraine's ability to access international capital markets could be restricted due to the disclosure of the requested information (as noted above), there is a risk that Ukraine would be unable to manage its sovereign debt and

---

[16] See Schedule of the Ministry of Finance of Ukraine on monthly sovereign debt payments in 2022 (available at: https://mof.gov.ua/storage/files/%D0%9F%D0%BE%D0%BC%D1%96%D1%81%D1%8F%D1%87%D0%BD%D1%96%20%D0%BF%D0%BB%D0%B0%D1%82%D0%B5%D0%B6%D1%96%20%D0%B2%202022%20%D1%81%D1%82%D0%B0%D0%BD%D0%BE%D0%BC%20%D0%BD%D0%B0%2001_02_2022.xlsx).

[17] Law of Ukraine No. 1928-IX "On the State Budget of Ukraine for the Year 2022" dated December 2, 2021, Annexes (available at: https://zakon.rada.gov.ua/laws/show/1928-20#Text).

[18] Resolution of the Cabinet of Ministers of Ukraine No. 1291 dated December 9, 2021 (available at: https://zakon.rada.gov.ua/laws/show/1291-2021-%D0%BF#Text).

implement the relevant policies in line with the Strategy. This could result in severe consequences for Ukraine's economy and would likely pose a big risk to its financial stability.

29.     Furthermore, to the extent that Document Requests 4-7 seek information regarding Ukraine's issuance, redemption, purchase or cancellation of sovereign bonds, there are restrictions on the disclosure of such information in Ukrainian securities legislation, in addition to any restrictions that may exist as a matter of the U.S. securities legislation. Pursuant to Ukrainian legislation, the information about Ukraine's plans to issue new, or redeem, purchase or cancel its existing, securities may qualify as insider information. The latter includes non-public information about publicly traded securities which, once published, may materially influence the price of such instruments.[19] Ukrainian securities laws penalize unauthorized disclosure of insider information with fines (including fines for conducing transactions with use of insider information of up to 300% of the profit (income) received) and prohibition to work in the securities sphere for up to three years.[20]

30.     To the extent that Document Request 4 seeks information regarding "agreements related to fiscal agent, trustee, or paying agent relationships," the disclosure of such information is typically protected by the confidentiality provisions of the relevant agreements.

31.     It is also my opinion that the disclosure of the information requested by the discovery requests and subpoenas in this proceeding would make Ukraine extremely vulnerable and susceptible to adverse action by a hostile party, such as the Russian Federation, which could affect Ukraine's ability to make payments under its sovereign debt, cause default, and severely

---

[19] Law of Ukraine No. 3480-IV "On Capital Markets and Organized Commodity Markets" dated February 23, 2006, Article 145(1).

[20] Code of Ukraine on Administrative Offenses, Article 163-9; Criminal Code of Ukraine, Article 232-1; Law of Ukraine No. 448/96-VR "On State Regulation of Capital Markets and Organized Commodity Markets" dated October 30, 1996, Article 11(12).

affect its economy, financial stability, and wellbeing of millions of its residents.  This is explained in more detail below.

32.    The risks relating to managing Ukraine's sovereign debt are identified in the resolution of the Cabinet of Ministers of Ukraine dated August 1, 2012, No. 815.[21]  Such risks include, in particular:

a.  *budget risk* – the risk that the income of the State Budget will not be sufficient to make payments under the outstanding sovereign debt and/or cause Ukraine to require additional borrowings.  In this respect, Ukraine's economy is dependent on Russia's actions as its largest neighbor and Russia's ability to affect multiple spheres of Ukraine's economy.  Since late 2013, Russia's activities have made it harder to repay Ukraine's debt. Analysts identify a wide array of Russia's activities that deliberately targeted Ukraine's economy with the purpose of causing substantial harm. In particular, Russia has "fiddled" with gas supplies to Ukraine and "slapped on trade sanctions."[22]   Another analyst identifies the following harmful actions by Russia: (i) multiple non-tariff barriers against the import of goods of Ukrainian origin, (ii) impediments to the transit of goods to Ukraine (most recently, restrictions of supplies of coal from Kazakhstan to Ukraine), and (iii) rerouting gas transits from Ukraine.[23]  The disclosure of the information requested in Document Requests 4-6 to the entities

---

[21]  Resolution of the Cabinet of Ministers of Ukraine No. 815 dated August 1, 2012 (available at: https://zakon.rada.gov.ua/laws/show/815-2012-%D0%BF#Text).

[22]  See The Economist, Ukraine's conflict with Russia is also financial (January 21, 2017) (available at: https://www.economist.com/finance-and-economics/2017/01/21/ukraines-conflict-with-russia-is-also-financial).

[23]  See Economichna Pravda, How Russian Aggression Harms Ukrainian Economy, and What to Do in this Connection (January 18, 2022). (available at: https://www.epravda.com.ua/columns/2022/01/18/681554/).

affiliated with the Russian Federation will reward it with valuable information to better plan its further attacks against Ukraine, as it will be easier to time Russia's hostile activities with peak payments under Ukraine's debt.  As a result, the budget revenues available to Ukraine to source the necessary payments under such debt could be severely reduced;

b.  *currency risk* – the risk that the exchange rate of Ukraine's currency against the currency in which the debt is denominated could change in the unfavorable direction.  The value of Ukraine's currency decreased considerably since 2013, in large part due to Russia's actions.[24]  Analysts believe that recent actions by Russia against Ukraine are the most important factor currently affecting the value of the Ukrainian currency.[25]  Similarly to the above, the disclosure of the requested information (Document Requests 4-6) could permit Russia to time its activities with peak payments on Ukraine's sovereign debt, when adverse movements in the exchange rate could considerably increase Ukraine's budget expenses and, therefore, the risk of default;

c.  *liquidity risk* – the risk that the State Budget funds could become temporarily unavailable to make payments under the sovereign debt due to potential rapid decrease in the amount of liquid assets as a result of unexpected current liabilities and/or difficulties in borrowing additional funds in a timely fashion, and *refinancing risk* – the risk that the capacity of

---

[24] See The Economist, Ukraine's conflict with Russia is also financial (January 21, 2017) (available at: https://www.economist.com/finance-and-economics/2017/01/21/ukraines-conflict-with-russia-is-also-financial).
[25] See Economichna Pravda, How Russian Aggression Harms Ukrainian Economy, and What to Do in this Connection (January 18, 2022). (available at: https://www.epravda.com.ua/columns/2022/01/18/681554/).

the capital markets decreases, and this prevents Ukraine from borrowing the necessary amounts at an acceptable price and results in a higher price of the borrowings. This is what Ukraine is experiencing now, as Russia's perceived threat of expanding its invasion of Ukraine has already caused the price of Ukraine's borrowing to increase. After Russia moved thousands of its troops to Ukraine's borders, the spread on Ukraine's sovereign bonds increased to four digits, which is comparable to sovereign debt of the countries that are either in default or deep debt distress.[26] Analysts assess that, as a result of Russia's activities, Ukraine will not be able to access international capital markets for another 2-3 quarters,[27] recreating the problems that Ukraine experienced after the beginning of Russia's invasion of Ukraine in 2014. The disclosure of the requested information (Document Requests 4-6) would permit Russia to time future crises with Ukraine's plans to access international capital markets to refinance existing liabilities, which would cause the price of Ukraine's debt to soar and either greatly increase Ukraine's budget expenses or cause a default if the liabilities cannot be refinanced.

