**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UKRAINE,

                    Petitioner,

          v.

PAO TATNEFT,

                    Respondent.

21-mc-376 (JGK)(SN)

22-mc-36 (JGK)(SN)


**STATEMENT OF INTEREST OF**
**THE UNITED STATES OF AMERICA**

EDWARD Y. KIM
Acting United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2761

CHRISTOPHER K. CONNOLLY
Assistant United States Attorney
     - Of Counsel -

**TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND ........................................................................................................................2

DISCUSSION ...........................................................................................................................6

      A.     The Court Should Maintain the Moratorium on Third-Party Discovery for the Duration of Russia's Ongoing War of Aggression Against Ukraine................6

      B.     If the Court Determines the Stay Should be Lifted, It Should First Address the Proper Scope of Tatneft's Third-Party Discovery ..........................................13

CONCLUSION ........................................................................................................................14

## TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE(s)**

*Clinton v. Jones*,
    520 U.S. 681 (1997)............................................................................. 6, 7

*Jiminez v. Credit One Bank, N.A.*,
    377 F. Supp. 3d 324 (S.D.N.Y. 2019)............................................... 8

*Landis v. North American Co.*,
    299 U.S. 248 (1936)....................................................................... 6, 7, 8

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
    676 F.3d 83 (2d Cir. 2012).............................................................. 6, 8

*Republic of Turkey v. Christie's, Inc.*,
    316 F. Supp. 3d 675 (S.D.N.Y. 2018)............................................. 7

**STATUTES**

28 U.S.C. § 517 ............................................................................................. 1

Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* ...................... 13

**RULES**

Fed. R. Civ. P. 26 .......................................................................................... 7

Fed. R. Civ. P. 29 .......................................................................................... 7

Fed. R. Civ. P. 62 .......................................................................................... 7

Fed. R. Civ. P. 69 .......................................................................................... 7

## PRELIMINARY STATEMENT

The United States of America, by its attorney, Edward Y. Kim, Acting United States Attorney for the Southern District of New York, respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517,[1] in order to inform the Court of its interests concerning PAO Tatneft's motion to lift the "moratorium on discovery and discovery-related proceedings" entered by this Court in these related matters in March 2022.

The Court entered the moratorium—at the request of the parties and pursuant to its inherent authority—in response to Russia's full-scale invasion of Ukraine. Three other courts overseeing related matters—the U.S. District Court for the District of Columbia, U.S. Court of Appeals for the D.C. Circuit, and U.S. Court of Appeals for the Second Circuit—also entered stays as a result of the Russian invasion. Russia's war of aggression against Ukraine has now surpassed the one-thousand-day mark, and these matters all remain stayed.

The interests of the United States, and of the public more broadly, support maintaining the moratorium. The United States and its allies and partners have been steadfast supporters of Ukrainian sovereignty and territorial integrity in the face of Russia's war of aggression. Here, Ukraine has raised concerns that the post-judgment discovery sought by Tatneft is overly broad, that it is being sought to compromise Ukraine's national security by revealing sensitive military and economic information, and that the close ties between Tatneft and the Russian government make it likely that the discovery materials will end up in the hands of a foreign adversary. Given the credibility of these concerns, and the importance of Ukraine's national security to the interests

---

[1] Pursuant to 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

of the United States, the Court should maintain the moratorium until the conclusion of the conflict in Ukraine. In the alternative, if the Court were to determine that lifting the moratorium is appropriate, it should first allow time for the United States to consider whether to submit a further statement of interest providing its views on the appropriate scope of post-judgment discovery.

## **BACKGROUND**

These matters are ancillary to a District of Columbia district court matter where, in 2020, the court confirmed a foreign arbitral award that Tatneft had obtained against Ukraine. *See PAO Tatneft v. Ukraine*, 17-cv-582 (CKK) (D.D.C.), ECF No. 50. In 2021, the D.C. district court entered judgment in favor of Tatneft in the amount of $172.9 million. *Id.*, ECF No. 61.

Thereafter, Tatneft sought broad-ranging discovery in aid of execution against Ukraine and nineteen "State Controlled Entities" that Tatneft defined as equivalent to Ukraine for purposes of satisfying the judgment. *See, e.g., id.*, ECF No. 76-2. After Ukraine objected, Tatneft filed a motion to compel, which the D.C. district court granted. *Id.*, ECF No. 83. Ukraine appealed. *Id.*, ECF No. 85.