33.     Furthermore, purchases of sovereign debt under favorable conditions are an important element of sovereign debt management, which allows using the available finances to reduce the outstanding principal, smoothen Ukraine's sovereign debt service profile and alleviate

---

[26] See Reuters, Ukraine bonds sink into distress, Russia drops as tensions mount (January 17, 2022) (available at: https://www.reuters.com/markets/europe/ukraine-bonds-sink-into-distress-russia-drops-tensions-bite-2022-01-17/).

[27] See Economichna Pravda, How Russian Aggression Harms Ukrainian Economy, and What to Do in this Connection (January 18, 2022) (available at: https://www.epravda.com.ua/columns/2022/01/18/681554/).

the pressure on the State Budget of Ukraine. The information on the timing of such purchases, which is requested as part of Document Request 7, can be used to inflate the price of Ukraine's sovereign debt and, thereby, increase the price of the purchase or thwart the relevant liability management exercises altogether.

34.      Harm to Ukraine's Monetary, Banking and Financial System. As Governor of the NBU, I note that any actions against Ukraine, whether political, legal or financial, have a direct impact on Ukraine's financial indicators and stability. I cannot fail to notice that the claim against Ukraine in this legal proceeding is just a part of a broader strategy of economic, political and military aggression by the Russian Federation against Ukraine that has started in 2013. Notably, after Russia amassed its troops at the Ukrainian borders, the cost of CDSs and yields on the Ukrainian Eurobonds significantly increased.[28] Accordingly, I cannot fail to notice that this disclosure request by a Russia-controlled entity with close ties to the Russian government is another conspicuous attempt to gather additional information on the external borrowings of Ukraine.

35.      In my capacity as the Governor of the NBU and Member of the National Security and Defense Council of Ukraine, I am aware of that this action by Tatneft is one of several litigation attempts of the Russia-controlled entities against Ukraine. Particularly, I understand that the Russian Federation as the sole holder of Ukraine's U.S.$3 billion 5 per cent. notes issued December 2013 (the "**2013 Notes**") instructed the trustee, Law Debenture Trust Corporation Plc, to commence a case before English courts for collection from Ukraine of US$3.075 billion plus interest in relation to the 2013 Notes,[29] after the Russian Federation refused to take part in the

---

[28] See NBU Financial Stability Report (available at: https://bank.gov.ua/admin_uploads/article/FSR_pr_2021-H2_eng.pdf?v=4)

[29] The Law Debenture Trust Corporation Plc (Rev 1) v. Ukraine [2018] EWCA Civ 2026 (September 14, 2018) URL: http://www.bailii.org/ew/cases/EWCA/Civ/2018/2026.html

restructuring of the Ukrainian debt along with all other Ukrainian bondholders. There final judgment in this case has not been handed down yet, but a risk of such adverse judgment cannot be excluded.  This risk is described in detail in any prospectus for the issuance of Ukrainian sovereign bonds.

36.     Accordingly, I cannot fail but connect the dots and see that this discovery purportedly in aid of execution of a smaller judgment in the *Tatneft* case is in reality a Russian intelligence-gathering operation to collect information to facilitate the enforcement of potentially much greater judgment(s) in the *Law Debenture Trust Corporation* case and to take Ukraine hostage under a threat of substantial harm to its monetary stability, by seeking to attach or seize:

a.   the proceeds of Ukraine's capital market transactions – to ultimately prevent Ukraine from accessing international capital markets, thus creating for Ukraine's sovereign debt a severe refinancing crisis (as described in subparagraph 32(c) above); or

b.   the scheduled payments under Ukraine's outstanding sovereign debt – to impede Ukraine from honoring its payment obligations towards the holders of its sovereign debt and greatly increase the probability of Ukraine defaulting. In these circumstances, the terms of multiple loan agreements and bond issuances of Ukraine may allow the holders of the underlying debt to accelerate repayment of such loans and bonds, aggravating the situation and resulting in a severe liquidity crisis (as described in subparagraph 32(c) above).

37.     All or any of the risks described above may have a material adverse effect on Ukraine's financial condition and ability to access the international capital markets on

commercially acceptable terms, trigger a downgrade of Ukraine's credit ratings and negatively affect the trading price, liquidity and demand for its debt securities, which may impact its ability to perform its outstanding obligations.

38.    Based on my professional experience, I believe that the discovery of information in the Document Requests 1-7 in favor of Tatneft may open unlimited possibilities for the Russian Federation to use such information in its recovery process in parallel proceedings against Ukraine, including the *Law Debenture Trust Corporation Plc v. Ukraine*, and give additional leverage to the Russian Federation, and for that matter any other third party, over performance by Ukraine of its sovereign debt obligations. These concerns are not in any way alleviated by the fact that the Russian Federation is using the same legal counsel in the *Law Debenture Trust Corporation Plc v. Ukraine* case as Tatneft is using in this proceeding.[30]

39.    Considering that US$3.075 billion plus interest, which is sought by the Russian Federation in *Law Debenture Trust Corporation Plc v. Ukraine* is twenty times higher than Tatneft's claim in this case (and which is also almost half of the total defense expenditures budgeted by Ukraine for the year of 2022),[31] the disclosure as per Document Requests 1-7 would involve inherent risks and uncertainties for the stability of Ukraine's economy as a whole, as well as its national security.

40.    I agree with the statement made in Ukraine's legal submissions that Tatneft's Discovery Requests are far broader and far more intrusive than necessary to collect on a circa $170

---

[30]  See Cleary Gottlieb won a major victory in the English High Court on March 29, 2017, for the Ministry of Finance of the Russian Federation (available at: https://www.clearygottlieb.com/news-and-insights/news-listing/ministry-of-finance-of-the-russian-federation-wins-3-billion-english-court-victory) and also see Commercial Court orders Ukraine to pay US$3 billion on Notes held by the Russian Federation (available at: https://www.brickcourt.co.uk/news/detail/commercial-court-orders-ukraine-to-pay-us3-billion-on-notes-held-by-the-russian-federation).