The D.C. district court then set a schedule for rolling discovery responses, *id.*, ECF No. 89, and Ukraine moved for a protective order to restrict access to records produced in discovery, *id.*, ECF No. 90. Ukraine's motion for a protective order was pending, and the rolling discovery schedule was ongoing, when Russia commenced its full-scale invasion of Ukraine in February 2022. In light of the invasion, on March 4, 2022, the parties jointly moved "for a moratorium on discovery and all related proceedings before this Court, consistent with the parties' right to modify ordinary discovery procedures by stipulation, pursuant to the inherent authority of the Court, and in the interest of justice." *Id.*, ECF No. 104. The D.C. district court granted the motion, *id.*, ECF No. 105, and the matter remains stayed as of the date of this submission. So too does Ukraine's

appeal from the order granting Tatneft's motion to compel, which the D.C. Circuit stayed in March 2022 on the joint motion of the parties. *PAO Tatneft v. Ukraine*, 21-7132 (D.C. Cir.), Doc. Nos. 1937742, 1939952.

Separate from the discovery in aid of execution in the District of Columbia, in March 2021, Tatneft served subpoenas on 25 third-party financial institutions in New York, again seeking broad-ranging discovery in aid of execution and again defining "Ukraine" to encompass nineteen "State Controlled Entities." *See Ukraine v. PAO Tatneft*, 21-mc-376 (JGK)(SN) (S.D.N.Y.), ECF No. 3. Ukraine moved to quash the subpoenas. *Id.*, ECF No. 1. In an order dated July 19, 2021, this Court denied Ukraine's motion to quash, holding that Ukraine had not met its burden to demonstrate that its privacy interest in the information sought outweighed the information's probative value. *See id.*, ECF No. 16 ("July 2021 Order") 4-12. Although the Court acknowledged Ukraine's position that discovery would harm Ukrainian national security by disclosing sensitive information to a hostile state, it determined that Ukraine's submissions to date provided insufficient support for those allegations. *See id.* at 10 ("Its papers contain no affidavits or declarations from government figures or other affected entities saying why disclosure would harm Ukrainian interests."). In November 2021, Judge Koeltl affirmed the denial of Ukraine's motion to quash and remanded the case to this Court for consideration of the entry of a protective order. *Id.*, ECF No. 27. Ukraine appealed. *Id.*, ECF No. 28.

In February 2022, Ukraine moved to quash an additional 52 subpoenas that Tatneft served on third-party financial institutions. *Ukraine v. PAO Tatneft*, 22-mc-36 (JGK)(SN) (S.D.N.Y.), ECF No. 1. In support of its motion, Ukraine submitted declarations from its Ambassador to the United States, Oksana Markarova, *id.*, ECF No. 3 ("First Markarova Decl."); its Minister of Defense, Oleksii Reznikov, *id.*, ECF No. 4 ("First Reznikov Decl."); the Governor of the National

Bank of Ukraine, Kyrylo Shevchenko, *id.*, ECF No. 5; and the Chief Compliance Officer of the State Savings Bank of Ukraine, Iryna Mudra, *id.*, ECF No. 6.[2]

The declarations submitted by Ukraine attested, among other things, to the close ties between Tatneft and the Russian government, the breadth and sensitivity of the information the subpoenas sought, and the harms to Ukraine's national security that would arise in the event the Russian government accessed the information Tatneft obtained in discovery. For example, Ambassador Markarova explained that the information Tatneft sought "can be used to evaluate Ukraine's defense capabilities, to plan offensive measures that account for Ukraine's defense capabilities and exploit its weaknesses, and to interfere with Ukraine's efforts to sustain its national defense efforts, including by identifying, intimidating, and harming companies and individuals, including soldiers, and intelligence agents, with important roles in Ukraine's national defense." First Markarova Decl. ¶ 8. She explained how the Russian government obtains sensitive information "by offering positive and negative incentives" to individuals and companies, and by engaging in cyber-attacks, *id.* ¶¶ 9-11, and placed those threats within the broader context of Russia's increasing belligerence toward Ukraine at that time, *see id.* ¶¶ 12-19. Minister of Defense Reznikov similarly asserted that "disclosure of the [discovery] information by Ukraine . . . and by the financial institutions in response to PAO Tatneft's subpoenas, will inevitably cause extreme and irreparable harm to Ukraine's national security." First Reznikov Decl. ¶ 6. Reznikov explained how Tatneft's broad definition of "Ukraine," encompassing the "State Controlled Entities," swept in a broad range of sensitive economic, military, and technological information