[31]  The total defense budget of Ukraine for 2022 is UAH 152 billion (approx.US$ 5.2 billion). See BBC News Ukraine, Budget 2022 approved. Who and how much will receive. December 2, 2021. (available at: https://www.bbc.com/ukrainian/features-59436029)

million judgment.  They appear to be a mere pretext to obtain disclosure of information of great importance to Ukrainian national security and the stability of the Ukrainian economy.  They appear to be have more far-reaching implications at times of geopolitical tensions rising to the level of military hostilities.

41.    The concerns I have raised about harms to Ukraine's monetary, banking and financial system and about violations of Ukrainian bank secrecy laws are made in good faith based on my professional experience, as well as personal understanding of the relevant facts and law.

42.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 07 February 2022.

_____
Kyrylo Shevchenko

ОКРУЖНИЙ СУД СПОЛУЧЕНИХ ШТАТІВ АМЕРИКИ
ПІВДЕННОГО ОКРУГУ НЬЮ-ЙОРКА

ЩОДО ПОВІСТОК, ВИДАНИХ НА ІМ'Я
АТ "ДЕРЖАВНИЙ ЕКСПОРТНО-ІМПОРТНИЙ БАНК
УКРАЇНИ"; BANK POLSKA KASA OPIEKI SA;
ФЕДЕРАЛЬНИЙ БАНК НІМЕЧЧИНИ (DEUTSCHE
BUNDESBANK); РЕЗЕРВНИЙ БАНК АВСТРАЛІЇ; AB
SEB BANKAS; SEB SECURITIES, INC.; БАНК
МОНРЕАЛЯ; BMO FINANCIAL CORP.; BMO CAPITAL
MARKETS CORP.; THE BANK OF NEW YORK MELLON
CORPORATION; BARCLAYS BANK PLC; BARCLAYS
CAPITAL INC.; BNP PARIBAS FORTIS SA/NV; BNP
PARIBAS USA, INC.; BNP PARIBAS; БАНКУ CITIBANK
N.A.; ФІРМАМ CITIGROUP INC.; CITIGROUP GLOBAL
MARKETS LTD.; COMMERZBANK AG; COMMERZ
MARKETS LLC; CREDIT SUISSE (SWITZERLAND) LTD.;
CREDIT SUISSE AG; CREDIT SUISSE (USA), INC.;
БАНКУ DANSKE BANK A/S; ФІРМАМ DANSKE
MARKETS INC.; DEUTSCHE BANK TRUST COMPANY
AMERICAS; DEUTSCHE BANK TRUST CORPORATION;
DEUTSCHE BANK AG; DNB BANK ASA; DNB CAPITAL
LLC; DNB MARKETS, INC.; HSBC BANK PLC; HSBC
NORTH AMERICA HOLDINGS INC.; JPMORGAN CHASE
BANK N.A.; JPMORGAN CHASE & CO.; J.P. MORGAN
SECURITIES PLC; J.P. MORGAN SECURITIES LLC;
MUFG BANK, LTD.; MUFG AMERICAS HOLDING
CORPORATION; MUFG SECURITIES AMERICAS INC.;
БАНКУ RAIFFEISEN BANK INTERNATIONAL, AG;
ФІРМІ RB INTERNATIONAL MARKETS (USA) LLC;
БАНКАМ SANTANDER BANK POLSKA S.A.;
STANDARD CHARTERED BANK PLC; STANDARD
CHARTERED BANK (HONG KONG) LTD.; ФІРМАМ
STANDARD CHARTERED SECURITIES (NORTH
AMERICA) LLC; UBS SWITZERLAND AG; UBS
AMERICAS INC.; UBS AG; UBS AMERICAS HOLDINGS
LLC; UNICREDIT BANK AG; TA UNICREDIT CAPITAL
MARKETS LLC:

УКРАЇНА,

                          Заявник

        -проти-

ВАТ "ТАТНЄФТЬ",

                          Відповідач

Інші, Справа №
_____

(За справою №
1:17-cv-00582-CKK, що перебуває
на розгляді у Окружному суді
Сполучених Штатів Америки
Округу Колумбія)

**ЗАЯВА КИРИЛА ШЕВЧЕНКА
НА ПІДТРИМКУ ПОДАННЯ
УКРАЇНИ ПРО СКАСУВАННЯ
АБО ЗМІНУ ПОВІСТОК
(СУДОВИХ ЗАПИТІВ ПРО
РОЗКРИТТЯ ІНФОРМАЦІЇ)**

Я, Кирило Шевченко, заявляю, що:

1.      Я є Головою Національного банку України (далі – "НБУ"), який є центральним банком України. Я працюю на цій посаді з липня 2020 року. Окрім загального керівництва та нагляду за діяльністю НБУ я особисто контролюю та наглядаю, серед іншого, за діяльністю самостійних підрозділів НБУ за такими напрямками, як система управління ризиками, безпека та збереження державної таємниці. Я також входжу до складу Ради національної безпеки і оборони України, яка є державним координаційним органом з питань національної безпеки та оборони при Президентові України.

2.      Я працюю у фінансовому секторі України останні двадцять сім років. У 2009-2010 роках та у 2014 році я був першим заступником Голови Правління АТ "УкрГазБанк", а з травня 2015 року по липень 2020 року обраний Головою Правління АТ "УкрГазБанк". Мій досвід включає також перебування на посадах у правлінні кількох приватних фінансових установ, я також очолював Державну іпотечну установу з 2006 року по 2009 рік, а також був радником Прем'єр-міністра України у 2009 році.

3.      Ця заява ґрунтується на моїх власних знаннях, досвіді та експертизі, у тому числі як експерта в сфері банківської діяльності, обізнаного щодо відповідних українських законів, регуляторних актів та усталених практик.

4.      Я склав цю заяву українською мовою. Переклад моєї заяви з української мови на англійську організувала міжнародна юридична фірма Winston & Strawn LLP.

5.      Ніщо у цій заяві не слід вважати відмовою від привілеїв або прав з боку України. Для уникнення неоднозначності тлумачення: ніщо у цій заяві не слід прирівнювати до згоди на юрисдикцію або відмови від суверенного імунітету України, у тому числі від імунітету НБУ як центрального банку України, імунітету його посадових

2

осіб та майна за Законом США про іноземні суверенні імунітети (Foreign Sovereign Immunities Act).

6.     Як мені повідомили посадовці Міністерства юстиції України, Україна є стороною судових проваджень, що ведуться паралельно у федеральних судах США: в окрузі Колумбія як відповідач та у Нью-Йорку як третя особа.

7.     Як я розумію від Міністерства юстиції України, Татнєфть подала кілька запитів про розкриття інформації від України в Окружний суд округу Колумбія у справі 1:17-cv-00582-CKK. Я також розумію від Міністерства юстиції України, що Татнєфть подала близько 25 повісток (запитів про розкриття інформації) до ряду фінансових установ в рамках справи 1:21-mc-00376, що розглядається в Окружному суді Південного округу Нью-Йорка. Нещодавно Міністерство юстиції України також повідомило мене, що 25 січня 2022 року Татнєфть подала ще близько 52 додаткових повісток (запитів про розкриття інформації) до фінансових установ на додаток до початкових близько 25 повісток.