---

[2] At around the same time, Ukraine moved for a protective order in 21-mc-376. ECF Nos. 33, 34. In support of that motion, it filed declarations from Chief Compliance Officer Mudra, Ambassador Markarova, and Minister of Defense Reznikov. ECF Nos. 35-37. Ukraine's motion in 21-mc-376 remained pending at the time these matters were stayed.

relevant to Ukraine's national security.  *See id.* ¶¶ 8-10.  And he asserted "that the Russian Federation through Tatneft is exploiting the U.S. justice system and legal mechanisms available under the American law in order to extract sensitive information from Ukraine." *Id.* ¶ 45; *see also id.* ¶ 17 ("Based on the evidence and information that is available to me as the Minister of Defense . . . there is a very practical and realistic threat that information provided to Tatneft, or even to Tatneft's outside counsel, will find its way into the hands of the Russian Federation [ ] where it will be used to undermine Ukraine['s] national security and defense.").[3]

On March 4, 2022, the parties filed joint motions in both matters, seeking "a moratorium on discovery and all related proceedings before this Court . . . consistent with the parties' right to modify ordinary discovery procedures by stipulation, pursuant to the inherent authority of the Court, and in the interest of justice."  21-mc-376, ECF No. 56.[4]  This Court entered its order imposing the moratorium that same day.  *Id.*, ECF No. 57.  The parties also sought and received a stay from the Second Circuit in Ukraine's appeal from the denial of its motion to quash in 21-mc-376.  *Ukraine v. PAO Tatneft*, 21-2979 (2d Cir.), ECF Nos. 47, 53.  In subsequent status reports filed in both matters before this Court over a period of nearly two years, the parties "agree[d] that the moratorium . . . should remain in effect" because "[t]he war in Ukraine remains ongoing" and "[n]either an end of the war nor a ceasefire is in sight."  *See id.*, ECF Nos. 58, 69, 73, 82.

Now Tatneft moves to lift the moratorium.  It explains that it "is a public company, with shareholders," asserts that "[t]he stay of discovery was never meant to suspend Tatneft's right to

---

[3] On February 28, 2022, Ukraine filed an amended motion to quash and a second declaration from Ambassador Markarova, addressing, among other things, the implications of Russia's invasion, which began just days earlier.  *See id.*, ECF Nos. 25-27.

[4] Beginning with the parties' joint letter seeking a moratorium, records filed in one matter have also been filed in the other matter.  Where that is the case, this Statement of Interest will cite only to the docket number in 21-mc-376.

take post-judgment discovery for the duration of the conflict between Ukraine and Russia," and argues that the Court has "no valid basis for continuing the moratorium." *Id.*, ECF No. 94 ("Tatneft Br.") at 1. Ukraine opposes the motion: owing to "Russia's unlawful invasion," "[t]he justifications for the Court's exercise of its broad discretion to control its docket have only grown stronger over time." *Id.*, ECF No. 97 ("Ukraine Opp.") at 1.

## DISCUSSION

The United States and its allies and partners have been steadfast supporters of Ukrainian sovereignty and territorial integrity in the face of Russia's war of aggression. Here, Ukraine has raised credible concerns that the post-judgment discovery sought by Tatneft—which seeks worldwide information on Ukrainian accounts and assets, as well as detailed information concerning the "State Controlled Entities"—is not only overbroad, but is also likely to compromise Ukraine's national security. Given those credible concerns, the interests of the United States and the public weigh decidedly in favor of maintaining the moratorium for the duration of Russia's war of aggression.

**A.    The Court Should Maintain the Moratorium on Third-Party Discovery for the Duration of Russia's Ongoing War of Aggression Against Ukraine**

The Court has the authority to maintain the moratorium. "'[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the [cases] on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012) (quoting *Landis v. North American Co.*, 299 U.S. 248, 254 (1936)); *accord Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."). Moreover, Federal Rule of Civil Procedure 26(c) provides courts with "considerable

discretion" to stay discovery. *Republic of Turkey v. Christie's, Inc.*, 316 F. Supp. 3d 675, 677 (S.D.N.Y. 2018) (quotation marks omitted).