8.     Я детально вивчив Запити про надання документів 1-7, викладені в найновіших повістках, і хочу висловити деякі міркування щодо їх обсягу.

9.     Наскільки я розумію зі змісту повістки, запити про розкриття інформації можуть вплинути безпосередньо на НБУ як центральний банк України, а також на кілька українських фінансових установ, включаючи, АТ "КБ ПриватБанк", АТ "Державний експортно-імпортний Банк України", АТ "УкрГазБанк", АТ "Державний ощадний банк України" (Ощадбанк) (далі – "Українські Банки"), під тим приводом, що всі вони, будучи визначені як "Ідентифіковані установи під контролем держави", підпадають під визначення терміну "Україна".

3

10.     Як Голова НБУ, який також є контрольно-наглядовим органом (регулятором) щодо вищезазначених Українських Банків, я не можу погодитися з тим, що запропоноване визначення терміну "Україна" є доречним, і що з юридичної та практичної точки зору можливо виконати усі Запити про надання документів.

11.     Основною функцією НБУ є забезпечення стабільності грошової одиниці України, монетарної стабільності, а також стабільності банківської системи України.[1] А відтак, економічна стабільність Держави Україна залежить від НБУ. Поряд з іншою діяльністю, НБУ постійно отримує від Уряду України актуальну інформацію про державний борг та пов'язані з ним виплати від Уряду України, яка використовується НБУ для аналізу та моніторингу платіжного балансу України, монетарних процесів та грошово-кредитного ринку.[2]

12.     За українським законодавством НБУ має статус самостійної юридичної особи.[3] Зокрема, українське законодавство прямо виключає відповідальність НБУ за зобов'язаннями українських органів державної влади або українських фінансових установ (у тому числі Українських Банків).[4]А відтак не можна вважати, що НБУ підпадає під визначення терміну "Україна" у цьому провадженні.

13.     Що стосується Українських Банків, то кожен з них є самостійною юридичною особою, структурно та функціонально відокремленою від Держави Україна.[5] З мого досвіду

---

[1]   Конституція України, стаття 99; Закон України № 679-XIV "Про Національний банк Україні" від 20 травня 1999 р. стаття 6.
[2]   Закон України № 679-XIV "Про Національний банк Україні" від 20 травня 1999 р., статті 52 та 57.
[3]   Закон України № 679-XIV "Про Національний банк Україні" від 20 травня 1999 р., стаття 4
[4]   Закон України № 679-XIV "Про Національний банк Україні" від 20 травня 1999 р., стаття 4.
[5]   Статут АТ "Державний експортно-імпортний банк України", статті 23 та 24 (доступно за посиланням: https://www.eximb.com/assets/files/download/statut-2020.pdf); Статут АТ "УкрГазБанк", стаття 2.3 (доступно за посиланням: https://www.ukrgasbank.com/upload/file/statyt_2020.pdf); Статут АТ "КБ ПриватБанк", статті 20-23 (доступно за посиланням: https://static.privatbank.ua/files/Statut_11.09.2019.pdf.pdf); Статут АТ "Державний ощадний банк України

роботи на керівних посадах в АТ "УкрГазБанк" та АТ "Державний ощадний банк України"(Ощадбанк), Українські Банки, як і будь-які інші комерційні банки, мають самостійні корпоративні органи управління, у тому числі кожен з них має своє правління та наглядову раду. Українське законодавство виключає також відповідальність Українських Банків за зобов'язаннями Держави Україна та НБУ, так само, як виключає таку відповідальність для інших комерційних банків в Україні.[6] А відтак, Українські Банки також не можна вважати такими, що підпадають під визначення терміну "Україна" у рамках цього провадження.

14.     Розкриття даних за Запитами про надання документів 1-3. З мого професійного досвіду, інформація, запитувана у Запитах про надання документів 1-3, є охоронюваною згідно з українським законодавством про державну та банківську таємницю.

15.     На мою думку, Запити про надання документів 1-3 мають занадто широкий обсяг і включають вимогу надати *будь-яку* інформацію про активи України (у тому числі *будь-які* документи), якими володіє Україна (визначення якої є дуже широким), на *будь-яких* рахунках, відкритих у  *будь-якій* юрисдикції за межами України. Фактично, таке всеохоплююче формулювання може бути витлумачене як таке, що включає практично усю інформацію: і конфіденційну, і неконфіденційну. Одним з випадків надання інформації в обсязі, вказаному у Запитах про надання документів 1-3, може виявитися інформація про місцезнаходження міжнародних резервів України, які НБУ як центральний банк України зберігає в іноземних банках та фінансових інструментах.

---

(Ощадбанк)", статті 21-24 (доступно за посиланням: https://www.oschadbank.ua/uploads/0/887-statut_at_oschadbank201119.pdf).

[6]   Закон України № 2121-III "Про банки і банківську діяльність" від 7 грудня 2000 року, стаття 5.

16.     Поточний обсяг міжнародних резервів України забезпечує фінансування 4,1 місяця майбутнього імпорту, що є передумовою для виконання зобов'язань України та поточних операцій Уряду й НБУ.[7] Тому як член Ради національної безпеки і оборони України відмічаю, що інформація про ці активи є дуже конфіденційною з точки зору державної таємниці,[8] і її розкриття може завдати істотної шкоди економіці України.

17.     Інформація, запитувана у Запитах про надання документів 1-3, охоплює також відомості про різні банківські рахунки (наприклад, накопичувальні рахунки, накопичувальні рахунки для отримання оплати за контрактами, рахунки дебіторської заборгованості будь-якого виду, брокерські рахунки, депозитні рахунки та кореспондентські рахунки) та про залишки на рахунках, відкритих, наскільки я розумію, НБУ та іншими Українськими Банками в іноземних банках, а також відомості про операції, здійснювані клієнтами банків. Зокрема, кореспондентські рахунки, відкриті в фінансових установах, розташованих на території США, що використовуються Українськими Банками для здійснення платежів у доларах США від імені усіх їх клієнтів. Відтак, вищезазначена інформація по суті значною мірою охоплюється банківською таємницею.[9]

18.     На мою думку, виконання вимог Запитів про надання документів 1-3 без порушення при цьому норм українського законодавства про банківську таємницю є неможливим.