Tatneft acknowledged and invoked the Court's "inherent authority" to stay "discovery and all related proceedings" when it jointly sought the moratorium following Russia's invasion of Ukraine. 21-mc-376, ECF No. 56 (citing, *inter alia*, *Landis*, 299 U.S. at 254). Its about-face is unavailing. Tatneft now argues that the post-judgment discovery procedures in Federal Rules of Civil Procedure 62 and 69 preclude a stay and require Ukraine to either pay the judgment or submit to discovery. *See* Tatneft Br. 11-13. But it does not, and cannot, point to any authority holding that those rules abrogate the Court's "power to control its own docket." *Clinton*, 520 U.S. at 706. Indeed, as Ukraine observes, "the Underlying Action [in D.C. district court], and the Two Pending Appeals [before the D.C. Circuit and Second Circuit] are all currently stayed and have been stayed since Russia launched its full-scale invasion of Ukraine in February 2022," Ukraine Opp. 14— without any objection from Tatneft, and despite the fact that Ukraine has neither paid the judgment nor posted bond.[5] Moreover, Tatneft's claim that Rule 26 does not apply because there is no "pending action," Tatneft Reply 2-3, relies on an overly-cramped reading of the Rule, and is undermined by Tatneft's own reliance on Federal Rule of Civil Procedure 29—another pre-judgment discovery rule—as a ground for urging the Court to impose the moratorium in the first place, *see* 21-mc-376, ECF No. 56. In any event, even if Rule 26 does not apply, that does not disturb this Court's inherent authority to "control the disposition of the cases on its docket," *Landis*, 299 U.S. at 254—a bedrock principle that Tatneft now seeks to elide but cannot credibly dispute.

---

[5] Tatneft notes that, approximately one year after the Russian invasion, a state-owned Ukrainian bank commenced an action in D.C. district court to confirm an arbitral award against the Russian Federation. Tatneft Reply (ECF No. 99) 5. That proceeding was stayed in September 2024. *See Joint Stock Company State Savings Bank of Ukraine v. Russian Federation*, 23-cv-764 (ACR) (D.D.C.), minute entry dated Sept. 18, 2024.

Staying proceedings "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis*, 299 U.S. at 254-55. In determining whether a stay is appropriate, district courts within the Second Circuit often consider five factors: "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil ligation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest." *Jiminez v. Credit One Bank, N.A.*, 377 F. Supp. 3d 324, 336 (S.D.N.Y. 2019) (quotation marks omitted); *see also Louis Vuitton*, 676 F.3d at 99 n.13 (acknowledging district courts' use of five-factor test and citing cases). These factors do not "replac[e] the district court's studied judgment as to whether the civil action should be stayed based on the particular facts before it," but rather "act as a rough guide for the district court as it exercises its discretion." *Louis Vuitton*, 676 F.3d at 99.

Here, the fourth and fifth factors—the interest of the United States, which is not a party to the litigation, and the public interest—overlap and weigh heavily in favor of the Court maintaining the moratorium.[6] The United States, its partners, and its allies are committed to Ukraine's sovereignty and territorial integrity, and have given substantial economic and security assistance

---

[6] The parties have, in sum and substance, addressed the first three factors in their motion papers. *See* Tatneft Br. 15-23; Ukraine Opp. 15-24; Tatneft Reply 5-10. Although those factors are beyond the scope of this Statement of Interest, the United States nonetheless observes that Tatneft barely attempts to explain how it is now prejudiced by a moratorium it affirmatively sought in March 2022, and whose renewal it affirmatively requested multiple times thereafter on the ground that the war in Ukraine was ongoing (as it still is). Put another way, there are no changed circumstances that provide a basis for Tatneft's change in position. Nor has Tatneft explained why it has not sought to lift the moratorium in the underlying D.C. district court matter, where discovery directed against Ukraine itself was pending at the time of Russia's invasion. On the other hand, the ongoing Russian war of aggression against Ukraine provides an ample foundation for Ukraine's support for the moratorium and its articulation of the burdens it would face if the moratorium were lifted.

to Ukraine. The highest levels of U.S. leadership, including bipartisan Congressional leadership, have visited Ukraine to lend their support.  Numerous public U.S. government pronouncements have expressed support for Ukraine.  And a broad international effort has been underway to support Ukraine's survival and defense in the largest war in Europe since World War II.  Were Russia to use information obtained as part of U.S. discovery to further its war of aggression against Ukraine, it would undermine not only Ukraine's security, but also the foreign policy and national security interests of the United States and its allies.  Accordingly, it is imperative to the interests of the United States and its partners supporting the defense of Ukraine, as well as to the broader public interest, that the U.S. discovery process is not misused by foreign adversaries for non-litigation-related purposes that undermine the national security interests of the United States and our partners.  Maintaining the moratorium that has been in place—in this case and all related cases—since the start of Russia's invasion nearly three years ago safeguards these important interests.