---

[7]   Див. офіційний сайт НБУ (6 січня 2022 року) (доступно за посиланням: https://bank.gov.ua/en/news/all/u-2021-rotsi-mijnarodni-rezervi-ukrayini-zrosli-do-mayje-31-mlrd-dol-ssha).
[8]   Закон України № 3855-XII "Про державну таємницю" від 21 січня 1994 року, стаття 8(1)(2).
[9]   Поняття банківської таємниці сформульовано в українському законодавстві досить широко і охоплює, поряд з іншим (i) відомості про банківські рахунки клієнтів, у тому числі про кореспондентські рахунки банків, відкриті у Національному банку України, (ii) інформація про операції, проведені на користь чи за дорученням клієнта, та про вчинені ним правочини, а також (iii) відомості стосовно комерційної діяльності клієнтів чи комерційної таємниці, будь-якого проекту, винаходів, зразків продукції та іншу комерційну інформацію тощо. Див. Закон України № 2121-III "Про банки і банківську діяльність" від 7 грудня 2000 року, стаття 60.

19.     Перш за все, усі банки, які здійснюють діяльність в Україні, як власне і сам НБУ, зобов'язані забезпечувати та гарантувати збереження банківської таємниці, і їм категорично забороняється розголошувати інформацію, яка належить до банківської таємниці. Українським законодавством встановлено суворі кримінальні, цивільно-правові та інші санкції за розголошення інформації, охоронюваної банківською таємницею.[10]

20.     У цьому контексті українське законодавство суворо обмежує коло осіб, яким може надаватися доступ до інформації, охоронюваної банківською таємницею. Це обмеження стосується не лише комерційних банків, які здійснюють діяльність в Україні, але й НБУ. Зокрема, відомості, що становлять банківську таємницю, можуть загалом бути розкритими з дозволу клієнта або на підставі рішення суду України. Існує також вичерпний перелік українських державних органів, які мають право звертатися до банків із запитами про розкриття інформації, що становить банківську таємницю, у виняткових випадках, коли розкриття такої інформації є необхідним в ході проведення розслідувань в кримінальних провадженнях, а також в фінансовій та бюджетній сферах, запобігання та протидії легалізації (відмиванню) доходів, одержаних злочинним шляхом, або фінансуванню тероризму, дотримання податкового законодавства, тощо.[11]

21.     В українському законодавстві відсутній механізм, який дозволяв би розкривати інформацію, що становить банківську таємницю, іноземному суду на підставі

---

[10]   Закон України № 2121-III "Про банки і банківську діяльність" від 7 грудня 2000 року, стаття 61(1); Правила зберігання, захисту, використання та розкриття банківської таємниці (затверджені постановою НБУ № 267 від 14 липня 2006 року) (доступно за посиланням: https://zakon.rada.gov.ua/laws/show/z0935-06#Text); Цивільний кодекс України, стаття 1076 (1).

[11]   Закон України № 2121-III "Про банки і банківську діяльність" від 7 грудня 2000 року, стаття 62.

рішення іноземного суду (окрім якщо відповідне рішення іноземного суду не буде належним чином визнане та набуде законної сили на території України). [12]

22.    По-друге, навіть якщо припустити для цілей аргументу, що конкретні державні органи могли надати свою згоду на розкриття інформації відповідно до Запитів про надання документів 1-3 щодо *їх власних* Рахунків, така згода в будь-якому разі не поширюватиметься на будь-яких інших юридично самостійних осіб, які на даний момент охоплюються надзвичайно широким терміном "Україна". Як пояснено в пунктах 12-13 вище, НБУ та Українські Банки є самостійними та юридично відокремленими юридичними особами, та компетентний державний орган України у рамках цього провадження не може надати згоди на розкриття інформації від імені НБУ чи Українських Банків. Так само, Україну не може бути прирівняно до інших третіх осіб, які помилково охоплюються терміном "Ідентифіковані установи під контролем держави", як описано в п.27 нижче.

23.    Українське законодавство встановлює санкції не лише за розкриття, а й за неправомірне використання розкритої інформації. Будь-які особи, поведінка яких сприяла такому незаконному розголошенню або використанню охоронюваної та конфіденційної інформації, якщо це завдало збитків банку або його клієнту, можуть бути притягнені до кримінальної відповідальності, а також нести цивільно-правову відповідальність за відшкодування таких збитків, а також моральної шкоди.[13] Це, зокрема застосовано щодо розкриття інформації про операції за кореспондентськими рахунками, відкритими Українськими Банками в фінансових установах, розташованих на території США. Операції

---

[12]  Нещодавня зміна до статті 62² Закону України «Про банки і банківську діяльність» передбачила право НБУ розголошувати інформацію, що становить банківську таємницю, іноземним органам влади, у тому числі іноземним судам, але ці повноваження можуть бути реалізовані лише у випадках, коли розкриття необхідне для виконання функцій НБУ (основна функція – забезпечення стабільності української національної валюти) та/або захисту інтересів НБУ. Закон України № 2121-III «Про банки та банківську діяльність» від 07 грудня 2000 року, ст.62².

[13]  Закон України № 2121-III "Про банки і банківську діяльність" від 7 грудня 2000 року, стаття 61.

за такими кореспондентськими рахунками здійснюються Українськими Банками на користь дуже великої кількості їх різноманітних українських клієнтів, які не мають жодного відношення до цього провадження і ніколи не давали згоди на розкриття інформації. На представництва та філії Українських Банків за кордоном однаково поширюються правила України щодо банківської таємниці. Відповідно, нехтування фінансовими установами, розташованими на території США, представництвами чи філіями Українських Банків, а також самими Українськими Банками, українського законодавства щодо банківської таємниці може призвести до численних позовів від клієнтів банків за неправомірне розкриття інформації, що становить банківську таємницю, а також кримінальної відповідальності.[14]

24.     <u>Розкриття даних за Запитами про надання документів 5-7</u>. Як Голова НБУ, я вважаю,  що запити на розкриття документів та повістки у цьому провадженні мають на меті розкриття конфіденційної, непублічної інформації щодо конкретних рахунків (Запити про надання документів 1-3) та посередників (Запит про надання документів 4), які використовуються Україною у зв'язку із залученням, обслуговуванням та погашенням державного боргу. Україна розраховує на необмежений доступ до таких рахунків та оперативну допомогу з боку посередників, щоб своєчасно виконувати свої зобов'язання щодо виплат перед міжнародними кредиторами та власниками облігацій. Якщо інформацію про таких посередників або рахунки буде розкрито третім особам (включаючи Російську Федерацію, як описано в п.п.36-40 нижче), будь-яке втручання у роботу таких посередників чи рахунків з боку третьої особи, створить ризики для відповідних розрахунків України зі своїми міжнародними кредиторами та власниками облігацій. У випадку, якщо переказ будь-

---

[14] Закон України № 2121-ІІІ "Про банки і банківську діяльність" від 7 грудня 2000 року, стаття 61; Цивільний кодекс України, стаття 1076 (2). Кримінальний кодекс України, Статті 231 та 232.

яких відповідних коштів буде поставлений під загрозу, це призведе до несплати Україною відповідних сум своїм міжнародним кредиторам або власникам облігацій, і в кінцевому підсумку призведе до перехресного невиконання зобов'язань (cross-default) за державним боргом України. Будь-яка з таких подій призведе до згубних наслідків для економіки та фінансової стабільності України.