The United States has reviewed the submissions Ukraine has made following the Court's denial of the motion to quash in 21-mc-376 and finds the concerns raised in them to be credible. To begin, the United States credits Ambassador Markarova's assertion that "[t]he Subpoenas demand sweeping disclosure of all transactions and accounts relating to Ukraine, which is specifically defined to include Ukraine's military, defense-industrial base, nuclear generating company, national railway, port authority, National Bank, Import-Export Bank, national food and grain conglomerate, and many other organizations of critical importance to Ukraine's defense against Russia's ongoing aggression."  Ukraine Opp., Ex. A ("Third Markarova Decl.") ¶ 10.  The United States notes that many of the entities on the foregoing list, beyond Ukrainian military targets, have been repeatedly attacked or threatened by Russia during the war.  The broad scope of Tatneft's third-party subpoenas, and their sweeping definition of Ukraine to include what Tatneft

9

defines as "State Controlled Entities," lend support to Ambassador Markarova's assertion that "the Subpoenas are a transparent effort to gather military intelligence in aid of Russia's ongoing aggressive war against Ukraine." *Id.* ¶ 9. Moreover, information regarding Ukraine's national security-related transactions implicated by the subpoenas also implicates the national security of the United States. As Ukraine explains in its opposition brief, "[t]he United States and Ukraine's many other allies have rallied to Ukraine's defense by providing vast military, financial, intelligence, humanitarian, and diplomatic support—support of the most sensitive nature that would be exposed in the financial records Tatneft demands." Ukraine Opp. 1-2.

Tatneft's claim that the sensitive information Ukraine believes is called for in the subpoenas is already publicly available, Tatneft Reply 6-8, is speculative at best and, accordingly, does not undermine the credibility of Ukraine's concerns regarding the nature and scope of the discovery Tatneft seeks and the uses to which that discovery would be put. Nor has this Court "rejected" Ukraine's assertions of harm. Tatneft Br. 21. To the contrary, the Court's July 21 Order merely concluded that Ukraine's submissions to date were insufficient to support its claims. July 21 Order 10-11. But Ukraine has now submitted the "declarations from government figures or other affected entities saying why disclosure would harm Ukrainian interests," *id.* at 10, that the Court previously determined it lacked. The Court has not yet issued a decision that takes those declarations into account.

The United States also credits Ukraine's identification of a near-certain risk that information provided to Tatneft in discovery would find its way to the Russian government and be used in ways that would harm Ukraine's national security and, by extension, the interests of the United States. Ample public information exists reflecting a close relationship between Tatneft and the Russian government. Tatneft's management board chairman, Rustam Nurgalievich

Minnikhanov, is the Head of the Republic of Tatarstan, and was sanctioned by the United States in 2023 for being a leader or official of the Russian Federation. As Ukraine explains, Minnikhanov has been involved in issues relating to Russia's invasion of Ukraine, and Tatneft's board includes numerous other Tatarstan government officials. Ukraine Opp. 10 & Third Markarova Decl. ¶¶ 22, 23. Indeed, in its 2021 evaluation of Tatneft's bond rating, Fitch Ratings identified the Republic of Tatarstan as Tatneft's largest ultimate shareholder. Under the Russian constitution, republics are federal subjects of the Russian government and not separate states or entities. Even the arbitration panel whose decision underlies these matters, while concluding that Tatneft was a private entity, recognized that "[t]here is undoubtedly a government presence in Tatneft's governing bodies and some features of its operations." 17-cv-582 (CKK) (D.D.C.), ECF No. 27-3 at 43.

Moreover, the Russian Federation has increasingly become a surveillance state with severely eroded rule of law protections where, even if an entity such as Tatneft wanted to keep information from other governmental actors (and there is no confidence in Tatneft wanting to do so), it might not be possible to keep such information from the Russian government. In the view of the United States, the Russian Federation has moved to a war economy, and the energies of the Russian government, and broader economy, are directed in significant part to its prosecution of the illegal war against Ukraine. All these facts support a conclusion that Tatneft has close ties to the Russian government and that, if Tatneft were to obtain sensitive information through the discovery process in these matters, that information would ultimately find its way to the Russian government, which would use it to further undermine Ukraine's sovereignty and, by extension, the interests of the United States. Tatneft again errs to the extent it asserts that this Court has already considered and rejected Ukraine's claims about the relationship between Tatneft and Russia.