25.     Крім того, запити на розкриття документів та повістки передбачають розкриття конфіденційної, непублічної інформації в надмірному обсязі про минулі та очікувані випуски цінних паперів Україною (Запити про надання документів 4-5) та пов'язані з ними капітальні трансферти (Запит про надання документів 6-7). Будь-яке розкриття такої інформації може потенційно вплинути на ціну або торгівлю відповідними цінними паперами України, а також на інші зобов'язання України за зовнішнім боргом. Таким чином, це в кінцевому підсумку обмежить можливість доступу України до міжнародних ринків капіталу на комерційно прийнятних умовах і спричинить серйозний тиск на економіку України, валютні резерви та загальну фінансову стабільність. Україна вже зазнавала таких труднощів після незаконної окупації та спроби анексії Криму Росією у 2014 році. Зокрема, Україна змогла отримати доступ до фінансування від міжнародних ринків капіталу лише після надання кредитних гарантій з боку Сполучених Штатів.[15]

26.     Занепокоєння, описане вище, посилюється використанням невиправдано широкого визначення терміну "Україна", як я вже зазначав, щодо НБУ та Українських Банків, яке також включає "Ідентифіковані установи під контролем держави"(а саме, основні державні підприємства, що працюють у стратегічних галузях економіки, таких як нафтогазова (НАК "Нафтогаз України"), авіаційна (Державне авіаційне підприємство

---

[15] Див. на офіційному сайті Посольства США в Україні (3 червня 2016 року) (доступно за посиланням: https://ua.usembassy.gov/u-s-signs-loan-guarantee-agreement-ukraine/).

"Україна") та інфраструктурна (АТ "Українська залізниця"). Багато з цих компаній мають значний рівень валютної заборгованості і продовжують відчувати складнощі з рефінансуванням таких зобов'язань або доступом до нового фінансування. Як наслідок, обмежений доступ України до міжнародних ринків капіталу також негативно вплине на такі суб'єкти, і це матиме серйозні наслідки для відповідних галузей економіки.

27.     Слід зазначити, що Україна у значній мірі залежить від зовнішніх джерел фінансування Державного Бюджету та обслуговування існуючого зовнішнього боргу. Зокрема, за інформацією Міністерства фінансів України[16], у 2022 році на погашення та обслуговування зовнішнього боргу України припадає 126,8 млрд. грн. (або близько 4,4 млрд. доларів США), а також 431,8 млрд. грн. (або близько 15,1 млрд. доларів США) на погашення та обслуговування внутрішнього боргу України. Щоб мати можливість здійснювати такі виплати, Україні потрібно буде рефінансувати всі або принаймні частину цих сум за рахунок нових запозичень. Згідно з Державним бюджетом України на 2022 рік[17], Україна планує здійснити зовнішні запозичення на суму 151,2 млрд. грн. (або близько 5,3 млрд доларів США) і внутрішні запозичення на суму 420 млрд. грн. (близько 14,7 млрд доларів США).

28.     Крім того, відповідно до Середньострокової стратегії управління державним боргом на 2021-2024 роки, затвердженої Кабінетом Міністрів України[18], Україна визначила, що її основною метою управління державним боргом є "*залучення необхідного*

---

[16]  Див. графік Міністерства фінансів України щодо щомісячних платежів за державним боргом у 2022 році (доступно за посиланням:
https://mof.gov.ua/storage/files/%D0%9F%D0%BE%D0%BC%D1%96%D1%81%D1%8F%D1%87%D0%BD%D1%96%20%D0%BF%D0%BB%D0%B0%D1%82%D0%B5%D0%B6%D1%96%20%D0%B2%202022%20%D1%81%D1%82%D0%B0%D0%BD%D0%BE%D0%BC%20%D0%BD%D0%B0%2001_02_2022.xlsx).

[17]  Закон України № 1928-IX від 2 грудня 2021 року «Про Державний бюджет України на 2022 рік», додатки (доступно за посиланням: https://zakon.rada.gov.ua/laws/show/1928-20#Text).

[18]  Постанова Кабінету Міністрів України № 1291 від 9 грудня 2021 року (доступно за посиланням: http://search.ligazakon.ua/l_doc2.nsf/link1/KP211291.html).

встановлено, що "*з метою гарантування виконання Україною наявних боргових зобов'язань необхідними є забезпечення <u>надійного доступу до ринків капіталу в наступних роках та постійний контроль ризику рефінансування</u>*". З огляду на те, що можливість доступу України до міжнародних ринків капіталу може бути обмежена через розкриття запитуваної інформації (як зазначено вище), існує ризик того, що Україна не зможе управляти своїм державним боргом та впроваджувати відповідні заходи відповідно до Стратегії. Це може призвести до негативних наслідків для економіки України та, ймовірно, створить великий ризик для її фінансової стабільності.

29.     Крім того, якщо в Запитах про надання документів 4-7 міститься вимога про надання інформації щодо випуску, погашення, купівлі або анулювання державних облігацій Україною, існують обмеження на розкриття такої інформації в законодавстві України про цінні папери, в доповнення до можливих обмежень, які можуть існувати відповідно до американського законодавства. Відповідно до законодавства України, інформація про плани України щодо випуску нових або викупу, купівлі чи анулювання наявних цінних паперів може кваліфікуватися як інсайдерська інформація. Остання включає непублічну (неоприлюднену) інформацію про цінні папери, що перебувають в обігу на фондовій біржі, яка після опублікування може суттєво вплинути на ціну таких цінних паперів.[19] Українське законодавство про цінні папери передбачає штрафи за несанкціоноване розкриття інсайдерської інформації (у тому числі штрафи за здійснення операцій з використанням

---

[19] Закон України № 3480-IV «Про ринки капіталу та організовані товарні ринки» від 23 лютого 2006 року, Стаття 145(1).

інсайдерської інформації в розмірі до 300% отриманого прибутку (доходу)) та заборону працювати у сфері цінних паперів на строк до трьох років.[20]

30.     В тій мірі, в якій вимога про надання інформації згідно з Запитом про надання документів 4 стосується "угод, пов'язаних із відносинами з фіскальним агентом, довіреною особою або платіжним агентом", розкриття такої інформації зазвичай захищається положеннями про конфіденційність відповідних угод.

31.     Також на мою думку, розкриття інформації, яка вимагається у запитах на розкриття документів та повістках у цьому провадженні, зробить Україну надзвичайно вразливою та незахищеною від негативних дій ворожої сторони, такої як Російська Федерація, що може вплинути на здатність України здійснювати платежі за державним боргом, спричинити дефолт і негативно вплинути на економіку, фінансову стабільність і добробут мільйонів її громадян. Нижче це пояснюється більш детально.