11

Tatneft Br. 21.  The Court found the evidence provided by Ukraine at that stage to be lacking, July 21 Order 10-11—but Ukraine has now provided evidence that the United States finds persuasive.

Finally, the United States credits Ukraine's position that a protective order is unlikely to ameliorate its concerns.  As Ambassador Markarova explains, "merely gathering the records of Ukraine's international transactions in a single place outside the security of the banking system would leave that information highly vulnerable to Russian intelligence."  Third Markarova Decl. ¶ 29.  Other declarations Ukraine has now submitted in these matters explain how Russian intelligence uses cyber-attacks and other strategies to obtain sensitive information like the discovery material at issue here.  *See, e.g.*, First Markarova Decl. ¶¶ 9-19; Reznikov Decl. ¶¶ 13-17, 37-42.  The evidence of close ties between Tatneft and the Russian government discussed above lends further credence to Ukraine's view that a protective order would be insufficient to guard against disclosure of sensitive discovery material to the Russian government, which would undermine both Ukraine's and the United States' interests.  Indeed, given the geopolitical situation, the United States shares Ukraine's concern that "Tatneft has no incentive to honor a protective order."  Ukraine Opp. 12.  And even if Tatneft did honor such an order, the United States believes Ukraine's declarations credibly assert a risk that Russia could obtain this information once it is in Tatneft's possession through Russian cyber-operations or through other Russian intelligence strategies.

The United States, its allies and partners, and the public have strong interests in supporting Ukrainian sovereignty and territorial integrity in the face of continued Russian aggression.  A critical part of that interest is ensuring that U.S. discovery procedures are not used to compromise Ukraine's national security through the production of sensitive information related to Ukraine's defense and economy.  Ukraine has proffered credible evidence that Tatneft's third-party discovery

implicates information that is sensitive to Ukraine's national security, that the close relationship between Tatneft and the Russian government makes it likely that sensitive information will end up in the hands of a hostile foreign power, and that a protective order is unlikely to safeguard that information. The United States' interest and the public interest therefore weigh heavily in favor of denying Tatneft's motion and maintaining the moratorium.

**B.    If the Court Determines the Stay Should be Lifted, It Should First Address the Proper Scope of Tatneft's Third-Party Discovery**

In the alternative, if the Court were to decide to lift the moratorium, it should first address the proper scope of Tatneft's third-party discovery. There are ample procedural grounds for doing so. Ukraine's second motion to quash, in 22-mc-36, is fully briefed and pending. So too is Ukraine's motion for a protective order in 21-mc-376. Further, just prior to the entry of the moratorium, Ukraine submitted letters seeking leave to move for reconsideration of the denial of its first motion to quash. 21-mc-376, ECF Nos. 52, 53. Given these unresolved issues and the amount of time that has elapsed since the parties' filings (not to mention Russia's invasion and subsequent events), the Court can and should reconsider the scope of discovery before lifting the moratorium.

Respectfully, the United States would then consider filing a further statement of interest to address the scope of discovery. The United States has a substantial interest in ensuring that post-judgment discovery into a foreign state's property carefully adheres to basic principles of relevance and is sensitive to comity, reciprocity, and foreign relations concerns.[7] Those concerns are, if anything, heightened here, where a key strategic partner is potentially subject to broad discovery

---

[7] For example, the Foreign Sovereign Immunities Act, 28 U.S.C. 1602 *et seq.*, which reflects the customary international law of sovereign immunity, limits exceptions to immunity of State-owned property from attachment or execution to property used for a commercial activity in the United States.

implicating a foreign adversary in the midst of an ongoing conflict. If the Court were to decide to lift its moratorium, the United States would first respectfully request time to consider whether to state its views on these issues before any discovery proceeds.

## CONCLUSION

For the foregoing reasons, the Court should deny Tatneft's motion and maintain the moratorium that has been in place since March 2022. In the alternative, if the Court were to decide to lift the moratorium, it should first allow time for the United States to consider whether to submit a further statement of interest concerning its views on the appropriate scope of post-judgment discovery.

Dated: New York, New York
      December 20, 2024

                        Respectfully submitted,

                        EDWARD Y. KIM
                        Acting United States Attorney
                        Southern District of New York

By: */s/ Christopher K. Connolly*
                        CHRISTOPHER K. CONNOLLY
                        Assistant United States Attorney
                        86 Chambers Street, 3rd Floor
                        New York, New York 10007
                        Telephone: (212) 637-2761
                        E-mail: christopher.connolly@usdoj.gov