32.     Ризики, пов'язані з управлінням державним боргом України, визначені постановою Кабінету Міністрів України № 815 від 01.08.2012 року.[21] Такі ризики включають, зокрема:

>      a.  *бюджетний ризик* – ризик недовиконання дохідної частини Державного Бюджету, що може призвести до невиконання зобов'язань Україною з обслуговування державного боргу та збільшення обсягу необхідних державних запозичень. У зв'язку з цим, економіка України залежить від дій Росії як її найбільшого сусіда та від здатності Росії

---

[20]  Кодекс України про адміністративні правопорушення, Стаття 163-9; Кримінальний кодекс України, Стаття 232-1; Закон України № 448/96-ВР «Про державне регулювання ринків капіталу та організованих товарних ринків» від 30 жовтня 1996 року, Стаття 11(12).

[21]  Постанова Кабінету Міністрів України № 815 від 1 серпня 2012 року (доступно за посиланням: https://zakon.rada.gov.ua/laws/show/815-2012-%D0%BF#Text).

впливати на різні сфери економіки України. З кінця 2013 року дії Росії ускладнили погашення Україною свого боргу. Аналітики виділяють широкий спектр дій Росії, які свідомо спрямовані на заподіяння значної шкоди економіці України. Зокрема, Росія "маніпулювала" з поставками газу в Україну та "вдарила торговими санкціями."[22] Інший аналітик визначає такі шкідливі дії з боку Росії: (i) численні нетарифні бар'єри проти імпорту товарів українського походження, (ii) перешкоди для транзиту товарів в Україну (із нещодавнього, обмеження постачання вугілля з Казахстану в Україну) та (iii) перенаправлення транзиту газу з України.[23] Розголошення інформації, зазначеної в Запитах про надання документів 4-6 компаніям, афілійованим з Російською Федерацією, надасть останній доступ до цінної інформації, що дозволить їй краще планувати свої подальші атаки на Україну, оскільки Росія зможе посилювати свою ворожу діяльність проти України у періоди настання строків сплати за українським боргом. Як наслідок, кошти з бюджету, доступні Україні для здійснення необхідних платежів за таким боргом, можуть значно зменшитись;

b. *валютний ризик* – ризик того, що курс валюти України до валюти, в якій номіновані зобов'язання за боргом, може змінитися у

---

[22] Див. Економіст, Конфлікт України з Росією має також фінансовий характер (21 січня 2017 року) (доступно за посиланням: https://www.economist.com/finance-and-economics/2017/01/21/ukraines-conflict-with-russia-is-also-financial).

[23] Див. Економічна правда, Як російська агресія шкодить українській економіці та що з цим робити (18 січня 2022 року). (доступно за посиланням: https://www.epravda.com.ua/columns/2022/01/18/681554/).

несприятливу сторону. Вартість української валюти істотно знизилася з 2013 року, значною мірою з огляду на дії Росії.[24] Аналітики вважають, що останні дії Росії проти України є найважливішим фактором, який зараз впливає на вартість української валюти.[25] Як було вказано вище, розголошення запитуваної інформації (Запити про надання документів 4-6) може надати Росії можливість здійснювати свої атаки на Україну у періоди пікових виплат за державним боргом України, коли несприятливі зміни курсу обміну можуть значно збільшити витрати українського бюджету, а отже, і створити ризик дефолту;

c. *ризик ліквідності* – ризик того, що кошти Державного бюджету можуть тимчасово стати недоступними для здійснення платежів за державним боргом внаслідок можливого швидкого зменшення обсягу ліквідних активів у результаті виникнення непередбачених поточних грошових зобов'язань та/або труднощів з оперативним залученням коштів шляхом запозичень, та *ризик рефінансування* – ризик зменшення ємності ринків капіталу, що унеможливлює запозичення Україною в обсязі, необхідному для рефінансування боргу за прийнятною ціною, та призводить до збільшення вартості запозичень. Саме це наразі переживає Україна, оскільки потенційна загроза, що

---

[24] Див. Економіст, Конфлікт України з Росією має також фінансовий характер (21 січня 2017 року) (доступно за посиланням: https://www.economist.com/finance-and-economics/2017/01/21/ukraines-conflict-with-russia-is-also-financial).

[25] Див. Економічна правда, Як російська агресія шкодить українській економіці та що з цим робити (18 січня 2022 року). (доступно за посиланням: https://www.epravda.com.ua/columns/2022/01/18/681554/).

Росія поглибить своє вторгнення в Україну, вже спричинила підвищення вартості запозичення Україною. Після того, як Росія перекинула тисячі своїх військ до кордонів України, спред державних облігацій України зріс на чотири цифри, що можна порівняти з державним боргом країн, які перебувають у стані дефолту або мають серйозні боргові проблеми.[26] Аналітики вважають, що в результаті діяльності Росії Україна не зможе вийти на міжнародні ринки капіталу ще 2-3 квартали,[27] що відтворює проблеми, з якими Україна зіткнулася після початку вторгнення Росії в Україну у 2014 році. Розголошення запитуваної інформації (Запити про надання документів 4-6) може надати Росії можливість синхронізувати майбутню кризу з планами України щодо виходу на міжнародні ринки капіталу для рефінансування наявних зобов'язань, що призведе до різкого зростання ціни боргу України та або значно збільшить витрати українського бюджету, або спричинить дефолт, якщо зобов'язання не зможуть бути рефінансовані.

33.    Крім того, купівля державного боргу на вигідних умовах є важливим елементом управління державним боргом, що дозволяє використовувати наявні фінанси для зменшення непогашеної основної суми, покращення обслуговування державного боргу України та зменшення тиску на Державний бюджет України. Інформація про строки такого

---

[26] Див. Reuters, Облігації України зазнають кризи, російські облігації падають в ціні, по мірі того, як зростає напруга (17 січня 2022 року) (доступно за посиланням: https://www.reuters.com/markets/europe/ukraine-bonds-sink-into-distress-russia-drops-tensions-bite-2022-01-17/).

[27] Див. Економічна правда, Як російська агресія шкодить українській економіці та що з цим робити (18 січня 2022 року). (доступно за посиланням: https://www.epravda.com.ua/columns/2022/01/18/681554/).

придбання, яка зазначена у Запиті про надання документів 7, може бути використана для завищення ціни державного боргу України і, таким чином, підвищення ціни купівлі або повного припинення відповідних заходів з управління зобов'язаннями.

34.    <u>Шкода для грошово-кредитної, банківської та фінансової системи України.</u> Як голова НБУ зазначаю, що будь-які дії проти України, чи то політичні, юридичні чи фінансові, безпосередньо впливають на фінансові показники та стабільність України. Я не можу не відмітити, що, схоже, позов до України в цьому провадженні є лише частиною ширшої стратегії економічної, політичної та військової агресії з боку Російської Федерації проти України, яка розпочалася у 2013 році. Зокрема, після того, як Росія зібрала свої війська біля українських кордонів, вартість кредитних дефолтних свопів та дохідність українських єврооблігацій значно зросла.[28] Таким чином, не можу не прийти до висновку, що цей запит на розкриття інформації компанії, що є тісно пов'язаною із російським урядом, є черговою спробою зібрати додаткову інформацію про зовнішні запозичення України.

35.    В своїй якості як Голова НБУ та член Ради національної безпеки і оборони України, мені відомо, що цей позов Татнєфті є однією з декількох спроб підконтрольних Росії компаній ініціювати судові провадження проти України. Зокрема, наскільки я розумію, Російська Федерація, як єдиний власник українських облігацій на суму 3 мільярди доларів США зі ставкою 5 процентів, випущених у грудні 2013 року (далі – **"Облігації 2013 року"**) надала розпорядження довірчому управителю, компанії Law Debenture Trust Corporation Plc, порушити справу в судах Англії про стягнення з України суми у розмірі 3,075 мільярда доларів США плюс проценти у зв'язку з Облігаціями 2013 року,[29] після

---

[28]  Див.    Звіт    НБУ    про    фінансову    стабільність    (доступно    за    посиланням: https://bank.gov.ua/admin_uploads/article/FSR_pr_2021-H2_eng.pdf?v=4)
[29]  Див. справу The Law Debenture Trust Corporation Plc (Rev 1) проти України [2018] EWCA Civ 2026 (14 вересня 2018 року) URL: http://www.bailii.org/ew/cases/EWCA/Civ/2018/2026.html

відмови Російської Федерації взяти участь у реструктуризації українського боргу разом з усіма іншими власниками українських облігацій. Остаточного рішення у цій справі ще не винесено, але не можна виключати ризик того, що рішення у цій справі буде негативним для України. Цей ризик описаний в проспекті емісій державних облігацій України.

36.    Відповідно, з сукупності всіх обставин складається враження, що розкриття інформацій нібито на забезпечення виконання рішення у справі *Татнєфті* на меншу суму, є нічим іншим як розвідувальна операція Росії по збору інформації з метою забезпечення виконання рішення(-ень) у справі *Law Debenture Trust Corporation Plc* на значно більшу суму, щоб фактично зробити Україну заручницею ситуації і маніпулювати загрозою істотної шкоди її монетарній стабільності, шляхом накладення арештів або стягнення:

      a.    доходів від операцій на ринку капіталу України – з метою обмеження доступу України до міжнародних ринків капіталів, що створить серйозну кризу рефінансування для державного боргу України (як було описано в підпункті 32(c) вище); або

      b.    заплановані платежі України на сплату непогашених зобов'язань за державним боргом – щоб не допустити виконання Україною своїх платіжних зобов'язань перед кредиторами її державного боргу, та істотно підвищити ризик дефолту України. За цих обставин умови багатьох кредитних договорів та випусків облігацій України можуть дозволити кредиторам за невиплаченим боргом прискорити погашення заборгованості за такими кредитами та облігаціями, що погіршить ситуацію та призведе до серйозної кризи ліквідності (як було описано в підпункті 32(c) вище).

37.    Усі або будь-які ризики, описані вище, можуть мати істотний негативний вплив на фінансовий стан України та можливість виходу на міжнародні ринки капіталу на комерційно прийнятних умовах, спровокувати зниження кредитних рейтингів України та негативно вплинути на торгову ціну, ліквідність та попит на її боргові цінні папери, що може вплинути на здатність України виконувати свої зобов'язання.

38.    Виходячи з мого професійного досвіду, я вважаю, що розголошення інформації, зазначеної у Запитах про надання документів 1-7, на користь Татнєфті може надати Російській Федерації необмежені можливості щодо використання такої інформації на свою користь в рамках паралельних проваджень проти України, включаючи справу компанії *Law Debenture Trust Corporation Plc проти України*; та надати Російській Федерації, а, у зв'язку з цим, будь-яким іншим третім сторонам, додаткові переваги щодо виконання Україною своїх зобов'язань з погашення державного боргу. Це занепокоєння жодним чином не пом'якшується тим фактом, що Російська Федерація залучила того самого юридичного радника для свого представництва у справі за позовом *Law Debenture Trust Corporation Plc проти України*], що й Татнефт у цій справі.[30]

39.    Враховуючи, що 3,075 мільярда доларів США плюс проценти, які вимагає Російська Федерація у справі компанії *Law Debenture Trust Corporation Plc проти України*, у двадцять разів перевищує позов Татнєфті у цій справі (і що також становить майже половину загальних витрат на оборону, передбачених бюджетом Україна на 2022 рік),[31]

---

[30] Див. Cleary Gottlieb здобула велику перемогу у Високому суді Англії 29 березня 2017 року на користь Міністерства фінансів Російської Федерації (доступно за посиланням: https://www.clearygottlieb.com/news-and-insights/news-listing/ministry-of-finance-of-the-russian-federation-wins-3-billion-english-court-victory); Господарський суд зобов'язав Україну виплатити 3 мільярди доларів США за облігаціями, які зберігаються в Російській Федерації (доступно за посиланням: https://www.brickcourt.co.uk/news/detail/commercial-court-orders-ukraine-to-pay-us3-billion-on-notes-held-by-the-russian-federation).

[31] Загальний бюджет України на оборону у 2022 році становить близько152 мільярдів гривень (близько 5,2 мільярда доларів США). Див. BBC News Україна, Затверджений бюджет на 2022 рік. Хто і скільки отримає, 2 грудня 2021 року (доступно за посиланням: https://www.bbc.com/ukrainian/features-59436029)

розголошення інформації, зазначеної у Запитах про надання документів 1-7, передбачає значні ризики та невизначеність щодо стабільності економіки України в цілому, а також національної безпеки.

40. Я погоджуюсь із твердженням, зробленим у юридичних заявах України, що Запити про надання документів Татнєфті є набагато ширшими і необґрунтованими, ніж необхідно для стягнення приблизно 170 мільйонів доларів США. Вони є лише приводом для розкриття інформації, яка має велике значення для національної безпеки України та стабільності української економіки. Вони матимуть більш далекосяжні наслідки у час, коли геополітична напруженість зростає до рівня військових дій.

41. Занепокоєння, які я висловив щодо шкоди для грошово-кредитної, банківської та фінансової системи України та щодо порушень українського законодавства про банківську таємницю, висловлюються сумлінно, виходячи з мого професійного досвіду, а також особистого розуміння відповідних фактів і законодавства.

42. Я заявляю, усвідомлюючи можливу відповідальність у вигляді покарання за надання неправдивих відомостей згідно із законодавством Сполучених Штатів Америки, що вищезазначене є правдивим і правильним.


Підписано 09 лютого 2022 року.


_____

Кирило Шевченко